No. 22-12593

## In the
# United States Court of Appeals
## for the Eleventh Circuit

Richard Rose, et al.,

*Plaintiff-Appellees,*

v.

Georgia Secretary of State,

*Defendant-Appellant.*

On Appeal from the United States District Court for the
Northern District of Georgia, Atlanta Division.
No. 1:20-cv-02921 — Steven D. Grimberg, *Judge*

## BRIEF OF DEFENDANT-APPELLANT

Bryan K. Webb
   *Deputy Attorney General*
Russell D. Willard
   *Senior Asst. Attorney General*
Charlene McGowan
   *Assistant Attorney General*

Christopher M. Carr
   *Attorney General of Georgia*
Stephen J. Petrany
   *Solicitor General*
Drew F. Waldbeser
   *Deputy Solicitor General*
Office of the Georgia
   Attorney General
40 Capitol Square, SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov

*Counsel for Defendant-Appellant*

Rose v. Secretary of State, No. 22-12593

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

I hereby certify that the following persons and entities may have an interest in the outcome of this case:

Bartlit Beck LLP, Counsel for Plaintiff-Appellees

Beranek, Lori, Counsel for Amicus Curiae U.S. Department of Justice

Carr, Christopher, Attorney General, Counsel for Defendant-Appellant;

Clarke, Kristen, Counsel for Amicus Curiae U.S. Department of Justice

Erskine, Kurt R., Counsel for Amicus Curiae U.S. Department of Justice

Georgia Department of Law, Counsel for Defendant-Appellant

Grimberg, Steven D., Judge, U.S. District Court, Northern District of Georgia;

Herren, Jr., T. Christian, Counsel for Amicus Curiae U.S. Department of Justice

Hughes, Aileen Bell, Counsel for Amicus Curiae U.S. Department of Justice

Jacoutot, Bryan F., Counsel for Defendant-Appellant

Karlan, Pamela S., Counsel for Amicus Curiae U.S. Department of Justice

LaRoss, Diane, Counsel for Defendant-Appellant

Rose v. Secretary of State, No. 22-12593

Martinez, Nicolas, Counsel for Plaintiff-Appellees

McCorkle, Brionté, Plaintiff

McGowan, Charlene, Counsel for Defendant-Appellant

Mellett, Timothy F., Counsel for Amicus Curiae U.S. Department of Justice

Morrissette, Wesley, Counsel for Plaintiff-Appellees

Mosley, Wanda, Plaintiff

Petrany, Stephen J., Counsel for Defendant-Appellant

Raffensperger, Brad, in his official capacity as Secretary of State of Georgia, Defendant

Rose, Richard, Plaintiff

Sells, Bryan L., Counsel for Plaintiff-Appellees

Sitton, Janie Allison (Jaye), Counsel for Amicus Curiae U.S. Department of Justice

Taylor English Duma LLP, Counsel for Defendant-Appellant

The Law Office of Bryan L. Sells, LLC, Counsel for Plaintiff-Appellees

Tyson, Bryan P., Counsel for Defendant-Appellant

U.S. Department of Justice, Amicus Curiae

Waldbeser, Drew F., Counsel for Defendant-Appellant

Webb, Bryan K., Counsel for Defendant-Appellant

Willard, Russell D., Counsel for Defendant-Appellant

Rose v. Secretary of State, No. 22-12593

Woodall, James "Major", Plaintiff

/s/ *Stephen J. Petrany*
Stephen J. Petrany

## STATEMENT REGARDING ORAL ARGUMENT

The Court has already set this case for oral argument the week of December 12, 2022.

# TABLE OF CONTENTS

**Page**

Statement Regarding Oral Argument...............................................i

Table of Authorities ........................................................ iv

Jurisdiction .................................................................. 1

Statement of Issues ......................................................... 2

Introduction ................................................................. 3

Statement of the Case....................................................... 7

    A. Section 2 and Vote Dilution ................................... 8

    B. Factual Background ........................................... 11

    C. Proceedings Below............................................. 13

    D. Standard of Review .......................................... 19

Summary of Argument .................................................... 19

Argument ................................................................... 24

    I. Plaintiffs failed to establish a § 2 violation because they failed to prove that they have lesser opportunity "on account of race." ................................................. 26

        A. To establish vote dilution "on account of race," a plaintiff must prove *racial* bloc voting, not bloc voting attributable to ordinary partisan politics. .................... 27

            1. Statutory text, history, and precedent establish that if the majority blocks the minority group's preferred candidates because of ordinary partisan politics, there is no "racial bloc voting." ................................ 28

ii

## TABLE OF CONTENTS
### (continued)

Page

2.  If § 2 allowed *partisan* bloc voting to form the basis of a claim, it would be unconstitutional. ................. 37

3.  Plaintiffs' counter-arguments are unpersuasive..... 39

B.  There is no racial bloc voting here because ordinary partisan politics, not race, explain Commission voting patterns....................................................................... 43

II. Plaintiffs' requested remedy would impermissibly alter Georgia's form of government............................................ 49

III. The district court made numerous legal errors in examining the totality of the circumstances. ...................................... 60

Conclusion........................................................................................ 63

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Abbott v. Perez,*
   138 S. Ct. 2305 (2018) ................................................................ 60

*Ala. Assn. of Realtors v. Dept. of Health and Human Services,*
   141 S. Ct. 2485 (2021) ................................................................ 52

*Baird v. Consol. City of Indianapolis,*
   976 F.2d 357 (7th Cir. 1992) ..........................................4, 31, 39

*Baten v. McMaster,*
   967 F.3d 345 (4th Cir. 2020) ...................................................... 53

*Boyd v. Nebraska,*
   143 U.S. 135 (1892) ................................................................... 52

*Brnovich v. Democratic Natl. Comm.,*
   141 S. Ct. 2321 (2021) ....................................................3, 19, 52

*Chisom v. Roemer,*
   501 U.S. 380 (1991) ..................................................................... 7

*City of Boerne v. Flores,*
   521 U.S. 507 (1997) ..............................................................21, 36

*City of Mobile v. Bolden,*
   446 U.S. 55 (1980) ..........................................................*passim*

*Clarke v. City of Cincinnati,*
   40 F.3d 807 (6th Cir. 1994) ...................................................... 34

*Cooper v. Harris,*
   137 S. Ct. 1455 (2017) ............................................................. 42

*Cousin v. McWherter*,
  840 F. Supp. 1210 (E.D. Tenn. 1994) ........................................ 41

*Davis v. Chiles*,
  139 F.3d 1414 (11th Cir. 1998) ...............................22, 49, 51, 55

*Georgia State Conf. of NAACP v. Fayette Cnty. Bd. of
  Comm'rs*,
  952 F. Supp. 2d 1360 (N.D. Ga. 2013) ..................................... 56

*Gonzalez v. City of Aurora, Illinois*,
  535 F.3d 594 (7th Cir. 2008) ........................................21, 32, 49

*Goosby v. Town Bd. of Town of Hempstead, N.Y.*,
  180 F.3d 476 (2d Cir. 1999)...........................................34, 35, 46

*Greater Birmingham Ministries v. Sec'y of Ala.*,
  992 F.3d 1299 (11th Cir. 2021) ...........................................27, 61

*Gregory v. Ashcroft*,
  501 U.S. 452 (1991) .....................................................38, 50, 56

*Holder v. Hall*,
  512 U.S. 874 (1994) ...........................................................*passim*

*Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ.*,
  4 F.3d 1103 (3d Cir. 1993)......................................................... 40

*Jennings v. Rodriguez*,
  138 S. Ct. 830 (2018) ................................................................. 38

*Johnson v. De Grandy*,
  512 U.S. 997 (1994) .....................................................10, 19, 28

*League of United Latin Am. Citizens, Council No. 4434
  v. Clements*,
  999 F.2d 831 (5th Cir. 1993) ..............................................*passim*

*League of United Latin Am. Citizens v. Perry*,
  548 U.S. 399 (2006) .....................................................19, 27, 45

*Lewis v. Alamance County, N.C.*,
    99 F.3d 600 (4th Cir. 1996) ...................................................... 35

*Miller v. Johnson*,
    515 U.S. 900 (1995) ................................................................... 37

*NAACP, Inc., v. City of Niagara Falls, N.Y.*,
    65 F.3d 1002 (2nd Cir. 1995)..................................................... 40

*Nipper v. Smith*,
    39 F.3d 1494 (1994) ...........................................................*passim*

*Pittman v. Cole*,
    267 F.3d 1269 (11th Cir. 2001) ................................................ 58

*S. Christian Leadership Conf. of Alabama v. Sessions*,
    56 F.3d 1281 (11th Cir. 1995) .............................................*passim*

*Thornburg v. Gingles*,
    478 U.S. 30 (1986) .............................................................*passim*

*Uno v. City of Holyoke*,
    72 F.3d 973 (1st Cir. 1995).......................................32, 34, 43, 44

*Whitcomb v. Chavis*,
    403 U.S. 124 (1971) ..........................................................5, 8, 9, 30

*White v. Regester*,
    412 U.S. 755 (1973) ...........................................................*passim*

*Wright v. Sumter County Bd. of Elections and
    Registration*,
    979 F.3d 1282 (11th Cir. 2020) ................................................ 33

## Constitutional & Statutory Authorities

42 U.S.C. § 1973 (1965) ................................................................. 7

52 U.S.C. § 10301................................................................*passim*

Ga. Const. Art. III, § II, ¶ I(a) ...................................................... 57

Ga. Const. Art. IV, § I, ¶ I(a) ........................................................ 57

Ga. Const. Art. IV, § IV, ¶ III ...................................................... 54

1906 Ga. Laws 100, § 1 ................................................................ 53

S. Rep. No. 97-417 ................................................................. *passim*

U.S. Const. amend. XIV, § 1 ........................................................ 37

U.S. Const. amend. XV ........................................................... 7, 36

## JURISDICTION

The district court had subject-matter jurisdiction under

28 U.S.C. § 1331 because Plaintiffs sued under the Voting Rights

Act, 52 U.S.C. § 10301. This Court has appellate jurisdiction

under 28 U.S.C. §§ 1291, 1292. Defendant-Appellant filed a timely

notice of appeal on August 8, 2022, Doc. 152, three days after the

district court issued its final decision on August 5, 2022, Doc. 151.

## STATEMENT OF ISSUES

1.     Did the district court err when it held that Plaintiffs can establish illegal vote dilution, "on account of race or color," 52 U.S.C. § 10301, without establishing that patterns of voting are based on *race* rather than ordinary, race-neutral, partisan politics.

2.     Did the district court fundamentally alter Georgia's chosen "form of government" when it held that it could refashion Georgia's Public Service Commission into a body with members elected by single-member districts, rather than statewide elections. *Nipper v. Smith*, 39 F.3d 1494, 1532 (1994) (en banc).

3.     Did the district court err in holding that, under a totality of the circumstances, Georgia's elections for Public Service Commission "result" in a denial of equal opportunity for black voters, "on account of race or color." 52 U.S.C. § 10301.

# INTRODUCTION

Section 2 of the Voting Rights Act prohibits electoral devices that result in the denial or abridgement of the right to vote "on account of race or color." 52 U.S.C. § 10301(a). It is explicitly directed at ensuring equality of "opportunity," where equality means not having less political opportunity "than other members of the electorate," that is, voters of different race or color. *Id.* at § 10301(b). But § 2 does not apply where voters see their political fortunes diverge because of "interest-group politics," rather than race. *Thornburg v. Gingles*, 478 U.S. 30, 83 (1986) (White, J., concurring). That is because ordinary partisan disagreement does not show an inequality of opportunity—"in a majoritarian system, numerical minorities lose elections." *Holder v. Hall*, 512 U.S. 874, 901 (1994) (Thomas, J., concurring) (citations omitted).

Nevertheless, in its decision below, the district court accepted a § 2 vote dilution claim because black voters in Georgia (who generally do not vote for Republicans) regularly see their preferred candidates for Public Service Commission defeated (by Republicans). Plaintiffs never established—nor could they—that their preferred candidates' lack of electoral success was due to unequal opportunity "on account of race." There was no evidence that the non-black majority voted, on the basis of race, to defeat

3

black-preferred candidates. Instead, the evidence showed that non-black voters gave identical support to non-Republicans, regardless of race; race-neutral partisanship explained virtually all voter behavior. The district court thus enjoined Georgia's electoral system simply because Republicans have been too successful.

That is not how § 2 works. The theory of a vote dilution claim is that a racial minority has been "submerg[ed]" into a large electoral district, *Gingles*, 478 U.S. at 46, to "invidiously … cancel out or minimize the voting strength of racial groups," *White v. Regester*, 412 U.S. 755, 765 (1973) (citations omitted). For that claim to have any merit, a plaintiff must establish, among other things, *racial* bloc voting by the majority that prevents minority-preferred candidates from winning. *Gingles*, 478 U.S. at 50–51 (citations omitted). If the majority instead votes on the basis of ordinary, race-neutral partisanship, then even if minority-preferred candidates see little success, that failure is not "on account of race." 52 U.S.C. § 10301(a). "[E]qual openness," not particular electoral outcomes, is the "touchstone" of § 2. *Brnovich v. Democratic Natl. Comm.*, 141 S. Ct. 2321, 2338 (2021).

The district court erroneously held otherwise. In the district court's view, it does not matter whether the non-black majority

4

votes against black-preferred candidates "on account of race," 52 U.S.C. § 10301(a), or on account of ordinary, partisan politics (e.g., the majority votes for Republicans regardless of race). The district court viewed *any* situation where the majority votes for a different candidate than the minority as "racial" bloc voting sufficient to support a § 2 claim. In fact, according to the district court, it is "difficult if not impossible to disentangle" whether bloc voting is *racial* or *partisan*. Doc. 151 at 21.

Whether difficult or not (and in this case, it is not very difficult), distinguishing between *racial* bloc voting and *partisan* bloc voting is the entire ballgame. It is the distinction between a viable § 2 claim, where a voter's opportunity is diminished "on account of race or color," and ordinary partisan politics, where voters of every race enjoy the same opportunity, and the only difference in electoral outcomes is what *party* they happen to prefer.

In other words, "[t]he Voting Rights Act does not guarantee that nominees of the Democratic Party will be elected, even if black voters are likely to favor that party's candidates." *Baird v. Consol. City of Indianapolis*, 976 F.2d 357, 361 (7th Cir. 1992). As early as 1971, the Supreme Court rejected the idea that minority voters can claim vote dilution where their preferred candidates

lose simply because they prefer a party that tends to lose. "[A]re poor [blacks] … any more underrepresented than poor … whites who also voted Democratic and lost … ? We think not." *Whitcomb v. Chavis*, 403 U.S. 124, 154 (1971). Indeed, Congress's 1982 amendments to § 2 were explicitly meant to *codify* that case. *See Gingles*, 478 U.S. at 83, 97–98 (O'Connor, J., concurring). No wonder that numerous courts have held that, where "divergent voting patterns among white and minority voters are best explained by partisan affiliation," a plaintiff has not established the necessary "racial bloc voting." *League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 999 F.2d 831, 861 (5th Cir. 1993) (en banc).

The district court made another error, too. The district court's order is the first ever to hold that statewide elections for a statewide, quasi-judicial commission can be subject to a vote dilution challenge. The Voting Rights Act does not "permit the federal judiciary to force on the states a new model of government." *Nipper*, 39 F.3d at 1531. But demanding Georgia shift from a century-old, constitutionally required, statewide system to single-member districts does exactly that. *See Holder*, 512 U.S. at 876. Georgia's statewide elections ensure that its statewide Commission answers to the whole state without (real or

perceived) regional favor. Districted elections would fundamentally alter that style of governance—and with respect to a quasi-judicial entity, no less, where it is essential that voters not believe their area of the State was treated unfavorably due to "home cooking." *S. Christian Leadership Conf. of Alabama v. Sessions*, 56 F.3d 1281, 1297 (11th Cir. 1995) (en banc). Single-member districts are simply not a comparable "benchmark" for statewide elections. *Holder*, 512 U.S. at 881.

Either of these errors is independently sufficient to reverse the district court, but even if they were not, they (and other district court errors) establish at least that the court's analysis of the "totality of the circumstances" was fatally flawed. After correcting those errors, Plaintiffs cannot establish lesser "opportunity" on "account of race or color." 52 U.S.C. § 10301. The district court's decision cannot stand.

## STATEMENT OF THE CASE

Four black registered voters sued Georgia's Secretary of State, alleging that Georgia's statewide elections for Public Service Commission dilute their votes "on account of race or color," in violation of § 2 of the Voting Rights Act. The district court agreed and permanently enjoined the statewide system for

electing Commission members, cancelling the upcoming November elections for two Commission seats.

### A. Section 2 and Vote Dilution

When first enacted, § 2 of the Voting Rights Act was simply "a restatement of the Fifteenth Amendment." *Chisom v. Roemer*, 501 U.S. 380, 392 (1991) (citations omitted). The original statute provided that "[n]o voting qualifications or prerequisite to voting, or standard, practice, or procedure shall be imposed or applied … to deny or abridge the right of any citizen of the United States to vote on account of race or color." 42 U.S.C. § 1973 (1965). That was virtually identical to the Fifteenth Amendment's admonition that "[t]he right of citizens of the United States to vote shall not be denied or abridged … on account of race, color, or previous condition of servitude." U.S. Const. amend. XV. Although other provisions of the Voting Rights Act were controversial, § 2 "did not provoke significant debate in Congress." *Chisom*, 501 U.S. at 392 (citations omitted).

Fifteen years after the passage of the Act, the Supreme Court held that vote-dilution claims under either § 2 or the Fifteenth Amendment require a finding of discriminatory intent on the part of the legislature. *City of Mobile v. Bolden*, 446 U.S. 55, 61, 74 (1980). Justice White dissented, arguing that the Court had "cast[]

aside" its two precedents on vote dilution, *White v. Regester*, 412 U.S. 755 (1973), and *Whitcomb v. Chavis*, 403 U.S. 124 (1971). *See Bolden*, 446 U.S. at 101 (White, J., dissenting). In Justice White's view, those cases identified objective factors from which the Court could "infer[]" discrimination, without establishing direct proof that the legislature intended to discriminate. *Id.* In other words, courts could look at certain discriminatory "results" that imply discriminatory vote dilution. *Id.* at 99 (citation omitted).

In 1982, Congress sided with Justice White. It amended § 2 "to codify the 'results' test employed in *Whitcomb v. Chavis*, 403 U.S. 124 (1971), and *White v. Regester*, 412 U.S. 755 (1973)." *Gingles*, 478 U.S. at 83 (O'Connor, J., concurring). "Whereas *Bolden* required members of a racial minority who alleged impairment of their voting strength to prove that the challenged electoral system was created or maintained with a discriminatory purpose and led to discriminatory results, under the results test, 'plaintiffs may … establish discriminatory results without proving … discriminatory purpose.'" *Id.* at 84 (citing S. Rep. No. 97-417, *as reprinted in* 1982 U.S.C.C.A.N. 177, at 28 (1982)). The Senate Judiciary Committee Report accompanying the amended § 2 declared that it intended "to restore the pre-*Mobile* legal

standard" as embodied by the *Whitcomb* and *Regester* decisions. S. Rep. at 22–23, 27.

Not surprisingly, the amended text of § 2 is heavily reliant on *Whitcomb* and *Regester*. The amended statute first prohibits practices that "result[] in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a); *cf.*, *e.g.*, S. Rep. at 22–23 (looking to *Whitcomb* and *Regester* as basis for amended statute). It then provides that a "violation … is established" if, based on a "totality of the circumstances," the "political processes … are not equally open to participation" by the protected minority, "in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b). That is all-but-identical to language from *Regester*, which itself relied on *Whitcomb*. *See* 412 U.S. at 766–67 (citing *Whitcomb*, 403 U.S. at 149–50).

In *Thornburg v. Gingles*, the Supreme Court interpreted this new language, and it laid out a number of "preconditions" for a vote dilution claim. 478 U.S. at 49–50. Plaintiffs must establish (1) a "sufficiently large and geographically compact" minority group, (2) that the minority group is "politically cohesive," (3) and that

10

the majority votes as a racial bloc to defeat the minority group's preferred candidates. *Id* at 50–51. These prerequisites are required because unless they are present, the challenged scheme could not be said to "impede the ability of minority voters to elect representatives of their choice." *Id.* at 48.

Of course, these are just preconditions. *Johnson v. De Grandy*, 512 U.S. 997, 1011 (1994) (*Gingles* preconditions are not "sufficient" to "prove a § 2 claim"). Even if established, courts must still determine whether a vote dilution claim satisfies other requirements of § 2. That includes, at a minimum, identifying a relevant "benchmark" with which to compare the challenged scheme, *Holder*, 512 U.S. at 881, as well as a "totality of the circumstances" analysis based on the various factors identified in *Whitcomb* and *Regester* (and identified in the Senate Judiciary Committee Report accompanying the amended § 2), to determine whether a racial minority ultimately has less "opportunity" than other members of the electorate. *Gingles*, 478 U.S. at 36–37 (citing the nine Senate Report factors).

## B. Factual Background

The Georgia Public Service Commission is a five-member, "quasi-judicial," "quasi-legislative" body that regulates state utilities. Doc. 157 at 110; Doc. 151 at 8. Initially created in 1879 to

11

regulate railroads, over time its duties morphed into utilities regulation. Doc. 151 at 3–4. In 1906, the Georgia General Assembly fixed the method of selecting commissioners as statewide elections. *Id.* at 4. In 1945, the Commission's members were elevated to constitutional officers, to be "elected by the people." *Id.* at 4. From 1907 until today, there have been five commissioners, serving staggered terms, elected by eligible voters from across the entire State. *Id* at 4–5.

The only significant change to Commission elections in over a century was in 1998, when the General Assembly enacted a law requiring Commission members to *reside* in one of five districts. *Id.* at 5. Members are still elected by the entire State—the "districts" matter only for candidate qualification. *Id.*

Among the Commission's duties are decisions as to the rates that utility providers may charge, including whether providers can pass certain costs onto all utility ratepayers. *Id*. at 7. The Commission also controls permits for constructing power plants. Doc. 157 at 106–07, 111–12. The Commission regulates pole attachments and landlines for telecommunications, along with some jurisdiction over rural broadband internet connectivity. Doc. 151 at 7.

The Commission conducts many proceedings as an adjudicatory body: hearing witnesses, making evidentiary rulings, and weighing testimony. Doc. 121-3 at 4. Intervenors or staff can cross-examine witnesses. Doc. 157 at 107. The Commission also takes public comment, receiving hundreds of comments for typical rate cases. *Id.* at 109.

The Commission itself currently has one black and four white members, all Republicans. Doc. 158 at 80; Doc. 146-8 at 11–14; Doc. 140 at 69. Although Georgia's most recent statewide elections were highly competitive, with Democrats winning two U.S. Senate seats and the State's electoral votes for President, Republicans have generally dominated statewide elections in the past decade or more. And no Democrat has been elected to the Commission since David Burgess (a black Democrat) was appointed and then elected in 2000. Doc. 141 at 44–46; Doc. 151 at 18. Georgia as a whole has a voting age population that is roughly 53% white, 32% black, with the remainder members of other racial groups. Doc. 121-3 at 2.

### C.  Proceedings Below

**1.** Plaintiff-Appellees filed a complaint against Defendant-Appellant Secretary of State in July 2020. Doc. 1. Plaintiffs are four black registered voters who live in Fulton and DeKalb

Counties, Georgia. Doc. 121-3 at 3. Although it is undisputed that Plaintiffs have never been prevented from voting or registering to vote, *id.*; Doc. 139 at 96–97; Doc. 141 at 69, they allege that Georgia's statewide method for electing Commission members dilutes their votes in violation of § 2 of the VRA. *See generally* Doc. 1.

The Secretary moved to dismiss the complaint at the outset, arguing in part that the Commission's statewide elections were not subject to § 2 because there was no viable remedy the district court could impose. Doc. 22-1 at 16–19. Section 2 does not allow a federal court to "abolish a particular form of government and to use its imagination to fashion a new system." *Id.* at 16 (quoting *Nipper*, 39 F.3d at 1531). There is no "benchmark" against which to compare Georgia's statewide elections for a statewide Commission, so there is no way of saying anyone has less opportunity than they would have in some hypothetical alternative. *Id.* at 18 (quoting *Holder*, 512 U.S. at 880). The district court denied the motion, holding that even if the argument eventually had merit, it was insufficient to dismiss the case "at its inception." Doc. 36 at 22.

After discovery, the parties filed dueling motions for summary judgment. In the Secretary's motion for summary judgment, he

again argued that a change from statewide elections for a statewide commission (as required by Georgia's constitution) would be a change in the form of government, not a viable § 2 remedy. Doc. 80-1 at 15–21. Again the district court ruled that it was premature to decide the issue. Doc. 97 at 16–17.

Plaintiffs also filed a partial motion for summary judgment, asserting that they had proven all three *Gingles* preconditions. Doc. 79. As relevant here, Plaintiffs asserted that they had proven the third *Gingles* factor, racial bloc voting by the non-black majority, because "candidates preferred by Black voters have been defeated in elections for the Public Service Commission between 2012 and the present and … [these] candidates were not supported by a majority of white voters." *Id.* at 18. The Secretary objected that "the only point of agreement among the experts on statistical evidence is that voting in Georgia is polarized—but Plaintiffs' experts claim it is *racial*; the Secretary's expert finds it is *partisan*." Doc. 85 at 2–3. In other words, there might be bloc voting, but it was not *racial* bloc voting.

The district court disagreed and granted summary judgment to Plaintiffs as to racial bloc voting. The district court held that even if partisanship was the explanatory factor behind the divergent voting patterns, it did not matter for the purposes of the

third *Gingles* precondition. Relying on the plurality opinion in *Gingles*, the district court held that "'[f]or purposes of § 2, the legal concept of [racial bloc voting] incorporates neither causation nor intent. It means simply that the race of voters correlates with the selection of a certain candidate or candidates; that is, it refers to the situation where different races (or minority language groups) vote in blocs for different candidates.'" Doc. 97 at 31 (quoting *Gingles*, 478 U.S. at 62 (plurality op.)) (emphasis omitted).

**2.** At trial, Plaintiffs themselves testified, along with two experts. Plaintiffs gave largely anecdotal evidence of their preference for, e.g., lower rates, more solar power, and less nuclear power. *See e.g.*, Doc. 139 at 55; Doc. 140 at 105, 108. Plaintiffs' experts, meanwhile, gave evidence regarding voting patterns and the Senate Report factors.

Plaintiffs' expert, Dr. Popick, testified regarding voting patterns. He opined that voting was racially polarized in Commission elections because large majorities of black voters voted cohesively for the same candidates, and those candidates consistently lost to Republicans, who were supported by a majority of white voters. Doc. 140 at 19–23; Doc. 146-8 at 11–14. For his analysis, he relied on eleven Commission elections from 2012 to 2020. Doc. 140 at 12, 53. He did not analyze any other elections,

and he acknowledged that he did not try to separate racial voting patterns from partisan voting patterns because, in his view, it was not relevant. *E.g.*, Doc. 140 at 14, 24, 54–55, 78–79. He also admitted that a majority of black voters had not preferred a Republican in any Georgia election he was aware of. *Id.* at 69.

The Secretary's expert, Dr. Barber, did a deeper analysis. He explained that there were *partisan* voting patterns in the Commission elections; there was no difference at all in white voter support for non-Republican candidates, regardless of the candidate's race. Doc. 142 at 12–15, 111. He also examined other statewide and congressional races in Georgia. Using regression analyses, he showed that when controlling for race, partisanship still strongly predicts voting behavior in Georgia. *Id.* at 14–15. By contrast, when controlling for partisanship, race has only a minute effect. *Id.*

Nevertheless, the district court ruled for Plaintiffs. The court held that it was "difficult if not impossible to disentangle" partisan voting patterns from racial voting patterns and that such analysis was not "relevant," in any event. Doc. 151 at 21. The district court again held that simply because black voters tended to vote for different candidates than non-black voters, Plaintiffs established racial bloc voting. Doc. 151 at 21, 37–39. The district court also

again rejected the argument that mandating a change from a statewide system to single-member districts was a change in the form of government, beyond the scope of a § 2 claim. *Id.* at 58–60.

Finally, looking to the Senate Report factors, the court held that Plaintiffs had established a § 2 violation under the totality of the circumstances. The court weighed most "heavily" the second and seventh factors: racially polarized voting and minority candidate success. Doc. 151 at 36. Because it refused to consider evidence of partisanship, the court held that voting was extremely racially polarized, supporting Plaintiffs. *Id.* at 39. And as to the success of minority candidates, the court looked to evidence that about 5% of statewide elections had been won by black candidates in the past fifty years. Doc. 151 at 40–41.

The remaining factors were a mixed bag: the court found that there was a history of official discrimination in Georgia, that black voters suffered socioeconomic deficits, and that the Commission elections use supposedly anti-minority devices such as majority vote requirements. *Id.* at 41–51. But it also found that there were no problems with slating minority candidates, that elections were not characterized by racial appeals, and that there was no evidence of a lack of responsiveness by elected officials. *Id.*

Finally, the court held that Georgia's policy justification for the statewide system was "tenuous." *Id.* at 51–54. Although the district court had previously acknowledged that it was relevant whether statewide Commission elections are required by Georgia's constitution, Doc. 97 at 22, it declined to certify that question to the Supreme Court of Georgia and instead decided, in a page of analysis, without briefing or argument, that the Georgia constitution does not require statewide elections. Doc. 151 at 59–60.

Given its holding, the district court permanently enjoined statewide elections for the Commission, cancelling the upcoming November elections. *Id.* at 63–64.

### D.   Standard of Review

In a § 2 vote dilution case, this Court reviews legal questions *de novo* and factual questions for clear error. *Gingles*, 478 U.S. at 78–79.

## SUMMARY OF ARGUMENT

Georgia's statewide elections for Public Service Commission provide equal opportunity for voters of all races. The district court made multiple errors in ruling for Plaintiffs and should be reversed.

**I.** Plaintiffs cannot establish a § 2 vote dilution claim without showing that *race*, as opposed to other reasons like ordinary partisan politics, explains voting patterns for the Commission. "Congress and the Supreme Court" have refused "to equate losses at the polls with actionable vote dilution where these unfavorable results owe more to party than race." *Clements*, 999 F.2d at 860. Because Plaintiffs did not, and could not, make the necessary showing here, their claim fails.

**A.** In any vote dilution case, a plaintiff must establish that minority voters fail to elect their preferred candidates because the majority votes as a "racial bloc" to defeat them. *Gingles*, 478 U.S. at 51–52. Critically, the majority must vote as a *racial* bloc, not a *partisan* bloc. Section 2 does not guarantee "electoral success," just a playing field free of racial bias. *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 428 (2006) (quoting *De Grandy*, 512 U.S. at 1014 n.11).

The text of § 2 confirms as much: it prohibits only the "abridgement of the right … to vote *on account of race or color*." 52 U.S.C. § 10301(a) (emphasis added). There is no § 2 violation as long as the "political process[]" is "equally open to participation" by minority voters. *Id* at § 10301(b). That is the "core" of § 2. *Brnovich*, 141 S. Ct. at 2338. If most black voters prefer

20

candidates who lose because the majority simply prefers Republicans (regardless of race), black voters have the same "opportunity" to elect as anyone else. 52 U.S.C. § 10301(b).

Precedent is in accord. In *Gingles* itself, five Members of the Supreme Court made this basic point. There is not racially "polarized voting" merely because "the majority of white voters vote for different candidates than the majority of blacks." *Id.* at 83 (White, J., concurring); *see also id.* at 100–01 (O'Connor, J., concurring); *but see, e.g.*, Doc. 146-8 at 3 (Plaintiffs' expert defined racial bloc voting as any situation where "Black voters and white voters prefer different candidates"). Other circuit courts, too, have required proof of *racial* bloc voting, as opposed to ordinary partisan polarization.

If it were otherwise, § 2 would mandate both racial preferences and partisan preferences (not to mention proportionality, which the statute explicitly rejects). Black Democrats would have the power to reshape electoral districts to their partisan preferences—but white Democrats (or Asian or Hispanic Democrats) would not. Likewise, Democratic strongholds would always be impervious to § 2, but Republican strongholds would regularly invite federal intervention simply because black voters tend to vote for Democrats. "Section 2 requires an electoral

21

process 'equally open' to all, not a process that favors one group over another." *Gonzalez v. City of Aurora*, *Illinois*, 535 F.3d 594, 598 (7th Cir. 2008). Indeed, if § 2 *did* mandate federal intervention where ordinary partisan politics are the cause of polarization, it would be an unconstitutional overreach. *See City of Boerne v. Flores*, 521 U.S. 507, 535–36 (1997).

**B.** With the correct legal standard in hand, Plaintiffs cannot establish a § 2 violation. In fact, they did not even try, because they believed they were "not required to prove the absence of partisan polarization." Doc. 139 at 17. Their expert explicitly disclaimed any attempt to separate out a racial explanation for voting patterns as distinct from partisan voting patterns; he even suggested it was impossible to do so. *See e.g.*, Doc. 140 at 54–55, Doc. 142 at 150–151.

To the contrary, the evidence proved that race was *not* the driver of majority voting. The non-black majority votes for white and black candidates at identical rates. The Secretary's expert ran regression analyses that showed partisanship is *nine times* more predictive of voting patterns than race. Non-black voters in Commission elections simply tend to vote for Republicans. That is not illegal, and Commission elections do not violate § 2.

**II.** Section 2 does not "permit the federal judiciary to force on the states a new model of government." *Nipper*, 39 F.3d at 1531. Yet here, the district court held that it could force Georgia to shift from a statewide method of election for its statewide, quasi-judicial Commission, even though this fundamentally alters Georgia's model of governance. No other court has ever ordered such a remedy, yet the district court scarcely tried to explain why this was permissible.

That was error. For a § 2 claim to be viable, there must be an "objective and workable standard for choosing a reasonable benchmark by which to evaluate a challenged voting practice." *Holder*, 512 U.S. at 881. Otherwise, there is no way of saying a vote is "dilut[ed]," because dilution assumes a comparator. *Id.* There must be a viable remedy "within the confines" of Georgia's chosen form of government, as opposed to an incommensurable, distinct form of government. *Davis v. Chiles*, 139 F.3d 1414, 1421 (11th Cir. 1998) (citation omitted).

Here, switching to a single-member district system is no mere technical alteration—it alters the "form of a governing authority." *Holder*, 512 U.S. at 915 (Thomas, J., concurring). Georgia has constitutionally required statewide elections for the Commission for nearly eighty years, and for important reasons. Utilities

23

regulation necessarily cuts across any arbitrary district lines, and statewide elections ensure that commissioners have no incentive to, for instance, place unpopular projects in a "district" to which they are not beholden (or to place popular projects in their own districts). Moreover, the Commission acts most of the time as a court, holding hearings on rate cases, where to permit construction, and the like. If switched to districts, the risk of (or at least, the appearance of) "home cooking" would undermine the Commission's judicial character. *SCLC*, 56 F.3d at 1297. Section 2 does not mandate that sort of shift.

**III**. Even if these errors were not individually dispositive—and they are—they would at least establish that the district court erred in its totality-of-the-circumstances analysis. The district court heavily relied on its erroneous theories regarding racial polarization and the State's interest in maintaining a century-old, constitutionally required form of government. It also made other errors in its totality analysis. With the district court's errors corrected, Plaintiffs cannot establish lesser political "opportunity" under § 2.

## ARGUMENT

Plaintiffs assert a claim for vote dilution: essentially, a claim that black voters are "submerg[ed]," *Gingles*, 478 U.S. at 46, in a

voting district to "invidiously … cancel out or minimize the[ir] voting strength," *Regester*, 412 U.S. at 765 (citations omitted). To prove such a claim, Plaintiffs must establish the three *Gingles* preconditions: (1) a sufficiently-large, geographically-compact minority, (2) which is politically cohesive, and (3) "racial bloc voting" (also known as "racially polarized voting") that prevents minority voters from having the opportunity to elect their preferred candidates. *Gingles*, 478 U.S. at 50–51, 52 n.18. Plaintiffs must also establish that their proposed remedy does not fundamentally alter a state's chosen "form of government." *Nipper*, 39 F.3d at 1531. Finally, Plaintiffs must prove that the "totality of the circumstances" shows discriminatory results, applying the well-known Senate Report factors. 52 U.S.C. § 10301(b).

But Plaintiffs did none of these things. *First*, Plaintiffs did not even try to establish that *race*, rather than ordinary partisan politics, explains voting patterns for the Commission, nor could they. So they cannot prove the third *Gingles* precondition, *racial* bloc voting. *Second*, transforming Georgia's statewide electoral process for a statewide Commission, with quasi-judicial duties, into a single-member district agency, would be a shift in government, not a comparable "benchmark" to avoid vote dilution.

*See Holder*, 512 U.S. at 881. *Third*, even assuming that those legal errors are not individually dispositive, they (and other district court errors) establish that the district court erred in its totality-of-the-circumstances analysis.

### I.    Plaintiffs failed to establish a § 2 violation because they failed to prove that they have lesser opportunity "on account of race."

The basis for a § 2 vote dilution claim must be more than a simple failure to win elections. After all, in a majoritarian system, "numerical minorities lose elections." *Holder*, 512 U.S. at 901 (Thomas, J., concurring) (citations omitted). The crux of a claim is that minority voters, while able to vote, cannot elect their preferred candidates because their votes have been "submerg[ed]" in a majority that votes as a "racial bloc" against them. *Gingles*, 478 U.S. at 46, 49–52. The key point is that this majority bloc voting must be attributable to *race*, rather than, for instance, race-neutral partisan politics. Otherwise, it is not a matter of lesser opportunity for racial minorities, it is just ordinary "interest-group politics." *Id.* at 83 (White, J., concurring). And "Congress and the Supreme Court" have refused "to equate losses at the polls with actionable vote dilution where these unfavorable results owe more to party than race." *Clements*, 999 F.2d at 860.

With the proper standard in place, it becomes clear that Plaintiffs did not come close to satisfying their evidentiary burden. All the evidence points to a partisan disagreement, not racial discrimination. The non-black majority simply prefers Republicans, regardless of race. Because Georgia's Commission elections are driven by ordinary partisan politics, not race, Plaintiffs' claim fails.

### A.   To establish vote dilution "on account of race," a plaintiff must prove *racial* bloc voting, not bloc voting attributable to ordinary partisan politics.

The text of § 2, precedent, and common sense establish that there is no *racial* bloc voting where the majority votes on the basis of race-neutral partisan politics, rather than "on account of race." 52 U.S.C. § 10301(a). Plaintiffs' contrary view—that racial bloc voting is present anywhere a minority happens to vote for a different candidate than the majority—would raise serious questions about the constitutionality of § 2, which cannot be validly understood to require changes in state electoral districts on the basis of mere partisan polarization. And Plaintiffs' counter-arguments hold no water. Disentangling race and partisanship is neither irrelevant nor too "difficult" to achieve, Doc. 151 at 21; it is what § 2 requires.

27

**1. Statutory text, history, and precedent establish that if the majority blocks the minority group's preferred candidates because of ordinary partisan politics, there is no "racial bloc voting."**

The text of § 2 is explicitly directed at rooting out racially discriminatory laws. The provision requires plaintiffs to prove that there is a "standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote *on account of race or color*." 52 U.S.C. § 10301(a) (emphasis added). Plaintiffs must show that "the political processes leading to nomination or election in the State or political subdivision are not *equally open* to participation by members of a class of citizens … in that its members have less opportunity *than other members of the electorate* to participate in the political process and to elect representatives of their choice." *Id.* at § 10301(b) (emphasis added). Section 2 thus requires plaintiffs to show that the "challenged law … *caused*" them, "on account of race," to have less opportunity to elect their preferred candidates than members of other races. *Greater Birmingham Ministries v. Sec'y of Ala.*, 992 F.3d 1299, 1329 (11th Cir. 2021).

The text explicitly does *not* "guarantee" partisan victories or "electoral success." *LULAC*, 548 U.S. at 428 (citation omitted). If minority voters' preferred candidates lose elections for non-racial

28

reasons (e.g., they fail to elect candidates because they prefer Democrats in a Republican stronghold), they have exactly the same opportunity as "other members of the electorate," and they have not suffered any "abridgment" of the right to vote "on account of race." 52 U.S.C. § 10301. Justice Marshall made this point long ago; a voting system does not racially discriminate if the minority "community's lack of success at the polls was the result of partisan politics." *Bolden*, 446 U.S. at 109 (Marshall, J., dissenting). Section 2 does not, in other words, relieve minorities of the same "obligation to pull, haul, and trade to find common political ground" that affects all voters. *De Grandy*, 512 U.S. at 1020.

The text's focus on race is borne out in *Gingles* itself, which first articulated the need for plaintiffs to establish "racial bloc voting" in a § 2 claim. 478 U.S. at 46. The plurality opinion in *Gingles* asserted that mere differences in voter preference between minority and majority were sufficient to establish racial bloc voting (or "racially polarized voting"). *Id*. at 61–74. That is Plaintiffs' view, and the district court quoted and relied on the *Gingles* plurality in ruling for Plaintiffs: "'[f]or purposes of § 2, the legal concept of racially polarized voting incorporates neither causation nor intent. *It means simply that the race of voters*

29

*correlates with the selection of a certain candidate or candidates*; that is, it refers to the situation where different races (or minority language groups) vote in blocs for different candidates.'" Doc. 97 at 31 (quoting *Gingles*, 478 U.S. at 51 (plurality op.)). But the other five Justices in *Gingles* explicitly rejected that view.

A majority in *Gingles* thought that to establish racial polarization, plaintiffs must establish a racial explanation for voting patterns. Justice White, who penned the *Bolden* dissent that helped spur the 1982 amendments to § 2, explained in a concurrence that he did "not agree" that "there is polarized voting" merely because "the majority of white voters vote for different candidates than the majority of blacks." *Id.* at 83 (White, J., concurring). Justice White gave an example where six white and two black Democrats ran against six white and two black Republicans; under the plurality view, there would be polarized voting if the Republicans win while "80% of the blacks in the predominantly black areas vote Democratic." *Id.* But in Justice White's view, that would be "*interest-group politics* rather than a rule hedging against racial discrimination." *Id.* Likewise, speaking for four Members of the Court, Justice O'Connor explained that a rule ignoring racial causation would "give no effect whatever to the Senate Report's repeated emphasis on 'intensive racial

politics,' on 'racial political considerations,' and on whether 'racial politics … dominate the electoral process.'" *Gingles*, 478 U.S. at 101 (O'Connor, J., concurring) (citation omitted).

Indeed, as Justice O'Connor explained, the plurality's view, echoed by Plaintiffs here, would fly in the face of *Whitcomb v. Chavis*, one of the two Supreme Court precedents that the "[a]mended § 2 [was] intended to codify." *Gingles*, 478 U.S. at 83 (citations omitted). In *Whitcomb*, the Court explained that, although "ghetto" residents in Marion County consistently lost elections, that was because they "vote[d] predominantly Democratic," and Republicans generally won in the county. 403 U.S. at 153. "[H]ad the Democrats won all of the elections or even most of them, the ghetto would have had no justifiable complaints about representation." *Id.* at 152. And the failure of *Democrats* was insufficient to show illegality. "[A]re poor [blacks] of the ghetto any more underrepresented than poor ghetto whites who also voted Democratic and lost … ? We think not." *Id.* at 154. Thus, in *Gingles*, Justice O'Connor stressed that *Whitcomb* required courts to differentiate between situations where *race* explains voting patterns from those where the partisan "interests of racial groups" simply "diverge." 478 U.S. at 100.

31

Plaintiffs' view of § 2 would, by contrast, federally mandate a partisan preference. In jurisdictions where Democrats form a majority, electoral schemes will be legal because black voters' preferred candidates (Democrats) will routinely be elected. But in an identical jurisdiction with a Republican majority, an electoral scheme somehow violates § 2 just because the majority has different ideological preferences. Section 2 cannot be rationally interpreted as prohibiting election schemes where Republicans are in the majority but blessing jurisdictions where Democrats dominate. "The Voting Rights Act does not guarantee that nominees of the Democratic Party will be elected, even if black voters are likely to favor that party's candidates." *Baird*, 976 F.2d at 361. Instead, as the Senate Report makes clear, the amended § 2 applies only where "*racial* politics … dominate the electoral process." S. Rep. at 33 (emphasis added).

Plaintiffs' view would mandate not only a partisan preference but a racial preference. Here, for instance, black Democrats—like white Democrats and Asian Democrats and Hispanic Democrats—ordinarily fail to elect their preferred candidates because Georgia voters choose Republicans. Plaintiffs, however, claim that *black voters alone* among that group are entitled to a district in which they are guaranteed electoral success. But "Section 2 requires an

electoral process 'equally open' to all, not a process that favors one group over another." *Gonzalez*, 535 F.3d at 598. Section 2 does not require courts to mandate that black Democrats vote more successfully than white Democrats. *Clements*, 999 F.2d at 861 ("[W]hite Democrats have in recent years experienced the same electoral defeats as minority voters. If we are to hold that these losses at the polls, without more, give rise to a racial vote dilution claim warranting special relief for minority voters, a principle by which we might justify withholding similar relief from white Democrats is not readily apparent."). Plaintiffs would contort § 2 into a statutory grant of racial preference, not equality.

Plaintiffs' view would also eviscerate another aspect of § 2: its emphatic rejection of a right to proportionality. 52 U.S.C. § 10301(b) ("[N]othing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population."). Avoiding a requirement of proportionality was a central focus of Congress in amending § 2. *Gingles*, 478 U.S. at 84 (O'Connor, J., concurring). Yet if minority voters can establish racially polarized voting without proving any racial causality, this would "facilitate[] a back-door approach to proportional representation." *Uno v. City of Holyoke*, 72 F.3d 973, 982 (1st Cir. 1995). Virtually anywhere that a minority votes

33

cohesively, § 2 would demand separate majority-minority districts to ensure that minority voters elect their preferred candidates. To be sure, the *Gingles* preconditions are not sufficient, by themselves, to establish liability, but they are usually the lion's share. *Wright v. Sumter County Bd. of Elections and Registration*, 979 F.3d 1282, 1304 (11th Cir. 2020) ("[O]nly the very unusual case in which" a plaintiff "can establish the existence of the three *Gingles* factors but still have failed to establish a violation of § 2 under the totality of circumstances." (citation omitted)). If partisan polarization is sufficient to satisfy *Gingles*, § 2 will be transformed into a forbidden guarantee of proportional representation in almost every case.

The Senate Report also made clear that in "most communities" it would be "exceedingly difficult" for plaintiffs to satisfy the results test. S. Rep at 33. But if divergent voting patterns between black and non-black voters are sufficient to show "racial bloc voting," black voters will almost always be able to "prove" a § 2 violation in Republican strongholds because black voters overwhelmingly vote against Republicans.

Given all this, it should be no surprise that other circuits have rejected this view of § 2. The Fifth Circuit, for instance, has held that § 2 plaintiffs cannot succeed when they "have not even

attempted to establish proof of racial bloc voting by demonstrating that race, not … partisan affiliation, is the predominant determinant of political preference." *Clements*, 999 F.2d at 855. Likewise, the First Circuit holds that "plaintiffs cannot prevail on a VRA § 2 claim if there is significantly probative evidence that whites voted as a bloc for reasons wholly unrelated to [race]." *Uno*, 72 F.3d at 981.[1] And Judge Tjoflat has opined that, even if a plaintiff has provided *evidence* of racial bloc voting, a "defendant may rebut the plaintiff's evidence by demonstrating the absence of racial bias in the voting community; for example, by showing that the community's voting patterns can best be explained by other, non-racial circumstances." *Nipper*, 39 F.3d at 1524 (plurality op.).

To be sure, the courts have a minor disagreement on whether the third *Gingles* factor or the totality phase is the appropriate

---

[1] *See also, e.g.*, *Clarke v. City of Cincinnati*, 40 F.3d 807, 812 (6th Cir. 1994) ("When …. a racial group's preferred candidates are defeated despite the ability of its members to participate fully in that process, the Voting Rights Act should not provide that group with a remedy which is unavailable to other supporters of defeated candidates."); *Goosby v. Town Bd. of Town of Hempstead, N.Y.*, 180 F.3d 476, 496 (2d Cir. 1999) (where majority voters "support[] minority candidates … at levels equal to or greater than those of [non-minority] candidates, it [is] proper to conclude that … divergent voting patterns among [majority] and minority voters are best explained by partisan affiliation." (citation omitted)).

time to ensure racial, as opposed to partisan, polarization. The Fifth Circuit, for instance, holds that there is no third *Gingles* factor without proof of racial, as opposed to partisan, polarization. *Clements*, 999 F.2d at 892. The Second Circuit holds that the inquiry should be conducted at the totality-of-the-circumstances phase of analysis. *Goosby*, 180 F.3d at 493; *see also Lewis v. Alamance County, N.C.*, 99 F.3d 600, 615 n.12 (4th Cir. 1996) (noting differences among circuit courts).

But this minor disagreement does not matter very much. The key point is that Plaintiffs, who bear the ultimate burden of proof, must establish that *race* is the reason they supposedly lack equal "opportunity." 52 U.S.C. § 10301(b). And if voting patterns establish, instead, that *Republicans* always win (regardless of race), then non-Republican voters of all races have exactly the same opportunity to elect their candidates of choice, in *every case*. So while it makes far more sense to require proof of racial bloc voting as part of the third *Gingles* factor (if race is not the "domina[nt]" reason for bloc voting, there can be no "*racial* bloc voting." S. Rep. at 33 (emphasis added)), it is not a critical point. The analysis is ultimately the same, no matter what label a court attaches to it.

### 2. If § 2 allowed *partisan* bloc voting to form the basis of a claim, it would be unconstitutional.

Not only is Plaintiffs' view irreconcilable with the text or Supreme Court precedent, it would also make § 2 unconstitutional. Congress enacted § 2 under its power to enforce the Fifteenth Amendment, which prohibits only "purposeful discrimination," not laws that merely "resul[t] in a racially disproportionate impact." *Bolden*, 446 U.S. at 70 (citation omitted); *see also* U.S. Const. amend. XV. Section 2's results test goes beyond the constitutional provision that it purports to enforce. That might be proper, to the extent that § 2 can be understood as a tool for smoking out invidious discrimination. But Congress certainly cannot ensconce a particular racial minority or political party in a favored electoral position.

Congress may use its enforcement power only as a "congruen[t] and proportional[] ... means" to "remedy or prevent" the unconstitutional "injury" of intentional discrimination. *City of Boerne*, 521 U.S. at 519–20. The Fifteenth Amendment's enforcement power does not allow Congress to "alter[] the meaning" of the Constitution. *Id.* at 519. Accordingly, to ensure that § 2 stays within the bounds of the Fifteenth Amendment, the results test must be "limited to those cases in which constitutional violations [are] most likely." *Id.* at 533 (citation omitted).

37

If § 2 were interpreted as Plaintiffs hope, it would not fit within those constitutional bounds. As Justice White explained in his dissent in *Bolden*, the original results test was designed to target "objective factors" from which discrimination "can be *inferred*." 446 U.S. at 95 (emphasis added). The amendments to § 2 were meant to "restore" that test. *Gingles*, 478 U.S. at 43–44 & n.8 (citations omitted). But in situations where it is unclear whether race or party is the explanatory factor for voting patterns (much less situations where evidence establishes it as the latter), there is no way of understanding the application of § 2 as *enforcing* a ban on intentional racial discrimination.

What is more, interpreting § 2 to grant preferential treatment to particular racial groups would violate the Equal Protection Clause by compelling state action to benefit one racial group at the expense of others. *See* U.S. Const. amend. XIV, § 1. "[S]ubordinat[ing] traditional race-neutral districting principles" to increase minority voting strength violates the Constitution. *Miller v. Johnson*, 515 U.S. 900, 916 (1995). Where § 2 is used not to undo racial bias but to undo a pattern of *partisan* voting, in favor of one (and only one) racial minority, that is blatantly unconstitutional.

At a minimum, such an interpretation of § 2 raises constitutional questions and should be avoided if possible. "When a serious doubt is raised about the constitutionality of an act of Congress, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided." *Jennings v. Rodriguez*, 138 S. Ct. 830, 842 (2018) (citation omitted). That is doubly true where the district court's ruling would "upset the usual constitutional balance of federal and state powers." *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991). Courts should interpret statutes to do so only when congressional intent is "unmistakably clear." *Id*. (citations omitted). The text of § 2 does not suggest, much less require, the district court's counter-intuitive reading, and the Court should reject it.

### 3. Plaintiffs' counter-arguments are unpersuasive.

Against all of this, Plaintiffs erroneously argued (and the district court accepted) that they can prove racial bloc voting and a § 2 violation by showing merely that black voters tend to vote for a different party than non-black voters. *See, e.g.*, Doc. 139 at 17; Doc. 146-8 at 3 (Plaintiffs' expert defined racial bloc voting as any situation where "Black voters and white voters prefer different

candidates."). Indeed, in Plaintiffs' view, race and party are difficult, if not "impossible," to disentangle. Doc. 151 at 21. Plaintiffs' arguments in support of this view have no merit.

To start, the district court accepted Plaintiffs' argument that because race can be a strong "predictor" of party, Doc. 151 at 37, even if the voting patterns are explained by *partisan* differences, that does not matter because race informs which party someone votes for. That argument makes no sense. "[E]ven if [minority] voters are likely to favor [the Democratic] party's candidates," § 2 does not require election of Democrats. *Baird*, 976 F.2d at 361. Oftentimes the partisan "interests of racial groups" simply "diverge." *Gingles*, 478 U.S. at 100 (O'Connor, J., concurring). Partisan electoral losses are then nothing more than a consequence of the basic point that "in a majoritarian system, numerical minorities lose elections." *Holder*, 512 U.S. at 901 (Thomas, J., concurring) (citations omitted). It is not a sign of lesser "opportunity." 52 U.S.C. § 10301(b).

Next, the district court went so far as to accept Plaintiffs' argument that there *must* be a high correlation between race and party in any § 2 case because a plaintiff must show racial polarization and minority political cohesion. Doc. 151 at 37. That is not remotely correct, and it underscores the disconnect between

40

what § 2 accomplishes and what Plaintiffs are trying to use it for here. There can *absolutely* be racial bloc voting that cuts across party lines, and that is *precisely* the type of "invidious[]" discrimination that § 2 was meant to remedy. *Regester*, 412 U.S. at 765.

Suppose, for instance, the non-black majority consistently votes against the black minority's preferred candidate, regardless of whether they are Democrats or Republicans. That would be strong evidence of racial bloc voting. Or suppose that in primaries, where partisan affiliation is at least nominally identical, the non-black majority consistently votes against the black minority's preferred candidate—that also would be evidence of racial, as opposed to partisan, voting. *See, e.g.*, *id*. at 767 (explaining that "the black community ha[d] been effectively excluded from participation in the Democratic primary selection process"). Or suppose that patterns of voting show that the majority gives substantially less support to minority *candidates*. *See, e.g.*, *NAACP, Inc., v. City of Niagara Falls, N.Y.*, 65 F.3d 1002, 1017 (2nd Cir. 1995); *Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ.*, 4 F.3d 1103, 1128 (3d Cir. 1993). That, too, would be evidence of racial, as opposed to partisan, voting.

41

These are not hypotheticals; they are the actual situations § 2 was meant to address. To give just one instance, in *Cousin v. McWherter*, election results showed that, "[a]lthough historically blacks in Hamilton County have voted for the Democratic candidate," when there was a black Republican candidate, "blacks left the Democratic candidate and voted for [the] Republican black candidate, while 69.6% of the white vote went to [the] *white* [Democrat]*." 840 F. Supp. 1210, 1215 (E.D. Tenn. 1994), *vacated*, 46 F.3d 568 (6th Cir. 1995) (emphasis added). *That* is evidence of racially polarized voting.

By contrast, where voters "support[] the minority candidates slated by their parties at levels equal to or greater than those enjoyed by [majority] candidates," the "divergent voting patterns among [majority] and minority voters are best explained by partisan affiliation." *Clements*, 999 F.2d at 861. To equate that sort of partisan disagreement with invidious racial bias is dangerous and legally unsupportable.

\*    \*    \*

"Unless courts 'exercise extraordinary caution' in distinguishing race-based redistricting from politics-based redistricting, they will invite the losers in the redistricting process to seek to obtain in court what they could not achieve in the

political arena." *Cooper v. Harris*, 137 S. Ct. 1455, 1490 (2017) (Alito, J., concurring in part) (citation omitted). The same is true here: unless courts demand that plaintiffs prove that *race* rather than *party* explains a racial minority's apparent lack of electoral success, federal courts will reshape state electoral landscapes in service of a political party. Plaintiffs' rule would invite precisely that, and this Court should reject it.

### B. There is no racial bloc voting here because ordinary partisan politics, not race, explain Commission voting patterns.

With the proper rule in place, Plaintiffs' claim fails because they "have not even attempted to establish proof of racial bloc voting by demonstrating that race, not … partisan affiliation, is the predominant determinant of political preference." *Clements*, 999 F.2d at 855. And even if the Secretary shoulders some burden of production as to evidence on this score, he easily satisfied it. Either way, Plaintiffs' claim cannot succeed.

**1.** As established above, a successful § 2 claim requires that *race*, not *party*, is the cause of "divergent voting patterns." *Id.* at 861. Plaintiffs must, therefore, *prove* as much. But Plaintiffs here did not even try to do so. They and their witnesses repeatedly stated that they were *not* trying to distinguish race and party.

43

In their opening statement at trial, Plaintiffs explicitly declared that they were "not required to prove the absence of partisan polarization." Doc. 139 at 17. Likewise, in their view, "racial identity cannot be accurately disentangled from party affiliation." *Id*. After determining that black voters tended to vote differently than white voters, Plaintiffs' expert did not "investigate alternative explanations" for that divergence. Doc. 140 at 24. He "didn't do any analysis" on whether polarization was partisan in nature. *Id*. at 54–55. He declared that it is not even "possible" for an election to be polarized by party and not by race, at least where voters of one race are politically cohesive. Doc. 142 at 150–51. Simply put, Plaintiffs thought they need not prove anything beyond "diverge[nt]" voting patterns, so they did not try to do anything more. *Gingles*, 478 U.S. at 100 (O'Connor, J., concurring). That alone should be sufficient to reverse.

To be sure, a few courts have suggested that once plaintiffs establish that a minority votes cohesively and nevertheless usually loses, that is enough to draw an inference of racial bias, which the defendant must then rebut. *Uno*, 72 F.3d at 983; *cf. Nipper*, 39 F.3d at 1524–26 (plurality op.). But there is nothing in the statute that would support this kind of burden-shifting regime. And to the extent that those courts believed such an

inference was justified as a *practical* matter, on the basis that one would not *expect* a cohesive racial minority to repeatedly lose elections, that is not factually justified in today's world. Partisan polarization has "increased dramatically in the last 50 years." Doc. 142 at 15. In 1982, when § 2 was amended, it might have been suspicious for a cohesive racial minority to repeatedly lose elections, since party affiliation was far weaker. But in the current, highly partisan environment, when Democrats *usually lose*, the inference is not something racially suspect. The obvious inference is that *Republicans* simply usually win. The most sensible holding, then, is that because Plaintiffs did not even *try* to shoulder their burden to prove racial causation, their claim simply fails.

**2.** Even if the Secretary shoulders an "entry-level burden of production," he more than satisfied such a burden here. *Uno*, 72 F.3d at 983. Of course, even assuming the Secretary has a burden of production, the ultimate "burden of proof at all times remains with the plaintiffs." *Id.* And there was plenty of evidence establishing that party, rather than race, explains the "diverge[nt]" voting patterns at issue. *Gingles*, 478 U.S. at 100 (O'Connor, J., concurring).

To start, in the eleven Commission elections Plaintiffs' expert analyzed, there is no discernable difference in majority support for black versus white candidates. Doc. 146-8 at 13, Table 1; *see also* Doc. 142 at 111.[2] Plaintiffs' expert calculated white support for black-preferred candidates (none of whom were Republicans) at percentages ranging from approximately 12.5% to 24.3%. Doc. 146-8 at 13, Table 1. Among black-preferred candidates, the black candidates received, on average, 16.7% of the white vote, and the white candidates received, on average, 16.8%. *Id.* In other words, white support for non-Republican candidates is statistically identical, no matter the race of the candidate.

This evidence is critical, because identical support for candidates of different races is one of the tell-tale signs of partisan, as opposed to racial, bloc voting. That was Justice White's entire point in his short *Gingles* concurrence. 478 U.S. at 83. And in *Gingles* itself, the evidence was based on candidates of

---

[2] It would have been more appropriate to calculate the *non-black* support for the black-preferred candidates, as opposed to simply white voters. *See, e.g.*, *LULAC*, 548 U.S. at 444 (examining whether "Anglos and Latinos" in the majority would defeat black candidates). Section 2 is concerned with whether a minority voter has equal opportunity as compared to "other members of the electorate," 52 U.S.C. § 10301(b), not equal opportunity as compared to any particular racial group. But either way, the data here show no indication of racial, as opposed to partisan, voting.

*different* race, showing that "most white voters were extremely reluctant to vote for black candidates." *Id.* at 54. But where, as here, voters "support[] minority candidates … at levels equal to or greater than those of [non-minority] candidates, it [is] proper to conclude … 'that divergent voting patterns among [majority] and minority voters are best explained by partisan affiliation.'" *Goosby*, 180 F.3d at 496 (quoting *Clements*, 999 F.2d at 861).

There is more. Defendant's expert, Dr. Barber, dug deeper and provided statistical evidence that party, rather than race, explains voting patterns in Georgia. The district court credited Dr. Barber, finding only that his testimony was of "limited utility" because, in the court's view, the race/partisanship question was not "relevant." Doc. 151 at 20–21. Yet under the proper legal standard, Dr. Barber's testimony was highly relevant, indeed, dispositive.

Dr. Barber ran regression analyses of Georgia's statewide and congressional elections, controlling for various factors to isolate the effect of race or partisanship on voter behavior. Doc. 142 at 11–14; Doc. 147-2 at 9 & Fig. 3. The results of that analysis were compelling. When holding race constant, changing party preference changed the likelihood of voting for a Democrat by about *ninety* percentage points. Doc. 142 at 12. By contrast, when

47

holding party constant, changing a voter's race would change the likelihood of a person's vote by only about ten percentage points. *Id.*; Doc. 147-2 at 9 & Fig. 3. Put another way, when controlling for the other, partisanship was *nine times* more predictive of a person's vote than race.

Likewise, Dr. Barber analyzed support for candidates of different races in Georgia congressional elections. Black voter support for Democratic candidates was almost identical, regardless of whether the Democrat or the Republican was white or black. Doc. 142 at 14; Doc. 147-2 at 10 & Fig. 4. And white voter support for Democrats also showed little change (white voter support for Democrats went up slightly when *either* candidate was black). Doc. 142 at 14; Doc. 147-2 at 10 & Fig. 4.

The district court, although rejecting the relevance of this evidence, pointed as an aside to a few pieces of evidence that supposedly suggested a racial explanation for voting—but none actually do. Doc. 151 at 38. The district court noted that in some of the relevant elections, it was a Libertarian candidate (as opposed to a Democrat) challenging the Republican. *Id.* That does nothing to undercut the point: Republicans vote for Republicans, and Democrats vote *against* Republicans (even if they have to vote for a Libertarian). *See* Doc. 140 at 69 (Plaintiffs' expert

acknowledging that black voters' candidate of choice was never a Republican). That is still a partisan voting pattern. The district court also noted Plaintiffs' expert's opinion that "polarization is far more stark than partisan identification alone would predict." Doc. 151 at 38. But all that means is that not everyone who consistently votes for Republicans *identifies* as a Republican— their voting patterns are still partisan in nature, as Dr. Barber's analysis (not to mention Plaintiffs' expert's analysis) shows.

Plaintiffs did not introduce any evidence of primaries or establish in any way that the consistent voting behavior of the non-black majority had anything to do with a candidate's race. Doc. 140 at 14. The evidence instead reveals that voting in Georgia is polarized by party. Even if the Secretary shouldered a burden of production, he more than satisfied it, and the district court's ruling to the contrary must be reversed.

## II. Plaintiffs' requested remedy would impermissibly alter Georgia's form of government.

"Nothing in the Voting Rights Act suggests an intent on the part of Congress to permit the federal judiciary to force on the states a new model of government." *Nipper*, 39 F.3d at 1531. Indeed, "federal courts simply lack legal standards" to do so. *Id.* Yet the district court ignored Georgia's century-old,

49

constitutionally mandated structure for regulating utilities and held that § 2 requires Georgia to adopt a fundamentally new system for electing members of the Commission. No other court has ever held as much, and this is another independent, dispositive error that requires reversal.

**A.** For Plaintiffs to prevail, they must identify a "remedy *within the confines*" of Georgia's "model of government" that "does not undermine the administration of justice." *Davis*, 139 F.3d at 1421 (citation omitted). Vote "dilution" necessarily assumes a comparator—"Diluted relative to what benchmark?" *Gonzalez*, 535 F.3d at 598. And "[f]ederal courts may not … alter the state's form of government itself when they cannot identify 'a principled reason why one [alternative to the model being challenged] should be picked over another as a benchmark for comparison.'" *Nipper*, 39 F.3d at 1532 (quoting *Holder*, 512 U.S. at 881). That means a "voting practice cannot be challenged as dilutive under § 2" if "there is no objective and workable standard for choosing a reasonable benchmark by which to evaluate a challenged voting practice." *Holder*, 512 U.S. at 881.

So, for instance, a plaintiff cannot challenge a sole commissioner system as dilutive, because there is "no principled reason why" a "five-member commission" should be chosen rather

than a "single-commissioner structure." *Id*. There is no obvious "benchmark" or comparator by which to determine if the given mode of government is "dilutive." Why five commissioners rather than nine? Or why first-past-the-pole voting versus proportional voting? There is no "objective and workable standard" for that kind of analysis, and so § 2 does not cover that sort of claim. *Id*.

The search for a reasonable benchmark is particularly difficult when the challenged system is statewide. In challenges to political subdivisions, the court not only has more comparators (other counties or districts within the state), but also more remedial options. In a challenge to single-member districts, for instance, the court can require bigger, smaller, or differently shaped districts. States, however, are different. Fundamental sovereign characteristics limit the relief that federal judges can prescribe. For instance, a federal court cannot order Georgia to merge with Alabama. The "reconstitution of state governmental institutions" is similarly inappropriate. *Nipper*, 39 F.3d at 1532 n.75. Even "the Fourteenth Amendment does not override all principles of federalism," *Gregory*, 501 U.S. at 468, much less § 2, a statute.

Accordingly, in determining whether a proposed alternative foists a new system of government on the state, courts must

51

consider the basic characteristics of the state's chosen system. Take *Nipper*, where the plaintiffs challenged Florida's at-large elections for trial judges. 39 F.3d 1494. The plaintiffs asked the district court to create "electoral subdistricts within the territorial jurisdiction of the trial courts at issue." *Id.* at 1543 (plurality op.). The Court held that remedy was not an "objectively reasonable and workable solution" because it abolished a key feature of Florida's chosen electoral system: the "link between a trial judge's jurisdiction and the judge's elective base." *Id.* at 1541 (citation omitted). Swapping the at-large elections for subdistricts would "increase the potential for 'home cooking'"—because judges would have an incentive to prefer litigants from their own district over other litigants. *Id.* at 1544. "[T]he idea that judges should be responsive to constituents" was fundamentally inconsistent with Florida's "ideal of an independent-minded judiciary." *Id.*

And if a state has enshrined a particular model of government in its constitution, that strongly suggests a remedy requiring the state to enact a new model of government would be inappropriate. *Davis*, 139 F.3d at 1420. After all, "a state has an interest in maintaining the … selection model established by its constitution." *Id.* (citation omitted); *see also SCLC*, 56 F.3d at 1294) (same). The "power to prescribe the qualifications of its

officers, and the manner in which they shall be chosen," is a fundamental, sovereign state power. *Boyd v. Nebraska*, 143 U.S. 135, 161 (1892).

Finally, where a judicial act would "significantly alter the balance between federal and state power," courts must refrain unless Congress authorized that change with "exceedingly clear language." *Ala. Assn. of Realtors v. Dept. of Health and Human Services*, 141 S. Ct. 2485, 2489 (2021) (citation omitted). So to the extent there is any question as to whether a particular proposed § 2 remedy inappropriately interferes with state sovereign power and state interests, courts should break the tie by holding that it *does*, because § 2's regulation of a "standard, practice, or procedure" does not plainly authorize a fundamental change to the "form of a governing authority." *Holder*, 512 U.S. at 915 (Thomas, J., concurring).

**B.** Properly analyzed, Georgia's statewide system for Commission elections is a "facially neutral voting rule[] with [a] long pedigree[] that reasonably pursue[s] important state interests." *Brnovich*, 141 S. Ct. at 2343 (citations omitted). Plaintiffs' sought-after remedy here—carving up a statewide system for electing members of a statewide, quasi-judicial Commission—effectively abolishes Georgia's chosen system of

government. Yet the district court barely addressed these concerns (and appointed itself the arbiter of Georgia constitutional law, to boot).

There is no "objective and workable standard" for choosing between statewide elections for the Commission and single-member districts, which is precisely why federal courts should not order remedies requiring this kind of analysis. *Holder*, 512 U.S. at 881. Courts must limit themselves to remedies that are consistent with "the particular context of the challenged system." *Nipper*, 39 F.3d at 1530–31. And single-member districts are not compatible with fundamental aspects of the Commission.

The "relevant geographic area for the selection" of commissioners "is the entire State." *Baten v. McMaster*, 967 F.3d 345, 360–61 (4th Cir. 2020), *as amended* (July 27, 2020) (rejecting § 2 challenge to practice of granting all of South Carolina's presidential electoral votes to a single candidate). Georgia has repeatedly made clear that the statewide nature of Commission elections is important. The original 1906 Act spelled that out plainly. *See* 1906 Ga. Laws 100, § 1 (Law No. 453, Election of R.R. Comm'rs) (providing that commissioners shall be "elected by the electors of *the whole State*") (emphasis added). And then, in 1945, Georgia constitutionalized that procedure by amending its

constitution to confirm that Commissioners shall be "elected by the people." Ga. Const. Art. IV, § IV, ¶ III (1945).

Georgia's chosen model for Commission elections aligns each commissioner's interests with the state's best interests. *Nipper*, 39 F.3d at 1541–42 (plurality op.). Energy policy constantly involves tradeoffs—with implications for the entire state. Doc. 151 at 7; Doc. 157 at 85. The state needs power plants, which produce both power and jobs, but most people do not want to live next to them. *Id.* at 85, 90. Pipeline and power plant malfunctions are extremely dangerous, but modernizing and maintaining the energy grid is expensive. *Id.* at 86–88, 93. Commissioners must decide who bears those costs and in what way. *Id.* at 86–88. The Commission, to be effective, must be free to make these difficult decisions free of the pressure to "pursue an agenda on behalf of a particular" special interest, rather than the good of the state as a whole. *Nipper*, 39 F.3d at 1534–35 (plurality op.); Doc. 157 at 84. Georgia ensures this by linking the "electoral base" with the Commission's "jurisdiction" (the entire state). *Nipper*, 39 F.3d at 1542 (plurality op.). All affected voters "have the right to hold a [commissioner] accountable for his or her performance." *SCLC*, 56 F.3d at 1296–97.

That is especially important because the Commission is a quasi-judicial body. Doc. 121-3 at 5. It has a large docket filled with cases that affect all Georgians. Doc. 157 at 107. It hears rate cases, which involve adversarial argument, witnesses, weighing testimony, and then issuing a binding opinion. Doc. 151 at 8; Doc. 157 at 107. Those decisions set the utility rates for all Georgians. Doc. 151 at 8. The Commission also holds hearings where it considers whether to permit power plant construction. Doc. 157 at 106–07, 111–12. When appropriate, the Commission can also assess fines. Doc. 151 at 8. It is vital that the Commission appear impartial and independent while adjudicating these cases. Any appearance of "home cooking"—a commissioner favoring litigants and stakeholders from his district over the rest of the state— would throw the "fundamental fairness" of the Commission's proceedings into question. *SCLC*, 56 F.3d at 1297. Georgia has a strong interest in avoiding "even the appearance" that the Commission might engage in improper favoritism. *Davis*, 139 F.3d at 1421 (citation omitted).

"[D]istricting remed[ies]," however, encourage "greater 'responsiveness' on the part of [officials] to the special interests of the people who elected them." *SCLC*, 56 F.3d at 1297. Single-member districts produce "representatives" for "the people in their

districts." *Nipper*, 39 F.3d at 1534 (plurality op.). Put another way, "[c]reating a smaller electorate" inevitably "increase[s] the pressure to favor constituents." *SCLC*, 56 F.3d at 1297.

To be sure, single-member districts are a common remedy for cases that do *not* involve statewide, quasi-judicial state entities. *See, e.g.*, *Georgia State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs*, 952 F. Supp. 2d 1360, 1362 (N.D. Ga. 2013) (challenge to county board of commissioners). But "single-member districts … run counter to the state's … model" here. *Nipper*, 39 F.3d at 1531 (citation omitted). Commissioners should not be beholden "to the special interests of the people who elected them." *Id.* at 1544 (plurality op.). That is particularly true for a Commission focused on utilities—the Commission's decisions necessarily affect everyone statewide, in ways that cannot be divvied up by district. The district court's order does not just substitute a comparative method of election—it creates a fundamentally different type of state agency. At the very least, § 2 does not *unmistakably* authorize such an intrusion. *See Gregory*, 501 U.S. at 460.

Despite being the first court to choose single-member districts as a § 2 benchmark for statewide, quasi-judicial Commission, the district court never gave "a convincing reason" for doing so. *Holder*, 512 U.S. at 882. If anything, the district court improperly

suggested that the State bore the burden of articulating why Georgia chose this particular electoral mechanism. Doc. 151 at 52. It faulted the State for failing to offer "legislative history" or "policy statements" outlining its reasoning. *Id.* That misses the point. Federal courts have no license to remake a state's electoral systems when they disagree with its policy justification or find it wanting. Courts can conduct a vote dilution analysis only if they locate a "principled reason" for believing that the sought-after system is a meaningful comparator, rather than a change in governmental structure. *Holder*, 512 U.S. at 881. The district court all but assumed that single-member districts were an appropriate comparator here but did not meaningfully explain why.

The district court compounded its error by holding that Georgia's constitution does not require statewide elections for the Commission. The Georgia Constitution provides that the Commission "shall consist of five members who shall be elected by the people." Ga. Const. Art. IV, § I, ¶ I(a). That language means Commission elections are statewide—when the framers intended for elected officials to be elected from districts, they so specified. *See, e.g.*, Ga. Const. Art. III, § II, ¶ I(a) (explaining that state senators shall be "elected from single-member districts").

At the least, the district court should have certified the question to the Supreme Court of Georgia. *See Pittman v. Cole,* 267 F.3d 1269, 1285 (11th Cir. 2001). The district court itself recognized as much, Doc. 97 at 21–22, before inexplicably skipping that step and interpreting the Georgia constitution itself in a single page of analysis without briefing or argument, Doc. 151 at 59. To be sure, it should not ultimately matter—even without a constitutional requirement, the court lacked the power to transform Georgia's Commission into a different type of body. But the district court recognized that state constitutional backing would be another argument in favor of the Secretary, and it should not have rejected this point without certification.

*    *    *

The Commission is elected statewide because Georgia has determined that this is the method of government that best suits the State's regulation of utilities. There is no principled basis on which Plaintiffs can claim that single-member districts are an "objective" comparator. The district court erred in holding otherwise.

### III. The district court made numerous legal errors in examining the totality of the circumstances.

The Court need not reach the totality-of-the-circumstances phase of the analysis because the errors identified above are dispositive. But if the Court were to reach the totality phase, these errors—and additional errors—make clear that the district court's order cannot withstand scrutiny here, either.

The district court held that Senate Report factor two, which it weighed more "heavily" than the other factors, "weighs heavily in Plaintiffs' favor." Doc. 151 at 36, 39. But it did so only after legally erring by ignoring the unrebutted evidence that party, not race, explains voting polarization in Georgia. Even if that were not sufficient, on its own, to preclude Plaintiffs' claim, *see supra* § I, it still critically undermines the district court's finding that racial polarization weighs "heavily" in Plaintiffs' favor. In reality, factor two weighs heavily *against* Plaintiffs, because the polarization is driven by partisan preference, not race.

The district court also made multiple errors in holding that the policy reasons for a statewide system are "tenuous," Doc. 151 at 51–54. For one, as explained above, Georgia's sovereignty and linkage interests here are such that Plaintiffs' request is essentially a change in the form of government at issue. *See supra* § II. Even if that were not dispositive (and it should be), it is

60

enough to establish that this constitutionally required policy is not *tenuous*. Moreover, the district court placed the burden on the Secretary to *prove* the legitimacy of its policy, but it should have been Plaintiffs' burden to prove otherwise. *Id.* at 51–52; *cf., e.g.*, *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018) ("[T]he good faith of [the] state legislature must be presumed." (citation omitted).

The district court also "credit[ed]" the Secretary's policy justification that the Commission should be accountable to the whole electorate but then held that this concern "does not outweigh the interests of Black Georgians in not having their votes … diluted." Doc. 151 at 54 (citation omitted). That makes no sense. The district court credited the Secretary's concerns but then assumed the ultimate conclusion of vote dilution and somehow imported that conclusion back into Senate Report factor nine.

These errors are especially relevant since the remaining factors hardly leaned in favor of Plaintiffs. The district court found that three of the factors (access to slating, Doc. 151 at 45–46, lack of racial appeals, *id.* at 48–49, and responsiveness to minority concerns, *id.* at 50–51) favored the Secretary. And the remaining factors were, at best, extremely close calls.

With respect to Senate Report factor one (history of official discrimination), no one doubts that Georgia has a long past of

61

racial discrimination. *Id.* at 41–42. But it cannot, "in the manner of original sin, condemn governmental action" in perpetuity. *Greater Birmingham Ministries*, 992 F.3d at 1325 (citations omitted). Though the district court found that this factor favored Plaintiffs, it cannot be given much weight.[3]

With respect to Senate Report factor three (anti-minority electoral devices), the district court focused on two questionable points. *Id.* at 42–45. The district court noted how *large* Georgia is, asserting that large "election districts can enhance the opportunity for discrimination." *Id.* at 43. But this only illustrates the poor fit of a § 2 claim where the relevant Commission is *statewide*. Unlike counties or voting districts that can be carved up (sometimes suspiciously) in various ways, state lines are immutable. To penalize a century-old system because Georgia is a *big* state is utterly "arbitrary." *Holder*, 512 U.S. at 889. Likewise, the district court faulted Georgia's majority-vote, run-off system—

---

[3] Similarly, the district court found that few black candidates had won statewide elections (Senate Report factor seven), acknowledging that black candidates have had success in recent years but relying on decades-old election results. Doc. 151 at 39–41. Surely, the *current* state of black candidate success for statewide office is more relevant than what happened in the 1970s.

a bizarre notion because black-preferred candidates won both 2020 Senate elections only because of the run-off system.

In sum, if it were necessary to reach the totality analysis, Plaintiffs fail here as well. With the proper legal standards and the district court's errors corrected, Plaintiffs simply did not prove that Georgia's Public Service Commission elections are racially discriminatory.

## CONCLUSION

For the reasons set out above, this Court should reverse the judgment of the district court.

Respectfully submitted.

/s/ *Stephen J. Petrany*

Bryan K. Webb
  *Deputy Attorney General*
Russell D. Willard
  *Senior Asst. Attorney General*
Charlene McGowan
  *Assistant Attorney General*

Christopher M. Carr
  *Attorney General of Georgia*
Stephen J. Petrany
  *Solicitor General*
Drew F. Waldbeser
  *Deputy Solicitor General*
Office of the Georgia
  Attorney General
40 Capitol Square, SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov

*Counsel for Defendant-Appellant*

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure because it contains 12,963 words as counted by the word-processing system used to prepare the document.

/s/ *Stephen J. Petrany*
Stephen J. Petrany

## CERTIFICATE OF SERVICE

I hereby certify that on September 19, 2022, I served this brief by electronically filing it with this Court's ECF system, which constitutes service on all attorneys who have appeared in this case and are registered to use the ECF system.

/s/ *Stephen J. Petrany*
Stephen J. Petrany