No. 22-12593-J

# United States Court of Appeals
# for the Eleventh Circuit

RICHARD ROSE, BRIONTÉ McCORKLE,
WANDA MOSLEY, and JAMES "MAJOR" WOODALL,

*Plaintiffs-Appellees*,

v.

GEORGIA SECRETARY OF STATE,

*Defendant-Appellant.*

*Appeal from the U.S. District Court for the Northern District of Georgia,
Case No. 20-cv-2921, before the Honorable Steven D. Grimberg*

## APPELLEES' BRIEF

Nicolas L. Martinez
Wesley A. Morrissette
BARTLIT BECK LLP
54 West Hubbard Street
Suite 300
Chicago, Illinois 60654
(312) 494-4400
nicolas.martinez@bartlitbeck.com
wesley.morrissette@bartlitbeck.com

Bryan L. Sells
THE LAW OFFICE OF
  BRYAN L. SELLS, LLC
Post Office Box 5493
Atlanta, Georgia 31107
(404) 480-4212
bryan@bryansellslaw.com

*Counsel for the Plaintiffs-Appellees*

OCTOBER 19, 2022

Rose v. Georgia Secretary of State
22-12593-J

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

I hereby certify under Eleventh Circuit Rules 26.1, 26.1-2, and 26.1-3 that these persons and entities have or may have an interest in the outcome:

Bartlit Beck LLP

Beranek, Lori

Carr, Christopher

Clarke, Kristen

Erskine, Kurt R.

Georgia Department of Law

Grimberg, Steven D.

Herren, Jr., T. Christian

Hughes, Aileen Bell

Jacoutot, Bryan F.

Karlan, Pamela S.

LaRoss, Diane

Martinez, Nicolas

McCorkle, Brionté

McGowan, Charlene

[C-1 of 2]

**Rose v. Georgia Secretary of State**
**22-12593-J**

Mellett, Timothy F.

Morrissette, Wesley

Mosley, Wanda

Petrany, Stephen J.

Raffensperger, Brad

Rose, Richard

Sells, Bryan L.

Sitton, Janie Allison (Jaye)

Taylor English Duma LLP

The Law Office of Bryan L. Sells, LLC

Tyson, Bryan P.

U.S. Department of Justice

Webb, Bryan K.

Willard, Russell D.

Woodall, James "Major"

No publicly traded company has an interest in the outcome.

October 19, 2022                  /s/ Bryan L. Sells
                                  Bryan L. Sells
                                  The Law Office of Bryan L. Sells, LLC
                                  Post Office Box 5493
                                  Atlanta, Georgia 31107
                                  (404) 480-4212
                                  bryan@bryansellslaw.com

                                  [C-2 of 2]

## STATEMENT REGARDING ORAL ARGUMENT

This is a voting-rights challenge to the at-large method of electing members of Georgia's Public Service Commission. The Plaintiffs—a group of Black Georgians—sued Georgia Secretary of State Brad Raffensperger in July 2020, alleging that the at-large elections dilute Black voting strength in violation of Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301.

After more than two years of litigation and a week-long bench trial, the district court made detailed findings of fact and comprehensive conclusions of law to support its ultimate conclusion that the challenged election practice violates Section 2. The court enjoined future elections using the unlawful practice and gave the Georgia General Assembly an opportunity to devise a remedy at its next regular session beginning in January 2023.

The Secretary now appeals the district court's injunction and the finding of liability on which it is based. Despite the Secretary's assertion that the district court made several errors in arriving at its conclusion, the district court's rulings have ample support in the record and stay well within the lines of firmly established precedent.

Oral argument is not necessary for this Court to affirm the district court's well-reasoned opinion, but it is nonetheless appropriate here because this case affects the fundamental voting rights of millions of Black Georgians. No more than fifteen minutes per side will be necessary to address the most salient issues.

# TABLE OF CONTENTS

Certificate of Interested Persons and Corporate Disclosure Statement .................................................................... 2

Statement Regarding Oral Argument ........................................ 4

Table of Contents ...................................................................... 6

Table of Authorities .................................................................. 8

Statement of Jurisdiction ........................................................ 12

Statement of the Issues ........................................................... 13

Introduction ............................................................................. 14

Statement of the Case ............................................................. 18

    A.    Georgia's Public Service Commission ...................... 18

    B.    Section 2 of the Voting Rights Act .......................... 20

    C.    The Plaintiffs' Lawsuit .............................................. 24

    D.    The Bench Trial ......................................................... 27

    E.    The District Court's Opinion ................................... 32

    F.    The Stay Proceedings ............................................... 36

Standard of Review ................................................................. 39

Summary of Argument ............................................................ 41

Argument ................................................................................. 46

I.    The district court's finding of racial vote dilution is not clearly erroneous. .................................................................. 46

A.    The district court correctly applied settled law. ................... 47

B.    Substantial evidence supports the district court's finding of racial vote dilution. ............................................... 53

II.    The district court's finding of a feasible remedy is not clearly erroneous. ........................................................................... 63

A.    Substantial evidence supports the district court's finding that single-member districts would be a feasible remedy ................................................................ 64

B.    Single-member districts would not impermissibly alter Georgia's form of government ................................................ 67

Conclusion ................................................................................................ 76

Certificate of Compliance ....................................................................... 78

# Table of Authorities

## Cases

*American National Bank of Jacksonville v. FDIC,*
  710 F.2d 1528 (11th Cir. 1983) ............................................................. 52

*Anderson v. City of Bessemer City, North Carolina,*
  470 U.S. 564 (1985) ............................................................. 39

*Bartlett v. Strickland,*
  556 U.S. 1 (2009) ............................................................. 76

*Best Canvas Products & Supplies, Inc. v. Ploof Truck Lines, Inc.,*
  713 F.2d 618 (11th Cir. 1983) ............................................................. 55

*Catlin v. United States,*
  324 U.S. 229 (1945) ............................................................. 12

*Chapman v. Meier,*
  420 U.S. 1 (1975) ............................................................. 44, 64

*Childrey v. Bennett,*
  997 F.2d 830 (11th Cir. 1993) ............................................................. 44, 66

*Christian Legal Society Chapter of University of California,*
  *Hastings College of the Law v. Martinez,* 561 U.S. 661 (2010)............ 55

*City of Carrollton Branch of the NAACP v. Stallings,*
  829 F.2d 1547 (11th Cir. 1987) ............................................................. 53, 59

*City of Rome v. United States,*
  446 U.S. 156 (1980) ............................................................. 68

*Clerveaux v. East Ramapo Central School District,*
  984 F.3d 213 (2d Cir. 2021) ............................................................. 51

*Cox v. Barber,*
  568 S.E.2d 478 (Ga. 2002) (per curiam) ............................................................. 73

*CSX Transportation, Inc. v. General Mills, Inc.,*
  846 F.3d 1333 (11th Cir. 2017) ............................................................. 73

*Davis v. Chiles,*
  139 F.3d 1414 (11th Cir. 1998) ............................................................. 63, 68, 72

*East Carroll Parish School Board v. Marshall,*
  424 U.S. 636 (1976) (per curiam) ............................................................. 64

*Feldman v. American Dawn, Inc.*,
   849 F.3d 1333 (11th Cir. 2017) .......................................................... 75

*GEICO Indemnity Company v. Whiteside*,
   857 S.E.2d 654 (Ga. 2021) .................................................................... 75

*Goosby v. Town Board of Town of Hempstead, New York*,
   180 F.3d 476 (2d Cir. 1999) ................................................ 52, 58, 59

*Harding v. County of Dallas, Texas*,
   948 F.3d 302 (5th Cir. 2020) ............................................................... 50

*Helton v. AT&T Inc.*,
   709 F.3d 343 (4th Cir. 2013) ............................................................... 73

*Holder v. Hall*,
   512 U.S. 874 (1994) .................................................... 26, 45, 70, 71

*Johnson v. Hamrick*,
   196 F.3d 1216 (11th Cir. 1999) .......................................................... 53

*Johnson v. Hamrick*,
   296 F.3d 1065 (11th Cir. 2002) ................................................ 39, 40, 53

*Katzenbach v. Morgan*,
   384 U.S. 641 (1966) ............................................................................. 76

*League of United Latin American Citizens v. Clements*,
   999 F.2d 831 (5th Cir. 1993) (en banc) .......................................... 50, 58

*Lewis v. Alamance County, North Carolina*,
   99 F.3d 600 (4th Cir. 1996) ................................................................ 51

*Milwaukee Branch of the NAACP v. Thompson*,
   116 F.3d 1194 (7th Cir. 1997) ............................................................ 51

*Minnesota Voters Alliance v. Mansky*,
   138 S. Ct. 1876 (2018) ......................................................................... 73

*NAACP, Inc. v. City of Niagara Falls*,
   65 F.3d 1002 (2d Cir. 1995) ................................................................ 71

*Negrón v. City of Miami Beach*,
   113 F.3d 1563 (11th Cir. 1997) .......................................................... 40

*Nipper v. Smith*,
   39 F.3d 1494 (11th Cir. 1994) (en banc) ............................................ 68

9

*Nken v. Holder,*
  556 U.S. 418 (2009) ............................................................... 38

*Northwest Austin Municipal Utility District Number One v.*
  *Holder,* 557 U.S. 193 (2009) ................................................. 68

*Purcell v. Gonzalez,*
  549 U.S. 1 (2006) ................................................................... 37

*Rose v. Raffensperger,*
  No. 22A136, 2022 WL 3568483 (U.S. Aug. 19, 2022).......... 38

*Sanchez v. Colorado,*
  97 F.3d 1303 (10th Cir. 1996) .............................................. 48

*SCLC v. Sessions,*
  56 F.3d 1281 (11th Cir. 1995) (en banc) ....................... 40, 68

*Solomon v. Liberty County Commissioners,*
  221 F.3d 1218 (11th Cir. 2000) (en banc) ................. 39, 40, 51

*Solomon v. Liberty County, Florida,*
  899 F.2d 1012 (en banc) ....................................................... 53

*Tamiami Trail Tours, Inc. v. Georgia Public Service Commission,*
  99 S.E.2d 225 (Ga. 1957)................................................. 18, 69

*\*Thornburg v. Gingles,*
  478 U.S. 30 (1986) ........................................................ *passim*

*\*United States v. Marengo County Commission,*
  731 F.2d 1546 (11th Cir. 1984) ..................................... *passim*

*United States v. Steele,*
  147 F.3d 1316 (11th Cir. 1998) (en banc) ........................... 47

*Uno v. City of Holyoke,*
  72 F.3d 973 (1st Cir. 1995)....................................... 48, 51, 71

*Washington Market Company v. Hoffman,*
  101 U.S. 112 (1879) ............................................................. 74

*Wise v. Lipscomb,*
  437 U.S. 535 (1978) ............................................................. 64

*\*Wright v. Sumter County Board of Elections and Registration,*
  979 F.3d 1282 (11th Cir. 2020) .......................... 24, 39, 55, 68

10

## Constitutional Provisions

Ga. Const. art. IV, § 1, ¶ I ................................................. 19, 73, 74

La. Const. art. IV, § 21 ......................................................... 67

N.M. Const. art. XI, § 1 ........................................................ 68

Neb. Const. art. IV, § 20 ...................................................... 68

## Statutes

28 U.S.C. § 1291 .................................................................. 12

28 U.S.C. § 1292 .................................................................. 12

28 U.S.C. § 1343 .................................................................. 12

*52 U.S.C. § 10301 ......................................................... *passim*

La. Rev. Stat. § 45:1161.1 .................................................... 68

La. Rev. Stat. § 45:1161.5 .................................................... 68

Miss. Code Ann. § 77-1-1 ..................................................... 68

Mont. Code Ann. § 69-1-104 ................................................. 68

Neb. Rev. Stat. Ann. § 75-101.01 .......................................... 68

O.C.G.A. § 46-2-1 .......................................................... 19, 75

## Rules

Fed. R. App. P. 10 ................................................................ 32

Fed. R. Civ. P. 52 ................................................................ 40

## Other Authority

S. Rep. No. 97-417 ............................................................... 48

## STATEMENT OF JURISDICTION

This is an interlocutory appeal from a judgment enjoining the Secretary of State from using the at-large method of electing members of Georgia's Public Service Commission in any future elections. The district court entered judgment on August 8, 2022, and the Secretary appealed on the same day. This Court therefore has jurisdiction under 28 U.S.C. § 1292.

The Secretary's assertion that the district court's judgment is a final decision giving this Court jurisdiction under 28 U.S.C. § 1291 is incorrect. (Appellant's Br. 12.) "A 'final decision' generally is one which ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *Catlin v. United States*, 324 U.S. 229, 233 (1945). Here, though, there remains a remedial process to determine the method of electing Public Service Commissioners in future elections, so the orders from which the Secretary appeals leave much for the district court to do other than simply executing its judgment.

Because this case arises under Section 2 of the Voting Rights Act, 52 U.S.C. § 10301, the district court had subject-matter jurisdiction under 28 U.S.C. §§ 1331, 1343(a)(3)-(4), and 52 U.S.C. § 10308(f).

## STATEMENT OF THE ISSUES

1. Did the district court clearly err in finding—after a full trial on the merits and applying settled law—that at-large elections for Georgia's Public Service Commission result in vote dilution on account of race?

2. Did the district court clearly err in finding that single-member districts are a feasible remedy for racial vote dilution caused by at-large elections for Georgia's Public Service Commission?

## INTRODUCTION

The Georgia Public Service Commission, created in 1879, controls how much Georgians pay every month in gas and electric bills. Yet, although nearly one-third of Georgia's voters are Black, only one Black person has ever been elected to the Commission in its 143-year history. How can that be? The answer, which the Plaintiffs proved at trial, is vote dilution "on account of race." 52 U.S.C. § 10301(a).

The Commission has five members, and each must live in one of five residency districts. The commissioners, however, are not elected solely by the voters of the district in which they must reside. Instead, for more than a century, they have been elected at large by all voters in the State of Georgia. Voting in Commission elections, moreover, is highly polarized along racial lines. In other words, Black voters and White voters prefer different candidates in Commission elections, and they do so at rates exceeding 80 or 90 percent.

This extraordinary combination of at-large voting with high rates of racial polarization results in vote dilution on account of race. Take District 3, for example, which encompasses the Atlanta area and is majority-Black. All voters in Georgia, which is majority-White, vote for the District

3 commissioner. The result is that even though the candidate preferred by Black voters has won *every* county in District 3 in recent years, Black voters there are unable to elect their candidate of choice. Their votes are being diluted by the majority-White population that lives outside of District 3 and votes for a different candidate. This pattern has repeated itself without exception over the past decade. During that span, not one Black-preferred candidate has been elected to the Commission. Only White-preferred candidates have.

The Plaintiffs, who are all Black voters living in District 3, sued Georgia Secretary of State Brad Raffensperger in July 2020. They alleged that at-large elections for Public Service Commissioners dilute Black voting strength in violation of Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301.

After presiding over the case for more than two years, and following a week-long bench trial, the district court issued a 64-page decision holding that Georgia's at-large method of electing Public Service Commissioners violates Section 2. The court admitted more than 100 exhibits into evidence and heard trial testimony from more than a dozen witnesses, including three experts. Applying settled law, such as the Supreme

Court's seminal decision interpreting Section 2, *Thornburg v. Gingles*, 478 U.S. 30 (1986), the court conducted an "intensely local appraisal" of the "totality of the circumstances" surrounding Commission elections, *id.* at 79 (cleaned up). Having weighed the overwhelming evidence submitted by the Plaintiffs and assessed the credibility of the testifying witnesses, the court concluded that its appraisal "compels only one result"—a finding of racial vote dilution. (I:151 at 63.)[1]

That finding was not clearly erroneous. The Secretary, to be sure, disagrees with the district court's factual findings and credibility determinations, but he offers no valid reason for this Court to disturb them. The district court gave the Secretary every opportunity to rebut the Plaintiffs' evidence of racial vote dilution with proof that partisanship, not race, explained voting patterns in recent Commission elections. The court simply found the Secretary's evidence to be lacking, especially when compared to the Plaintiffs' (more than) substantial evidence of racial vote

---

[1] Throughout this brief, citations to the Secretary's Appendix will be in the form "Volume:Document Number at Page." Citations to the Plaintiffs' Supplemental Appendix will be in the form "Supp. App. Document Number at Page." For court documents, the cited page number is the number that appears in the header generated by the court in which the document was originally filed. A dotted underline indicates a hyperlink to the cited authority.

dilution. The court, for instance, held the Secretary to his repeated admissions that voting in Commission elections is racially polarized and credited the Plaintiffs' experts on the subject over the Secretary's. These are not bases for reversal.

Nor is the Secretary's apparent disagreement with settled law, which the district court faithfully applied. The court properly rejected the Secretary's plea to go beyond *Gingles* and require that the Plaintiffs disprove all purportedly nonracial explanations for voting patterns in Georgia. The text of Section 2 contains no such requirement, and no court has ever imposed it. The district court reasonably declined the Secretary's invitation to be the first. (*Id.* at 34.)

Just as reasonable is the district court's finding that the Plaintiffs' proposed remedy of single-member districts is feasible—not an impermissible alteration of Georgia's form of government. Single-member districts are the default remedy (and benchmark) for at-large elections that result in racial vote dilution, and there is no exception just because those elections are statewide. Furthermore, moving to single-member districts would neither change the Commission's size nor alter its jurisdiction. In fact, such a move would be especially appropriate here because the State

17

already uses five residency districts for Commission elections and has done so for more than two decades. Single-member districts would be familiar to Georgia voters and easy for the State to implement.

Because the district court's findings have ample support in the record and stay well within the lines of firmly established precedent, this Court should affirm.

## STATEMENT OF THE CASE

This case is a voting-rights challenge to Georgia's practice of using at-large, statewide elections for members of its Public Service Commission.

### A.    Georgia's Public Service Commission

The Public Service Commission is a quasi-legislative, quasi-judicial "administrative body" that regulates utilities in Georgia. *Tamiami Trail Tours, Inc. v. Ga. Pub. Serv. Comm'n*, 99 S.E.2d 225, 232 (Ga. 1957). Although the Commission "does not possess legislative powers," it "performs quasi-legislative functions by virtue of the express powers conferred upon it by the General Assembly." *Id.* Like a legislative body, the Commission conducts investigations, gathers evidence, holds hearings, and makes rules. (I:151 at 8.)

Among its duties, the Commission has the exclusive power to determine the rates that investor-owned utilities such as Georgia Power Company may charge its millions of consumers. (*Id.* at 7.) The Commission's decisions in this regard "affect the lives of every Georgian" by determining how much they must pay for such necessary services as gas and electricity. (*Id.*)

The Commission consists of five members. Ga. Const. art. IV, § 1, ¶ I(a). Georgia's Constitution provides that commissioners "shall be elected by the people," *id.*, but commits the "manner" of their election to the General Assembly, *id.* ¶ I(c). The General Assembly, in turn, provided that commissioners "shall be elected state wide" for staggered six-year terms. O.C.G.A. § 46-2-1 (a), (d).

Although Georgia law provides that commissioners are elected at large by all voters in the State, they are "required to be residents of one of five Public Service Commission Districts." O.C.G.A. § 46-2-1(a). These residency districts are also prescribed by statute and embrace whole counties within the State. O.C.G.A. § 46-2-1(c). District 3, which encompasses the Atlanta area, is majority-Black. (I:151 at 6.)

19

While residency districts were first adopted in 1998, the at-large, statewide manner of electing commissioners has been prescribed by state statute since 1906. (*Id.* at 4.) After more than a century of at-large contests, and although Georgia's voting-age population is more than 32 percent Black, only one Black person has ever been elected to the Commission. (*Id.* at 18; II:121-3 at 1.)

## B.    Section 2 of the Voting Rights Act

Section 2 of the Voting Rights Act of 1965 provides that:

> No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color . . . .

52 U.S.C. § 10301(a). Section 2, thus, forbids at-large elections that result in racial vote dilution. *Gingles*, 478 U.S. at 43-51.

To establish a Section 2 violation, a plaintiff must show, "based on the totality of circumstances," that:

> [T]he political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

52 U.S.C. § 10301(b).

20

The "essence" of a Section 2 vote-dilution claim "is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." *Gingles*, 478 U.S. at 47. "[A]t-large voting schemes" are one such practice when they "operate to minimize or cancel out the voting strength of racial minorities in the voting population." *Id.* at 47-48 (cleaned up). "The theoretical basis for this type of impairment is that where minority and majority voters consistently prefer different candidates, the majority, by virtue of its numerical superiority, will regularly defeat the choices of minority voters." *Id.* at 48.

In *Gingles*, the Supreme Court identified three preconditions for a vote-dilution claim under Section 2. "First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district." *Id.* at 50. "Second, the minority group must be able to show that it is politically cohesive." *Id.* at 51. "Third, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it—in the absence of

special circumstances, such as the minority candidate running unopposed—usually to defeat the minority's preferred candidate." *Id.* (cleaned up).

If a plaintiff satisfies these preconditions, Section 2 then requires a court to determine, based on a review of the "totality of circumstances," whether the challenged practice results in unequal electoral opportunity for minority voters. 52 U.S.C. § 10301(b); *see Gingles*, 478 U.S. at 43-44, 79. To answer that question, courts typically examine the list of nine "objective factors" contained in the Senate Report accompanying the 1982 amendments to Section 2. *Gingles*, 478 U.S. at 44-45. These so-called "Senate Factors" are:

1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5.  the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6.  whether political campaigns have been characterized by overt or subtle racial appeals;

7.  the extent to which members of the minority group have been elected to public office in the jurisdiction;

. . .

[8.]  whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group[; and]

[9.]  whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

*Id.* at 36-37.

"[T]here is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other." *Id.* at 45 (cleaned up). That said, the "most important" factors in proving a vote-dilution claim are the extent to which voting is racially polarized (Senate Factor 2) and the extent to which members of the minority group have been elected to public office in the jurisdiction (Senate Factor 7). *Id.* at 48 n.15. And while district courts must perform this totality-of-circumstances analysis, "it will be only the very unusual case in which a plaintiff

23

can establish the existence of the three *Gingles* factors but still have failed to establish a violation of § 2 under the totality of circumstances." *Wright v. Sumter Cnty. Bd. of Elections & Registration*, 979 F.3d 1282, 1304 (11th Cir. 2020) (cleaned up).

### C.    The Plaintiffs' Lawsuit

The Plaintiffs are four Black voters who reside in District 3 and have voted in recent Commission elections. (I:151 at 10.) They filed this lawsuit in July 2020 alleging that the at-large method of electing commissioners unlawfully dilutes the voting strength of Black Georgians, in violation of Section 2. (*Id.* at 1-2.) In support of their allegations under the first *Gingles* precondition, the Plaintiffs attached to their complaint an illustrative plan for replacing the at-large method with elections from five single-member districts. (II:1 at 5; II:1-3 at 1.) That plan included one majority-Black district encompassing the Atlanta area. (*Id.*)

The Plaintiffs sued Brad Raffensperger, in his official capacity as Secretary of State of the State of Georgia, to enjoin future use of the at-large method in Commission elections. (I:151 at 13.) The Secretary is Georgia's chief election official, and his duties include certifying the results of those elections. (*Id.*)

In August 2020, the Secretary moved to dismiss the Plaintiffs' complaint. (I:36 at 8.) He argued, as relevant here, that the Plaintiffs could not establish a feasible remedy under the first *Gingles* precondition because it was "beyond the capacity of federal courts" to alter a State's chosen "form of government" by converting Georgia's at-large method of election to one based on single-member districts. (*Id.* at 33-34.)

After full briefing and oral argument, the district court issued a 47-page ruling in January 2021 denying the Secretary's motion. (*Id.* at 46.) The court found the Secretary's feasibility argument to be premature for several reasons, including because "nothing in the language of Section 2" supported the Secretary's position that States should be treated differently from their political subdivisions. (*Id.* at 41.) To the contrary, the court found, "the statute applies equally to *states* and their political subdivisions." (*Id.* (citing 52 U.S.C. § 10301).) And there was no constitutional problem with applying the statute's plain meaning because binding circuit precedent holds that Section 2 "is a valid expression of congressional enforcement power" under the Fourteenth and Fifteenth Amendments. (*Id.* (citing *United States v. Marengo Cnty. Comm'n*, 731 F.2d 1546, 1557-61 (11th Cir. 1984)).)

25

After the close of discovery, the Secretary moved for summary judgment. (I:97 at 4.) He argued again that the Plaintiffs' proposed remedy was not feasible because it would "require the alteration of the form of government of the State of Georgia," in violation of the United States Constitution's Guaranty Clause and Tenth Amendment. (*Id.* at 17-18 (cleaned up) (citing *Holder v. Hall*, 512 U.S. 874 (1994)).) In response to the Secretary's motion, the United States filed a statement of interest explaining that nothing in the Supreme Court's *Holder* decision precludes the Plaintiffs' proposed remedy, which, unlike that in *Holder*, does not seek to change the size of the governing body. (*Id.* at 19-20.) The Plaintiffs, for their part, opposed the Secretary's motion and separately sought partial summary judgment on the three *Gingles* preconditions and on the Secretary's affirmative defenses. (*Id.* at 3.)

After full briefing and oral argument, the district court issued a 37-page ruling in January 2022 denying the Secretary's motion for summary judgment and granting in part the Plaintiffs' motions. (*Id.* at 36-37.) The court deferred the Secretary's feasibility argument until trial and declined the Secretary's invitation to certify to the Georgia Supreme Court the question whether the phrase "elected by the people" in the Georgia

Constitution requires that Commission elections be statewide. (*Id.* at 16-24.) The court largely granted summary judgment to the Plaintiffs on the three *Gingles* preconditions, finding the essential facts underlying each to be undisputed. (*Id.* at 24-32.) As to the racial bloc voting precondition, for example, the Secretary admitted that voting in recent Commission general elections had been "polarized along racial lines." (*Id.* at 29-30 & n.64.) The extent and causes of racial polarization in those elections, including any "effects of partisanship," would be addressed at trial as part of the totality-of-circumstances analysis. (*Id.* at 32.)

### D.    The Bench Trial

The district court presided over a five-day bench trial from June 27 to July 1, 2022. (I:151 at 2.) At trial, the Plaintiffs called a dozen witnesses, including two experts. (*Id.* at 10-19; *id.* at 21-29.) The Secretary called only his expert. (*Id.* at 19-21.) The court admitted more than 100 exhibits into evidence, but only six were from the Secretary's exhibit list. (I:Docket Sheet at 17.)

The Plaintiffs' first expert, Dr. Stephen Popick, served from 2006 to 2012 as an in-house statistician in the United States Department of Jus-

tice's Voting Rights Section. (I:151 at 13-14.) Dr. Popick performed a racial bloc voting analysis on all general elections for the Public Service Commission from 2012 through 2020 and summarized that analysis in these tables:

**Table 1: Summary of Election Analyses (Black-Preferred Candidate)**

| Election | Black-Preferred Candidate | Race of Candidate | Outcome | Black Support | White Support |
|---|---|---|---|---|---|
| 2021 - District 4 Runoff | Blackman | Black | LOST | 96.08% | 17.62% |
| 2020 - District 4 | Blackman | Black | RUNOFF | 94.33% | 14.83% |
| 2020 - District 1 | Bryant | Black | LOST | 94.46% | 14.47% |
| 2018 - District 5 | Randolph | White | LOST | 96.03% | 14.40% |
| 2018 - District 3 Runoff | Miller | White | LOST | 97.84% | 20.13% |
| 2018 - District 3 | Miller | White | RUNOFF | 96.55% | 14.83% |
| 2016 - District 2 | Hoskins | White | LOST | 79.18% | 14.64% |
| 2014 - District 4 | Blackman | Black | LOST | 81.29% | 24.28% |
| 2014 - District 1 | Monds | Black | LOST | 82.44% | 12.49% |
| 2012 - District 5 | Staples | White | LOST | 80.57% | 15.36% |
| 2012 - District 3 | Oppenheimer | White | LOST | 89.43% | 21.47% |

**Table 2: Summary of Election Analyses (White-Preferred Candidate)**

| Election | White-Preferred Candidate | Race of Candidate | Outcome | Black Support | White Support |
|---|---|---|---|---|---|
| 2021 - District 4 Runoff | McDonald | White | WON | 3.25% | 80.64% |
| 2020 - District 4 | McDonald | White | RUNOFF | 3.57% | 77.47% |
| 2020 - District 1 | Shaw | White | WON | 5.19% | 78.19% |
| 2018 - District 5 | Pridemore | White | WON | 2.82% | 79.69% |
| 2018 - District 3 Runoff | Eaton | White | WON | 1.87% | 78.97% |
| 2018 - District 3 | Eaton | White | RUNOFF | 3.67% | 78.01% |
| 2016 - District 2 | Echols | White | WON | 20.82% | 85.36% |
| 2014 - District 4 | McDonald | White | WON | 18.71% | 75.72% |
| 2014 - District 1 | Everett | White | WON | 17.56% | 87.51% |
| 2012 - District 5 | Wise | White | WON | 19.43% | 84.64% |
| 2012 - District 3 | Eaton | White | WON | 10.57% | 78.53% |

(II:146-8 at 13-14.)

28

As these tables demonstrate, Black voters were highly cohesive in their support for the same candidate in each election, with support ranging from 79.18 percent to 97.84 percent. (I:151 at 14.) In the six most recent PSC elections, Black voters supported the same candidate at a rate greater than 94 percent. (*Id.* at 15.) White voters, on the other hand, were cohesive around a different candidate in each election, with support ranging from 75.72 percent to 87.51 percent. (*Id.* at 14-15.) The result was that the White bloc of voters defeated the Black-preferred candidate in *every* PSC general election since 2012. (*Id.* at 15.) According to Dr. Popick, who had performed hundreds of racial bloc voting analyses on thousands of individual elections in his career, this pattern "is one of the clearest examples of racially polarized voting" he had ever seen. (*Id.* at 14-15 (cleaned up).)

The effect of these "highly polarized" voting patterns combined with the at-large method of election, Dr. Popick explained, was to dilute the votes of Black citizens in Georgia. (II:146-8 at 3.) In fact, Dr. Popick's analysis found that "the candidates preferred by Black voters" in the 2012 and 2018 elections for District 3, which is majority-Black, "would

have won if the election[s] had been held only among the voters in current Commission residency District 3, rather than statewide." (*Id.*)

The Plaintiffs' second expert, Dr. Bernard Fraga, is an associate professor of political science at Emory University and was qualified as an expert in political data analysis. (I:151 at 15.) Among his other opinions, Dr. Fraga testified that the level of racial polarization in PSC elections is "far more stark than partisan identification alone would predict" and that racial polarization in PSC elections increased after 2016 but partisan identification did not. (*Id.* at 38.)

Dr. Fraga also testified that Black candidates are substantially less likely than White candidates to win nonjudicial statewide elections in Georgia. (*Id.* at 18.) Of the 164 statewide elections held in Georgia between 1972 and 2021, including elections for the Public Service Commission, Black candidates won only 4.9 percent of the time. (*Id.*) Because 32.1 percent of Georgia's voting-age population is Black, Dr. Fraga concluded that Black Georgians are significantly underrepresented in statewide, elected offices. (*Id.* at 18-19.) Their underrepresentation on the five-member Public Service Commission is especially glaring, as il-

lustrated by the following trial demonstrative showing the single instance in the Commission's 143-year history in which a Black person has been elected to it:



(Supp. App. 145 at 6.)

The Secretary's expert, Dr. Michael Barber from Brigham Young University, conducted a regression analysis purporting to disentangle the impact of race and partisanship on Georgia elections. (I:151 at 19.) But his analysis, unlike Dr. Popick's, did not examine any PSC elections. (*Id.*) Nor did it, as Dr. Fraga explained in rebuttal, account for the impact that a voter's race or racial attitudes might have on the voter's partisanship, even though Dr. Barber's own scholarship had found that "race is the strongest predictor" of a person's actual partisan affiliation. (*Id.* at 20-21.) Regardless, Dr. Barber conceded that race was a significant factor in

determining vote choice in the non-PSC Georgia elections he did analyze. (*Id.* at 37.) Counsel for the Secretary made a similar concession in closing argument in response to a direct question from the district court:

> THE COURT: Do you concede that racial polarization exists?
>
> [COUNSEL FOR SECRETARY]: We do, Your Honor, yes.

(Supp. App. 143 at 40.)[2]

### E.    The District Court's Opinion

On August 5, 2022, the district court issued a 64-page decision concluding that Georgia's at-large method of electing Public Service Commissioners violates Section 2. (I:151 at 63-64.) The court analyzed each of the nine Senate Factors and found that six of the nine, including the two factors that *Gingles* instructs are "most important," weigh in the Plaintiffs' favor. (*Id.* at 36-54.)

In reaching this conclusion, the district court rejected the Secretary's argument that Section 2 requires a plaintiff to disprove "every possible covariant to ensure that the discriminatory effect is caused solely or

---

[2] Pursuant to Rule 10(e)(2)(A) of the Federal Rules of Appellate Procedure, the parties stipulated to correct the trial transcript to reflect that it was the Secretary's counsel who responded to the district court's question. (Supp. App. 167 at 1.)

even predominantly by race as opposed to some other factor," such as partisanship. (*Id.* at 33.) "The Secretary," the court explained, "cannot point to a single case establishing" such a rule. (*Id.* at 34.) Declining the Secretary's invitation to "impose" that requirement anyway, the court opted instead "to stay within the confines of the *Gingles* preconditions and the Senate Factors" in assessing whether Georgia's at-large method results in vote dilution "on account of race." (*Id.*)

Turning to the evidence, the district court considered but rejected the Secretary's argument that "partisanship better explains" the racially polarized voting in PSC elections that the Secretary had conceded. (*Id.* at 36.) The district court found Dr. Popick's testimony "highly persuasive and compelling evidence of racial polarization in PSC elections." (*Id.* at 15.) The court also found Dr. Fraga's testimony, including his observation that racial polarization existed in PSC general elections even when no Democrat was on the ballot, "highly persuasive and entitled to great weight." (*Id.* at 19; *id.* at 38.)

By contrast, the court found that Dr. Barber's analysis had "limited utility in this case" and that his failure to "consider the impact of race on party affiliation" in his regression analysis was a "crucial omission." (*Id.*

at 20.) Because, as Dr. Fraga explained, "race likely drives political party affiliation, not the other way around," the court found that Dr. Barber had failed to rebut the Plaintiffs' evidence of racial polarization. (*Id.* at 36-37.) In addition, the court noted that Dr. Barber had "conceded that race is a significant factor in determining vote choice." (*Id.* at 37.) Dr. Barber's "own scholarship," the court noted further, "tells us that race is the 'strongest predictor' of partisan identification—even more so than one's political views." (*Id.* (cleaned up).) The court therefore concluded that the Secretary, despite being given a full opportunity to do so, "has not offered any evidence of an alternate explanation for why minority-preferred candidates are less successful." (*Id.* at 39.)

The district court also found that the Plaintiffs had established a feasible remedy. (*Id.* at 56-60.) Citing *Gingles*, the court explained that single-member districting is "a standard remedy for a Section 2 violation caused by at-large elections," and that the Secretary had not shown why the statute should treat States any differently than their political subdivisions. (*Id.* at 57-58.) The court then exercised its discretion not to certify to the Georgia Supreme Court the question whether the State's Constitution requires statewide elections for the PSC. (*Id.* at 58-60.) The court

addressed this issue—and held that the source of Georgia's at-large "manner" of conducting PSC elections was statutory, not constitutional—even though the Secretary did not press it at trial and chose not to brief it in his proposed findings.

Nor did the Secretary's asserted interests in maintaining the at-large elections render the Plaintiffs' proposed remedy infeasible. "The Court expected the Secretary at trial to offer robust evidence" of those interests. (*Id.* at 52.) Instead, he offered only "lay opinions" from the Commission's current chair whose proffered justifications for the at-large method "were not tethered to any objective data" and "lacked foundation entirely." (*Id.* at 52-53.) These justifications, upon "close observation" by the district court, appeared to be "developed in preparation for her testimony and were not preconceived." (*Id.*)

The district court was also unpersuaded by the Secretary's attempt, through counsel's closing argument, to establish a "linkage" interest between the Commission's statewide jurisdiction and its electoral base. (*Id.* at 53-54.) The court explained that the decisions on which the Secretary relied all concerned judicial elections whose application the Eleventh Circuit has not extended "beyond that unique context." (*Id.* at 53.) "Although

35

the PSC's functions are considered both 'quasi-legislative' and 'quasi-judicial,'" the court reasoned, "it is by and large an administrative body with policy-making responsibilities that make it qualitatively different than courts." (*Id.* at 54.)

After rejecting the Secretary's remaining arguments that he does not raise here, the district court, having "followed its mandate under *Gingles* of conducting an 'intensely local appraisal' of the facts,'" concluded that the Plaintiffs had proved racial vote dilution under the "totality of circumstances." (*Id.* at 63.) The court permanently enjoined the Secretary from administering future Commission elections using the at-large method and gave the Georgia General Assembly an opportunity to devise a remedy at its next regular session beginning in January 2023. (*Id.* at 63-64.)

### F.    The Stay Proceedings

On August 8, 2022, the district court entered judgment for the Plaintiffs, and the Secretary filed his notice of appeal. (I:159 at 1.) The same day, the Secretary also filed an emergency motion for a stay pending appeal. In his motion, the Secretary argued that he was likely to suc-

ceed on the merits of his appeal for largely the same reasons he now advances—that the district court erred (1) "in weighing evidence of partisan voter behavior" and (2) by "finding that Plaintiffs' proposed remedy was a remedy it could order." (Mot. Stay 18, 21.) He also argued that the district court "erred by ruling too close to an election to obtain effective appellate review." (Id. at 25 (citing *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006)).)

On August 12, 2022, a divided motions panel of this Court granted a stay solely on *Purcell* grounds. In a 37-page dissent, Judge Rosenbaum—the only panelist who addressed the Secretary's merits arguments—concluded that the Plaintiffs, not the Secretary, "are likely to win on appeal." (Stay Op. 40.) As relevant here, Judge Rosenbaum summarized the evidence of racial versus partisan polarization presented at trial and found that the district court "did not clearly err in concluding that voting in PSC elections is racially polarized." (Id. at 30.)

Nor did the district court, Judge Rosenbaum concluded, permit a remedy that altered Georgia's form of government. (Id. at 29-30.) As she explained:

> The district court didn't, for instance, add a branch of government, or move a power from one branch to another. Nor did it

create a new office or impose new requirements on officehold-
ers. And it didn't change how any of the three branches must
conduct themselves. Instead, the district court enjoined a
state statute and instructed the state legislature to choose a
new manner of selecting PSC Commissioners.

(*Id.*) Relatedly, Judge Rosenbaum found that the district court "did not

abuse its discretion" in declining to certify a question to the Georgia Su-

preme Court because the Secretary "did not preserve this argument" and,

even if he had, the question was not "outcome determinative" in this case.

(*Id.* at 27-28.)

On August 19, 2022, the Supreme Court vacated the motions

panel's stay but gave this Court the opportunity to revisit whether a stay

was appropriate under "the traditional stay factors and a likelihood of

success on the merits." *Rose v. Raffensperger*, No. 22A136, 2022 WL

3568483, at *1 (U.S. Aug. 19, 2022). This Court then ordered the Secre-

tary "to file a supplemental brief addressing whether a stay pending ap-

peal is appropriate under the traditional stay factors in *Nken v. Holder*,

556 U.S. 418 (2009)." (Order for Supp. Briefing (Aug. 19, 2022).) Rather

than attempt again to show a likelihood of success on the merits, the Sec-

retary withdrew his stay motion.

## STANDARD OF REVIEW

This Court's review of a district court's finding of racial vote dilution under Section 2 is "only for clear error." *Wright*, 979 F.3d at 1301; *accord Gingles*, 478 U.S. at 79; *Solomon v. Liberty Cnty. Comm'rs*, 221 F.3d 1218, 1226 (11th Cir. 2000) (en banc). Under this standard, a finding is clearly erroneous only "if the record lacks substantial evidence to support it." *Johnson v. Hamrick*, 296 F.3d 1065, 1074 (11th Cir. 2002) (cleaned up).

This standard does not allow an appellate court to reverse the trier of fact simply because the reviewing court "would have decided the case differently." *Solomon*, 221 F.3d at 1226 (quoting *Anderson v. City of Bessemer City, North Carolina*, 470 U.S. 564, 573 (1985)). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Id.* at 1227 (quoting *Anderson*, 470 U.S. at 574). And unless the court is "compelled to conclude that the district court's findings are not supported by substantial evidence, [it] must affirm." *Hamrick*, 296 F.3d at 1074.

The clearly erroneous standard extends not only to a district court's ultimate finding of vote dilution and subsidiary findings of fact, but also

39

to its findings "regarding the probative value assigned to each piece of evidence." *Solomon*, 221 F.3d at 1227. The court of appeals must also give "due regard" to "the opportunity of the trial court to judge" the "credibility of witnesses." *Id.* at 1226 (quoting Fed. R. Civ. P. 52(a)).

This deferential standard "preserves the benefit of the trial court's particular familiarity with the indigenous political reality" of the state or local government under review. *Gingles*, 478 U.S. at 79. "Deference is afforded the district court's findings due to its special vantage point and ability to conduct an intensely local appraisal of the design and impact of a voting system." *Hamrick*, 296 F.3d at 1074 (quoting *Negrón v. City of Miami Beach*, 113 F.3d 1563, 1565 (11th Cir. 1997)); *accord Solomon*, 221 F.3d at 1226.

Accordingly, when "the district court's understanding of the law is correct," when "the record indicates that the court 'engaged in a searching and meaningful evaluation of all the relevant evidence,'" and when "there is 'ample evidence in the record to support the [district] court's conclusions, [this Court's] review is at an end." *Solomon*, 221 F.3d at 1228 (cleaned up) (quoting *SCLC v. Sessions*, 56 F.3d 1281, 1293 (11th Cir. 1995) (en banc)).

40

## SUMMARY OF ARGUMENT

After a five-day bench trial, the district court issued a well-rea-soned, 64-page decision finding that the at-large method of electing Pub-lic Service Commissioners unlawfully dilutes the votes of Black people in Georgia. In reaching that conclusion, the district court admitted more than 100 exhibits into evidence, carefully observed testimony from more than a dozen witnesses (including three experts), and made credibility determinations that were within its exclusive purview to make. This Court should affirm.

**I.** The district court properly applied settled law to evaluate the Plaintiffs' vote-dilution claim, and substantial evidence supports the dis-trict court's ultimate finding of racial vote dilution.

**A.** To determine whether the Plaintiffs had shown vote dilution "on account of race," 52 U.S.C. § 10301(a), the district court required them to establish the rigorous *Gingles* preconditions and offer sufficient evidence of the Senate Factors for the court to conclude, under the totality of cir-cumstances, that Georgia's at-large elections for the Public Service Com-mission violate Section 2. That is precisely what binding precedent de-manded of the district court.

41

Dissatisfied with settled law, the Secretary invited the district court to raise the bar on the Plaintiffs and require that they also *disprove* any and all assertedly nonracial explanations for voting patterns in Georgia. That is not the law. Neither the text of the statute nor the controlling case law interpreting it has ever levied such a requirement on Section 2 plaintiffs. "The Secretary," explained the district court, "cannot point to a single case establishing that, even if [the *Gingles* preconditions and Senate Factors] are satisfied, a plaintiff must still prove that race independent of partisanship explains the discriminatory effect." (I:151 at 34.) The district court properly declined the Secretary's invitation to be the first, opting instead "to stay within the confines of the *Gingles* preconditions and the Senate Factors." (*Id.*)

**B.** The evidence at trial supporting the district court's ultimate finding of vote dilution "on account of race" was not just substantial. It was overwhelming. The Secretary conceded (multiple times) that voting in PSC elections is racially polarized. As this Court held in *Marengo County Commission*—a controlling case on several key issues that is conspicuously absent from the Secretary's brief—racially polarized voting is

42

"[t]he surest indication of race-conscious politics" and "the keystone of a dilution case." 731 F.2d at 1566-67.

The district court also relied on substantial testimony from the Plaintiffs' experts to support its finding of racial vote dilution. The experts testified that voting in recent PSC elections was highly racially polarized, even when there was no Democrat on the ballot, and that such polarization was higher than party affiliation alone would predict. In fact, it was higher than the "severe and persistent" racial polarization that existed in *Gingles*. 478 U.S. at 41. The district court did not clearly err in crediting the Plaintiffs' experts over the Secretary's, whose analysis did not even examine PSC elections and whose own research found that race, not political views, is the "strongest predictor" of one's partisan identification. That the Secretary disagrees with the court's factual findings and credibility determinations is no basis for reversal.

**II.** Substantial evidence likewise supports the district court's finding that single-member districts are a feasible remedy for the racial vote dilution caused by Georgia's at-large elections for the Public Service Commission.

**A.** The text of Section 2 expressly covers voting practices "applied by any State," 52 U.S.C. § 10301(a), and single-member districts are the standard remedy for vote dilution caused by at-large elections, *see Chapman v. Meier*, 420 U.S. 1, 21 (1975). The district court found no reason to conclude that the standard remedy is infeasible in this case, and there is ample evidence in the record supporting that decision. The evidence includes testimony from one of the Secretary's chief employees that imposing single-member districts for Public Service Commission elections would be feasible, as well as testimony from two of the commissioners that their day-to-day work would not change if they were elected by district instead of statewide.

By contrast, the Secretary's only evidence of a State interest in maintaining the at-large scheme was the "lay opinion[]" of the commission's chair. (I:151 at 52.) The district court did not clearly err in discounting her testimony, which, upon "close observation," the court found to be untethered to data and lacking foundation. (*Id.* at 52-53.) That finding controls here because credibility determinations are within the "exclusive province" of the district court to make. *Childrey v. Bennett*, 997 F.2d 830, 834 (11th Cir. 1993).

**B.** Nor did the district court clearly err in rejecting the Secretary's claim that the Plaintiffs' proposed remedy would alter Georgia's chosen form of government. The principal cases on which the Secretary relies all concern judicial elections. This Court has never extended those cases outside that unique context, and it should not do so here for the first time in a case involving an administrative body that functions just like a county commission. Even if this Court did, the Plaintiffs' proposed remedy of single-member districts would not alter Georgia's chosen form of government. Districts would not, for instance, change the Commission's size or the territory over which it governs.

Contrary to the Secretary's assertions, single-member districts are the default benchmark in Section 2 cases concerning at-large elections, *see, e.g.*, *Holder*, 512 U.S. at 888 (O'Connor, J., concurring), and the Plaintiffs have offered several illustrative five-district plans, unchallenged by the Secretary, with which vote dilution can be measured. Finally, the district court did not abuse its discretion in declining to certify to the Georgia Supreme Court a straightforward question of law that the Secretary abandoned below, that the court correctly answered, and that, in any event, would have made no difference to the outcome of this case.

## ARGUMENT

The main question on appeal is whether findings of fact made by the district court after a full merits trial are clearly erroneous. They are not. The record contains ample evidence—much of it undisputed—to support the district court's findings and its ultimate conclusion, based on settled principles of law, that the at-large method of electing Georgia's Public Service Commissioners violates Section 2 of the Voting Rights Act.

## I.   The district court's finding of racial vote dilution is not clearly erroneous.

The Secretary's primary argument is that the Plaintiffs failed to prove vote dilution "on account of race." (Appellant's Br. 37-60.) His argument has two parts. He asserts first that controlling law required the Plaintiffs—as a further precondition to liability under Section 2—to disprove his contention that party, rather than race, better explains voting patterns in PSC elections. (*Id.* at 54-56.) The Secretary's second claim is that the evidence he offered at trial conclusively establishes that voting in PSC elections is not polarized along racial lines but is polarized along party lines instead. (*Id.* at 56-60.) Both claims are meritless.

### A.    The district court correctly applied settled law.

Any determination of what Section 2 means "must begin, and often should end as well, with the language of the statute itself." *United States v. Steele*, 147 F.3d 1316, 1318 (11th Cir. 1998) (en banc) (cleaned up). As the district court correctly observed (I:151 at 33), the text of Section 2 does not require minority plaintiffs to establish that their voting rights have been abridged "solely" on account of race or even "mostly" on account of race. *See* 52 U.S.C. § 10301(a). Rather, Section 2 prohibits all voting practices that—without further qualification—result in the abridgement of the right to vote "on account of race." *Id.* A plaintiff therefore need only show that race is *a* factor in vote dilution, not the only factor or the dominant factor. *Cf.* S. Rep. No. 97-417, at 27 n.109, *reprinted in* 1982 U.S.C.C.A.N. 177 (explaining that "on account of race" is intended to mean "with respect to race").

A plaintiff does so—and therefore establishes an inference of vote dilution "on account of race"—by proving the *Gingles* preconditions. *See Gingles*, 478 U.S. at 48-51 (describing the purpose of the preconditions); *Marengo Cnty. Comm'n*, 731 F.2d at 1567 (satisfying the second and third *Gingles* preconditions is the "surest indication of race-conscious politics");

47

*see also Sanchez v. Colorado*, 97 F.3d 1303, 1310 (10th Cir. 1996) (establishment of the three *Gingles* preconditions "creates the inference [that] the challenged practice is discriminatory"). As one of the cases on which the Secretary relies makes clear (Appellant's Br. 46), the "strong" inference of racial vote dilution created by satisfying the *Gingles* preconditions "will endure *unless and until* the defendant adduces credible evidence tending to prove that detected voting patterns can most logically be explained by factors unconnected to the intersection of race with the electoral system." *Uno v. City of Holyoke*, 72 F.3d 973, 983 (1st Cir. 1995).

Unhappy with settled law, the Secretary distorts it in a couple of ways. He claims, for example, that the district court's definition of "racially polarized voting" was "rejected" by a majority in *Gingles*. (Appellant's Br. 32, 40-41.) He is wrong. The definition the district court—and the Plaintiffs—used comes straight from the majority opinion in *Gingles*. (I:151 at 14 n.43 (citing *Gingles*, 478 U.S. at 54 n.21, which defines "racial bloc" or "racially polarized" voting as a situation "where black voters and white voters vote differently" (cleaned up)).)

The Secretary then tries to stitch together two concurring opinions in *Gingles* as establishing that Section 2 plaintiffs must disprove all supposedly nonracial causes of voting patterns. But neither Justice O'Connor, writing for three other Justices, nor Justice White, writing only for himself, took that position. They merely rejected the portion of Justice Brennan's opinion suggesting that causation evidence is always irrelevant, and they noted that Justice Brennan's view on that point "is not necessary to the disposition of this case." *Gingles*, 478 U.S. at 101 (O'Connor, J., concurring); *see also id.* at 83 (White, J., concurring). Tellingly, the Secretary cites no case that has ever found, buried in the *Gingles* concurrences, a requirement that a plaintiff disprove any and all assertedly nonracial explanations for voting patterns. As the district court correctly noted, "The Secretary cannot point to a single case establishing that, even if [the *Gingles* preconditions and Senate Factors] are satisfied, a plaintiff must still prove that race independent of partisanship explains the discriminatory effect." (I:151 at 34.)

Unable to cite any precedent for his proposed rule, controlling or otherwise, the Secretary resorts to hyperbole. (Appellant's Br. 43-45.)

49

Among his asserted parade of horribles, the Secretary claims that "if divergent voting patterns between black and non-black voters are sufficient to show 'racial bloc voting,' black voters will almost always be able to 'prove' a § 2 violation in Republican strongholds because black voters overwhelmingly vote against Republicans." (*Id.* at 45.) This assertion, however, misstates what plaintiffs must prove under the second and third *Gingles* preconditions (i.e., racial bloc voting *sufficient* usually to defeat the minority's preferred candidate) and ignores the first precondition entirely.

The Secretary also claims that decisions from the Fifth and First Circuits support his proposed rule (*id.* at 45-46), but he overstates the holdings of those cases. In *League of United Latin American Citizens v. Clements*, 999 F.2d 831 (5th Cir. 1993) (en banc) *("LULAC")*, the Fifth Circuit held only that the district court erred when it "excluded evidence" of the nonracial causes of voting preferences offered by the defendants at trial. *Id.* at 850-51. It did not purport to impose a rule requiring a plaintiff to disprove nonracial explanations for voting patterns, and that is evident in later decisions of the Fifth Circuit applying the standards in *Gingles*. *See, e.g.*, *Harding v. Cnty. of Dall., Tex.*, 948 F.3d 302, 308 (5th Cir. 2020).

50

The First Circuit's decision in *Uno* likewise stands only for the unremarkable proposition that a defendant may offer causation evidence for a court to consider in its totality-of-circumstances analysis. *See* 72 F.3d at 980. That is well-settled law in this Circuit and in others. *See, e.g.*, *Solomon*, 221 F.3d at 1225 (suggesting that evidence of non-racial causes is to be considered at the totality-of-circumstances stage); *accord Clerveaux v. E. Ramapo Cent. Sch. Dist.*, 984 F.3d 213, 230-32 (2d Cir. 2021); *Lewis v. Alamance Cnty., N.C.*, 99 F.3d 600, 615 n.12 (4th Cir. 1996); *Milwaukee Branch of the NAACP v. Thompson*, 116 F.3d 1194, 1199 (7th Cir. 1997). Thus, while *Uno* and *LULAC* mean that courts in the First and Fifth Circuits should consider a defendant's causation evidence—which is precisely what the district court did here—those cases do not require the Plaintiffs to disprove the Secretary's contention that party, rather than race, better explains voting patterns.

In fact, the court in *Uno* expressly rejected the very argument the Secretary advances here: "we emphasize that establishing vote dilution does not require the plaintiffs affirmatively to disprove every other possible explanation for racially polarized voting." *Uno*, 72 F.3d at 983. So did another case on which the Secretary relies. (Appellant's Br. 46 n.1.)

51

In *Goosby v. Town Board of Town of Hempstead, New York*, 180 F.3d 476, 495 (2d Cir. 1999), the defendant's "principal and pervasive argument" was, as it is here, "that political partisanship, rather than race, accounts for the defeat of black candidates." But that argument, the court explained, "represents a fundamental misunderstanding" of what Section 2 plaintiffs must plead and prove in a vote-dilution case. *Id.* What matters instead is "that the at-large system of voting made it impossible for blacks to elect their *preferred candidates*." *Id.* The same is true here.

In the end, the Secretary's criticisms of the district court's legal analysis amount to nothing more than his disagreement with binding precedent. As much as the Secretary and his amicus might prefer that *Gingles* be overruled (*see* Amicus Br. 14-18), or that Congress delete Section 2's results test and revert to one based on intent (Appellant's Br. 48),[3] neither is the business of this Court. *Gingles* remains good law

---

[3] The Secretary devotes a subsection of his brief to an argument that Section 2 would be an unconstitutional exercise of congressional authority if it were interpreted to prohibit purely partisan vote dilution. (Appellant's Br. 48-50.) But neither the Plaintiffs nor the district court interpret Section 2 in that way, so this argument is a straw man. In addition, the Secretary never raised this defense in his answer or in a motion to dismiss, so it is waived. *See Am. Nat'l Bank of Jacksonville v. FDIC*, 710 F.2d 1528, 1537 (11th Cir. 1983) ("[A]n affirmative defense that is not asserted

and establishes a stiff test for any Section 2 plaintiff to overcome. That the Secretary is dissatisfied with settled law is no basis to fault the district court for faithfully adhering to it.

## B. Substantial evidence supports the district court's finding of racial vote dilution.

To determine whether at-large elections for the Public Service Commission dilute Black voting strength "on account of race," the district court scrupulously applied the *Gingles* preconditions and the Senate Factors. (I:151 at 34 (citing *Gingles*, 478 U.S. at 48-51 (describing the purpose of the preconditions); *Solomon v. Liberty Cnty., Fla.*, 899 F.2d 1012, 1013-16 (en banc) (Kravitch, J., concurring)).) In doing so, it followed precedent and correctly gave greatest weight to Senate Factor 2 (racially polarized voting) and Senate Factor 7 (election of minorities in the jurisdiction). (*Id.* at 36 (citing *Gingles*, 478 U.S. at 48 n.15; *City of Carrollton Branch of the NAACP v. Stallings*, 829 F.2d 1547, 1555 (11th Cir. 1987)).) The district court then gave the Secretary every opportunity to rebut the

---

in a responsive pleading is generally deemed waived." (cleaned up)). In any event, this Court has already held that Section 2 is a constitutional exercise of Congress's enforcement authority that precludes a congruence-and-proportionality defense. *See, e.g., Johnson v. Hamrick*, 296 F.3d at 1081 n.5.; *Johnson v. Hamrick*, 196 F.3d 1216, 1219 n.3 (11th Cir. 1999); *Marengo Cnty. Comm'n*, 731 F.2d at 1556-63.

Plaintiffs' showing of racial polarization with evidence of nonracial explanations for electoral outcomes, and it simply found that the Secretary's evidence was lacking. (*Id.* at 39.)

Substantial evidence supports those findings. To start, the Secretary conceded that voting in PSC elections is polarized along racial lines. He admitted racial polarization at summary judgment. (I:97 at 29-30 & n.64.) He stipulated to racial polarization in the pretrial order. (II:121-3 at 4.) He conceded racial polarization during closing argument in response to a direct question from the district court. (Supp. App. 143 at 40.) And he conceded racial polarization in his motion for a stay of the district court's judgment. (Mot. Stay 21.)

The Secretary likewise conceded the facts underlying each of the three *Gingles* preconditions. He admitted at summary judgment that (1) Black voters in Georgia "are sufficiently numerous and geographically compact to form a majority in at least one single-member district in a five-district plan for the election of Commission members"; (2) "Black voters have been politically cohesive in general elections for members of the Commission since 2012"; and (3) "Candidates preferred by Black voters in those elections were [] not supported by the majority of white voters

and [were] defeated." (I:97 at 25, 27, 29.) These concessions alone are, as the Secretary acknowledges, the "lion's share" of the racial vote-dilution inquiry. (Appellant's Br. 45.) Indeed, "it will be only the very unusual case in which a plaintiff can establish the existence of the three *Gingles* factors but still have failed to establish a violation of § 2 under the totality of circumstances." *Wright*, 979 F.3d at 1304 (cleaned up).

Although the Secretary ignores these concessions in his opening brief, they are of great consequence. As this Court has explained, a pattern of racially polarized voting is "[t]he surest indication of race-conscious politics" and "the keystone of a dilution case." *Marengo Cnty. Comm'n*, 731 F.2d at 1566-67; *accord Wright*, 979 F.3d at 1305. The Secretary may not now argue that voting in PSC elections is *not* racially polarized. *See Christian Legal Soc'y Chapter of Univ. of Cal., Hastings Coll. of the L. v. Martinez*, 561 U.S. 661, 676-77 (2010) (factual stipulations are binding and conclusive); *Best Canvas Prods. & Supplies, Inc. v. Ploof Truck Lines, Inc.*, 713 F.2d 618, 621 (11th Cir. 1983) (a litigant is "bound by the admissions in his pleadings"). Under binding precedent, the Secretary's concessions alone support an inference of race-conscious politics.

But the district court did not depend only on the Secretary's concessions. The court also relied on the testimony of the Plaintiffs' experts. The court found the testimony of the Plaintiffs' statistician, Dr. Popick, to be "highly persuasive and compelling evidence of racial polarization in PSC elections." (I:151 at 15.) Dr. Popick analyzed all PSC elections since 2012 and found racially polarized voting in each one. (*Id.* at 14.) Black voters voted as a bloc at rates ranging from 79.18 percent to 97.84 percent, and White voters voted as a bloc at rates ranging from 75.72 percent to 87.51 percent. (*Id.* at 14-15.) And, despite strong cohesion, the Black-preferred candidate lost in *every* election. (*Id.* at 15.) According to Dr. Popick, who had performed hundreds of racial bloc voting analyses on thousands of individual elections in his career, this pattern "is one of the clearest examples of racially polarized voting" he had ever seen. (*Id.* at 14-15 (cleaned up).) The district court did not clearly err in crediting his testimony.

The district court also relied on the Plaintiffs' political scientist, Dr. Fraga, whose testimony it found to be "highly persuasive and entitled to great weight." (*Id.* at 19.) Dr. Fraga agreed with Dr. Popick that voting

in PSC elections is racially polarized, noting that the level of racial polarization in PSC elections is "far more stark than partisan identification alone would predict." (*Id. at 38*.) Dr. Fraga also observed that racial polarization in PSC elections increased after 2016 but partisan identification did not. (*Id.*) This evidence, as Judge Rosenbaum explained, is "fatal" to the Secretary's argument because "if he were right that any apparent racially polarized voting is just a proxy for partisan polarization, we'd expect to see the two metrics vary together." (Stay Op. 31 (Rosenbaum, J., dissenting).)

So too is the evidence, supported by Dr. Fraga's testimony, that racial polarization persisted in PSC elections even when no Democrat was on the ballot. (I:151 at 38.) The Secretary admits that a situation where "the non-black majority consistently votes against the black minority's preferred candidate" regardless of party "would be strong evidence of racial bloc voting." (Appellant's Br. 52.) That is exactly the situation here. White Georgians voted as a bloc to defeat the Black-preferred candidate in every PSC election since 2012, whether the Black-preferred candidate was a Democrat or not. What's more, White bloc voting was strongest in the 2014 election for District 1 where the Black-preferred candidate was

a Black Libertarian. In that same election cycle, the contest featuring a Black Libertarian for District 1 showed a *higher* degree of bloc voting among Black voters than the contest for District 4 featuring a Black Democrat. (I:151 at 38.) Similarly, there was a *higher* degree of Black support for the White-preferred candidate in the 2014 contest featuring the Democrat than in the one with no Democrat on the ballot. (Supp. App. 142 at 62.) Partisanship alone cannot explain this evidence.[4]

By contrast, the district court found the testimony of the Secretary's political scientist, Dr. Barber, to be "of limited utility in this case" for several reasons. (I:151 at 20.) First, the district court found that Dr. Barber "did not examine PSC elections at all and could not speak to the effect of

---

[4] The Secretary contends that "there is no discernable difference in majority support for black versus white candidates" in recent PSC elections and argues that this is "critical" evidence undermining the Plaintiffs' claim of racial vote dilution. (Appellant's Br. 57.) If this evidence were so "critical," however, the Secretary would have raised it below. He did not, and the record citation he provides does not reflect that he did. Nor did the district court make any such finding. Regardless, the Secretary tells only half the story because *none* of the White-preferred candidates in these elections were Black. They were all White. That distinguishes this case from others in which "white voters, *both Democrat and Republican*, supported minority candidates elected by their parties at levels equal to or greater than those of white candidates." *Goosby*, 180 F.3d at 496 (emphasis added) (citing *LULAC*, 999 F.2d at 861).

race or partisanship in those contests." (*Id.* at 19.) His regression analysis examined only non-PSC elections. That failure matters because "exogenous elections—those not involving the particular office at issue—are less probative than elections involving the specific office that is the subject of the litigation." *Goosby*, 180 F.3d at 497 (cleaned up); *accord Stallings*, 829 F.2d at 1560.

Second, the court found that Dr. Barber "did not consider the impact of race on party affiliation," and that his failure to do so was a "crucial omission" that undermined his analysis. (I:151 at 20.) This failure was problematic because, as Dr. Fraga explained in rebuttal, "race likely drives political party affiliation, not the other way around." (*Id.* at 36-37.) In other words, the causal relationship between the two variables, race and party, is a one-way street.

The Secretary nonetheless trumpets Dr. Barber's analysis as purportedly finding that "partisanship was *nine times* more predictive of a person's vote than race." (Appellant's Br. 59.) But the Secretary ignores Dr. Fraga's well-founded criticism that Dr. Barber's results are overstated. If one accepts that race often determines party (not the other way

around), and that party determines vote choice, Dr. Barber's results include the effects of race in his analysis purporting to isolate the effects of party affiliation only. (Supp. App. 142 at 141.) This problem, known in political science as "mediation," biases Dr. Barber's results "towards finding that race has a smaller effect" on vote choice than it actually does. (*Id.* at 147.) According to Dr. Fraga, mediation makes Dr. Barber's analysis "deeply flawed" and "fundamentally incapable of demonstrating a lack of racial polarization based on the extent of partisan polarization." (*Id.* at 148; Supp. App. 146-6 at 9.) The district court did not clearly err in crediting Dr. Fraga over Dr. Barber.

Third, Dr. Barber conceded that race is a "significant factor" in determining vote choice in the non-PSC elections he did analyze. (I:151 at 37.) His concession is consistent with his own scholarship concluding that race is the "strongest predictor" of partisan identification—even more so than one's political views. (*Id.*) Dr. Barber also admitted that voting in recent PSC general elections was racially polarized under the *Gingles* standard even when there was no Democrat on the ballot. (Supp. App. 142 at 64.) The district court properly held the Secretary to his expert's concessions.

The record contains ample other evidence, even if not expressly mentioned by the district court, that even the Secretary agrees supports a finding of racially polarized voting. The Secretary admits, for example, that "patterns of voting show[ing] that the majority gives substantially less support to minority *candidates*" is "evidence of racial, as opposed to partisan, voting." (Appellant's Br. 52.) But he ignores the evidence of that very sort in the record. Plaintiff Richard Rose testified that there were at least eleven Black candidates who ran opposed in Georgia's Republican primaries in 2022, but the only Black candidate who won was Herschel Walker, a celebrity and Georgia football legend. (Supp. App. 142 at 119-124.)

All of this evidence refutes the Secretary's assertion that the Plaintiffs "did not even try" to establish that race explains voting patterns in PSC elections. (Appellant's Br. 36.) The Plaintiffs did that in spades. They even presented evidence—which the district court credited—that the racial polarization in recent PSC elections is *greater* than the "severe and persistent" racially polarized voting found to exist in *Gingles*. (I:151 at 37; *Gingles*, 478 U.S. at 41.) Reviewing the entire record, the district

court properly concluded that the "Plaintiffs have proven . . . racial polarization in PSC elections" and found that the Secretary had failed to establish "an alternative explanation for why minority-preferred candidates are less successful." (I:151 at 39.) Those factual findings have substantial support in the record and are not clearly erroneous.

The same is true for several other factors the district relied on in finding racial vote dilution. Although the Secretary quibbles with some of these factual findings (Appellant's Br. 71-74), he fails to show that any are clearly erroneous. Importantly, he does not dispute the district court's finding in the Plaintiffs' favor on Senate Factor 5 (effects of discrimination), and he hardly disputes that the Plaintiffs proved Senate Factor 7 (election of minorities in the jurisdiction). Nor could he. The dearth of Black candidates elected statewide in Georgia is undeniable, and the particular lack of success they have had in PSC elections is stunning. (I:151 at 39-41.) As Senate Factor 7 is one of the two "most important" factors to consider in the totality-of-circumstances analysis, *Gingles*, 478 U.S. at 48 n.15, it alone strongly supports affirmance. Substantial evidence, moreover, justifies the district court's findings on Senate Factor 1 (history of racial discrimination), which the Secretary conceded below

62

(II:121-3 at 4), and Senate Factor 3 (voting practices that enhance discrimination), for which the court relied on Dr. Fraga's "persuasive[]" expert testimony (I:151 at 41-44.).[5]

These factual findings, together with the district court's findings on the *Gingles* preconditions and racial polarization in PSC elections, provide ample support for its ultimate finding of racial vote dilution. Indeed, they establish that "dilution must be found." *Marengo Cnty. Comm'n*, 731 F.2d at 1574.

## II. The district court's finding of a feasible remedy is not clearly erroneous.

The district court required the Plaintiffs to prove that their proposed remedy—replacing Georgia's at-large method of electing Public Service Commissioners with single-member districts—is "feasible." (I:97 at 9 (citing *Davis v. Chiles*, 139 F.3d 1414, 1419-20, 1423 (11th Cir.

---

[5] Although the district court found that three of the nine Senate Factors did not weigh in the Plaintiffs' favor, it did not find that any "weigh strongly against" them. *Marengo Cnty. Comm'n*, 731 F.2d at 1574. And two of these factors, Senate Factor 6 (racial appeals) and Senate Factor 8 (unresponsiveness), are of limited importance. *See id.* at 1571 (explaining that the "absence" of racial appeals "should not weigh heavily against a plaintiff proceeding under the results test of section 2"); *id.* at 1572 ("Unresponsiveness is considerably less important under the results test.").

1998)).) The court did not clearly err in finding that the Plaintiffs had done so.

### A. Substantial evidence supports the district court's finding that single-member districts would be a feasible remedy.

Applying settled law, the district court concluded that "[s]ingle-member districting is a standard remedy for a Section 2 violation caused by at-large elections." (I:151 at 57 (citing *Gingles*, 478 U.S. at 50 & n.17); *see also* Appellant's Br. 68 (conceding that "single-member districts are a common remedy" for at-large election schemes).) Indeed, single-member districts are the *required* remedy in such a scenario unless the court "can articulate such a singular combination of unique factors" justifying a different result. (I:151 at 57 (quoting *Chapman*, 420 U.S. at 21 (cleaned up)).) *Accord Wise v. Lipscomb*, 437 U.S. 535, 540-41 (1978); *East Carroll Par. Sch. Bd. v. Marshall*, 424 U.S. 636, 639 (1976) (per curiam).

Substantial evidence supports the district court's finding that the standard remedy is feasible in this case. Michael Barnes, the long-time director of the Secretary's Center for Election Systems, testified that single-member districts for the Public Service Commission would be feasible

and easy for the State to implement. (Supp. App. 141 at 14-15.) Two commissioners, including the longest-serving member, testified that moving to single-member districts would not meaningfully change their day-to-day work. (I:151 at 25-26.) And the Commission's chair was unable to identify a single rule governing the Commission's activities that could not be implemented if elections were held by district. (Supp. App. 157 at 98-99.) Consistent with these admissions, counsel for the Secretary "conceded that there is nothing facially problematic with the proposed map [of single-member districts] submitted by Plaintiffs and that it's exactly the kind of evidence that you could put forward to show the feasibility of a remedy." (I:151 at 57-58 (cleaned up).)

The district court was also well within its discretion to discount the Secretary's asserted interests in maintaining the at-large system. The Secretary offered no expert testimony and could point to no "policy statement" or "legislative history" that "might have articulated an explanation for why this particular electoral mechanism makes sense for Georgia." (*Id.* at 52.) In fact, Mr. Barnes agreed that his office "has no particular interest in whether Public Service Commissioners are elected statewide or by district," and that he had "[n]ever seen an official statement from

the Secretary of State's Office or any other part of state government articulating a special interest in maintaining the at-large statewide method of electing members of the Public Service Commission." (Supp. App. 141 at 15.)

The only evidence of a State interest the Secretary offered at trial was the "lay opinion[]" of the Commission's current chair. (I:151 at 52.) She speculated, for example, that commissioners in a districted system might fight over where power plants should be located or advocate different utility rates for different districts. (*Id.*) But the district court found her lay testimony on these points "unpersuasive." (*Id.*) It did so "not because the Court questions her sincere beliefs, but because they were not tethered to any objective data and they lacked foundation entirely." (*Id.* at 52-53.) Based on the court's "close observation" of the chair's trial testimony, it found "that the justifications she gave for the PSC's electoral structure were developed in preparation for her testimony and were not preconceived." (*Id.* at 53.)

These credibility determinations were within the "exclusive province" of the district court to make. *Childrey*, 997 F.2d at 834. They were also supported by substantial evidence, including the fact that five other

states currently elect their utility regulators by district. *See* La. Const. art. IV, § 21; La. Rev. Stat. §§ 45:1161.1, 45:1161.5; Miss. Code Ann. § 77-1-1; Mont. Code Ann. § 69-1-104; Neb. Const. art. IV, § 20; Neb. Rev. Stat. Ann. § 75-101.01; N.M. Const. art. XI, § 1(A). The chair, who testified that she was heavily involved in the national association of utility commissioners, could not identify any significant regulatory problems in the states that elect their commissioners by district. (Supp. App. 157 at 82-83, 94-95, 98-100.) The district court committed no clear error.

### B. Single-member districts would not impermissibly alter Georgia's form of government.

Notwithstanding the district court's well-supported factual findings and credibility determinations on the feasibility of single-member districts, the Secretary claims the district court nonetheless erred by allowing a remedy that "would impermissibly alter Georgia's form of government." (Appellant's Br. 60.) But none of the Secretary's arguments is persuasive.

First, the Secretary suggests that Georgia's "sovereign characteristics" somehow exempt it from Section 2. (Appellant's Br. 62-64.) As the district court explained throughout this litigation, however, the statute expressly applies to voting practices imposed "by any State." (I:36 at 20-

67

21 (citing 52 U.S.C. § 10301(a)).) That it does so poses no constitutional problems, according to settled law, under either the Guaranty Clause or the Tenth Amendment. *See City of Rome v. United States*, 446 U.S. 156, 183 n.17 (1980) (Guaranty Clause), *abrogated on other grounds as stated in Nw. Austin Mun. Util. Dist. No. 1 v. Holder*, 557 U.S. 193, 209-11 (2009); *Marengo Cnty. Comm'n*, 731 F.2d at 1560-61 (Tenth Amendment). The district court did not err in following that binding precedent.

Second, the cases on which the Secretary principally relies all concern judicial elections. (*See* Appellant's Br. 60-64 (citing *Davis*, 139 F.3d at 1420-21; *SCLC*, 56 F.3d at 1294; and *Nipper v. Smith*, 39 F.3d 1494, 1532, 1541-44 (11th Cir. 1994) (en banc)).) In those cases, this Court placed "insurmountable weight on a state's interest in preserving its constitution's judicial selection system and in maintaining linkage between its judges' jurisdictions and electoral bases." *Davis*, 139 F.3d at 1423. Importantly, however, this Court has confined this special treatment under Section 2 to judicial elections only. *Id.* at 1423-24; *see also Wright*, 979 F.3d at 1296-97 (affirming district court's finding of racial vote dilution under Section 2 even though the government's asserted interest in at-large elections was not tenuous).

This Court has never extended its special treatment beyond that unique context, and it should not do so for the first time here. For one, the Secretary offered no evidence at trial of any supposed "linkage" interest between the commissioners' jurisdiction and their electoral base. (I:151 at 53.) His counsel raised it only in closing arguments. (*Id.*) For another, the Public Service Commission is a quasi-legislative, quasi-judicial "administrative body." *Tamiami Trail Tours*, 99 S.E.2d at 232. It "performs quasi-legislative functions," *id.*, including conducting investigations, gathering evidence, holding hearings, and making rules. (I:151 at 8.) These functions, the district court reasonably found, make the Commission "qualitatively different than courts" and weakens whatever linkage interest might exist. (*Id.* at 54.) The Commission is far more like a county commission that makes zoning decisions and for which single-member districts would indisputably be a permissible remedy for at-large elections. (Appellant's Br. 68.) The quasi-judicial nature of those decisions does not make judges out of county commissioners. Nor does it here.

Third, even if this Court were to extend its judicial-elections cases to this one, the district court's ruling does not "force" on Georgia "a new

model of government." (Appellant's Br. 60 (cleaned up).) As Judge Rosenbaum explained, the decision below did not "add a branch of government," "move a power from one branch to another," "create a new office or impose new requirements on officeholders," or "change how any of the three branches must conduct themselves." (Stay Op. 29-30 (Rosenbaum, J., dissenting).) Furthermore, moving to single-member districts would not alter the Commission's jurisdiction or change the territory over which it governs. Each commissioner would still vote as one member of the Commission to make decisions on issues affecting the entire State. And as explained above, the evidence at trial was that switching to single-member districts would not even affect the commissioners' day-to-day work. (I:151 at 25-26.) The district court's ruling in no way abolishes Georgia's form of government.

Fourth, the Supreme Court's decision in *Holder v. Hall* does not preclude the Plaintiffs' proposed remedy. In *Holder*, the plaintiffs brought a Section 2 vote-dilution claim against a single-member county commission. The Supreme Court did not reject their Section 2 claim on the merits but instead held that plaintiffs "cannot maintain a § 2 challenge to the *size* of a government body." 512 U.S. at 885 (emphasis added).

Here, by contrast, the Plaintiffs do not challenge the size of Georgia's Public Service Commission, and nothing in the district court's decision alters it. The Plaintiffs have offered several illustrative plans within the context of a five-member Commission, including a plan using the five residency districts the State was using when the Plaintiffs filed this lawsuit. (II:146-8 at 8; *id.* at 17-22.) The Secretary has not challenged those plans, which demonstrate that the federal courts need not alter the Commission's size to remedy the racial vote dilution the Plaintiffs proved at trial.

Contrary to the Secretary's assertion (Appellant's Br. 18), single-member districts are a "reasonable benchmark" by which to evaluate the challenged voting practice here. *Holder*, 512 U.S. at 881. Indeed, they are the default benchmark. "In a challenge to a multimember at-large system," such as this one, "a court may compare it to a system of multiple single-member districts." *Id.* at 888 (O'Connor, J., concurring); *accord Uno*, 72 F.3d at 985-86; *NAACP, Inc. v. City of Niagara Falls*, 65 F.3d 1002, 1022 n.23 (2d Cir. 1995). Single-member districts are an especially appropriate benchmark here because the State already uses five residency districts for Commission elections and has done so for more than twenty years. (Appellant's Br. 23.) Converting those existing districts to

election districts (as the Plaintiffs proposed in one of their plans), or drawing similar ones based on traditional districting principles, would be familiar to Georgia voters and well "within the confines" of the State's chosen form of government. *Davis*, 139 F.3d at 1421 (cleaned up).

Finally, the district court did not abuse its discretion in declining to certify to the Georgia Supreme Court the question whether the phrase "elected by the people" in the State Constitution requires at-large elections for the Public Service Commission. Ga. Const. art. IV, § 1, ¶ I(a). As an initial matter, the Secretary abandoned his certification argument below. After requesting certification at summary judgment, the Secretary never raised the issue again in any meaningful way. He did not mention certification in his proposed pretrial order, made no substantive argument in support of it at trial, and said not a word about it in his 68-page post-trial proposed findings of fact and conclusions of law. (Stay Op. 27 (Rosenbaum, J., dissenting).)

The Secretary nonetheless criticizes the district court for "inexplicably skipping [certification] and interpreting the Georgia constitution itself in a single page of analysis without briefing or argument." (Appel-

lant's Br. 70.) But the Plaintiffs did brief the issue in their proposed findings (Supp. App. 145 at 158-63 & n.7), and the Secretary cannot complain about the district court's ruling against him on an argument he failed to preserve. *See CSX Transp., Inc. v. Gen. Mills, Inc.*, 846 F.3d 1333, 1336-37 (11th Cir. 2017); *see also Helton v. AT&T Inc.*, 709 F.3d 343, 360 (4th Cir. 2013) (finding appellant waived argument it did not raise "at trial or in its proposed Findings of Fact and Conclusions of Law" (cleaned up)).

Even if the Secretary had preserved the argument, the decision to certify lies within the district court's "sound discretion." *Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1891 n.7 (2018) (cleaned up). The district court here correctly determined that the answer to the Secretary's question is straightforward because the Georgia Constitution provides that the General Assembly shall determine the "manner" in which members of the Public Service Commission are to be "elected by the people." (I:151 at 59 (citing Ga. Const. art. IV, § 1, ¶ I(c)).) The General Assembly, in turn, prescribed by statute that "each member of the commission shall be elected state wide." O.C.G.A. § 46-2-1(a); *see also Cox v. Barber*, 568

S.E.2d 478, 479 (Ga. 2002) (per curiam) (citing the statute, not the Georgia Constitution, as the source of the Commission's at-large method of election).

The district court's reading is consistent with adjacent provisions of the Georgia Constitution concerning other boards and commissions. (I:151 at 59-60 (citing various provisions of Article IV).) Read together, these provisions establish *who* gets to appoint or elect members of these constitutional boards and commissions, but not *how*. The Georgia Constitution leaves the "manner" of electing Public Service Commissioners to the General Assembly, which chose to provide that the people elect them "state wide." It could also have chosen, consistent with the State Constitution, to provide that the people shall elect those commissioners by district.

By contrast, the Secretary's reading of "elected by the people" to mean the same thing as "elected state wide" would violate the "cardinal rule of statutory construction that significance and effect shall, if possible, be accorded to every word." *Washington Mkt. Co. v. Hoffman*, 101

U.S. 112, 115 (1879). The Secretary's reading would render the words "state wide" in the Georgia statute utterly superfluous.[6]

Even if the Secretary's reading were plausible, the district court still did not abuse its discretion because certification would not have affected the outcome below. *See GEICO Indem. Co. v. Whiteside*, 857 S.E.2d 654, 658 n.1 (Ga. 2021) ("We do not give advisory opinions or respond to certified questions that are anticipatory in nature."). After carefully weighing each of the nine Senate Factors, the district court concluded that most of them—including the two most important factors—weighed in the Plaintiffs' favor. (I:151 at 36-54.) A different ruling on the Secretary's peripheral legal question would not have made a difference, and he does not explain how it could have.

---

[6] The Secretary now claims that the phrase "elected by the people" in Article IV of the Georgia Constitution compels statewide elections for the Public Service Commission because a provision for electing state senators in Article III provides that they shall be "elected from single-member districts." (Appellant's Br. 69.) The Secretary never made this argument below, so this Court should not consider it. *See Feldman v. Am. Dawn, Inc.*, 849 F.3d 1333, 1344 (11th Cir. 2017) ("We will not consider arguments raised for the first time on appeal."). Regardless, this provision from a different Article sheds no light on the meaning of "elected by the people." If anything, it suggests the framers knew how to specify the manner of election but chose not to do so for the Public Service Commission.

As Judge Rosenbaum put it, "I'm not sure why Georgia could dilute the votes of Black Georgians if it prescribed the system in its Constitution rather than by statute." (Stay Op. 28 (Rosenbaum, J., dissenting).) She's right to be skeptical. "It is common ground that state election-law requirements," including those found in a state constitution, "may be superseded by federal law." *Bartlett v. Strickland*, 556 U.S. 1, 7 (2009) (plurality opinion); *see also, e.g.*, *Katzenbach v. Morgan*, 384 U.S. 641 (1966) (holding that New York's constitutional literacy test violated the Voting Rights Act). Georgia could not shield discriminatory election practices from federal law simply by enshrining them in its constitution.

## CONCLUSION

The district court's detailed findings of racial vote dilution and feasibility have ample support in the record and stay well within the lines of firmly established precedent. For these reasons, and those explained above, this Court should affirm the district court's judgment.

76

October 19, 2022                    Respectfully submitted,

                                    */s/ Bryan L Sells*
                                    Bryan L. Sells
                                    THE LAW OFFICE OF BRYAN L. SELLS, LLC
                                    Post Office Box 5493
                                    Atlanta, Georgia 31107
                                    Tel.: (404) 480-4212
                                    bryan@bryansellslaw.com

                                    Nicolas L. Martinez
                                    Wesley A. Morrissette
                                    BARTLIT BECK LLP
                                    54 West Hubbard Street, Suite 300
                                    Chicago, Illinois 60654
                                    Tel.: (312) 494-4400
                                    Fax: (312) 494-4440
                                    nicolas.martinez@bartlitbeck.com
                                    wesley.morrissette@bartlitbeck.com

                                    *Counsel for the Plaintiffs-Appellees*

## CERTIFICATE OF COMPLIANCE

This document complies with the word limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f) and Eleventh Circuit Rule 32-4, this document contains 12,578 words.

This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 14-point, Century Schoolbook font.

October 19, 2022         */s/ Bryan L. Sells*
                         Bryan L. Sells
                         THE LAW OFFICE OF BRYAN L. SELLS, LLC
                         Post Office Box 5493
                         Atlanta, Georgia 31107
                         Tel.: (404) 480-4212
                         bryan@bryansellslaw.com
                         *Counsel for the Plaintiffs-Appellees*