No. 22-12593

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

———————————

RICHARD ROSE, *et al.*,

Plaintiffs-Appellees

v.

GEORGIA SECRETARY OF STATE,

Defendant-Appellant

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA

———————————

BRIEF FOR THE UNITED STATES AS AMICUS CURIAE IN SUPPORT OF
PLAINTIFFS-APPELLEES AND URGING AFFIRMANCE

———————————

RYAN K. BUCHANAN
 United States Attorney
 Northern District of Georgia

AILEEN BELL HUGHES
 Assistant U.S. Attorney
 Office of the United States Attorney
 600 U.S. Courthouse
 75 Ted Turner Drive, SW
 Atlanta, GA 30303
 (404) 581-6000

KRISTEN CLARKE
 Assistant Attorney General

ERIN H. FLYNN
JONATHAN L. BACKER
 Attorneys
 Department of Justice
 Civil Rights Division
 Appellate Section
 Ben Franklin Station
 P.O. Box 14403
 Washington, D.C.  20044-4403
 (202) 532-3528

*Rose* v. *Georgia Sec'y of State*, No. 22-12593

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

In accordance with Eleventh Circuit Rules 26.1-1 to 26.1-3, the United States certifies that, in addition to those identified in the briefs filed by appellant, appellees, and amicus, the following persons have an interest in this case:

1.   Backer, Jonathan L., U.S. Department of Justice, Civil Rights Division, counsel for the United States;

2.   Bell Hughes, Aileen, Office of the U.S. Attorney, counsel for the United States;

3.   Buchanan, Ryan K., Office of the U.S. Attorney, counsel for the United States;

4.   Flynn, Erin H., U.S. Department of Justice, Civil Rights Division, counsel for the United States.

The United States certifies that no publicly-traded corporation has an interest in the outcome of this appeal.

s/ Jonathan L. Backer
JONATHAN L. BACKER
 Attorney

Date:  October 26, 2022

C-1 of 1

# TABLE OF CONTENTS

**PAGE**

CERTIFICATE OF INTERESTED PERSONS
AND CORPORATE DISCLOSURE STATEMENT ..........................................C-1

INTEREST OF THE UNITED STATES ..................................................................1

STATEMENT OF THE ISSUES...............................................................................2

STATEMENT OF THE CASE...................................................................................2

    *1.*    *Statutory Framework*..........................................................................2

    *2.*    *Procedural History*.............................................................................5

SUMMARY OF THE ARGUMENT ........................................................................7

ARGUMENT

    I    EVIDENCE THAT RACIALLY POLARIZED VOTING
        PATTERNS ARE CORRELATED WITH PARTISAN
        PREFERENCES DOES NOT DEFEAT A SECTION 2
        VOTE-DILUTION CLAIM .............................................................. 8

        *A.*    *Courts May Consider Evidence Of Partisan*
            *Voting Preferences Only As Part Of Section 2's*
            *Totality Analysis*........................................................................8

        *B.*    *Evidence Of Partisan Voting Preferences Can Defeat*
            *A Section 2 Claim Only When The Evidence Shows*
            *That, Despite Apparent Racial Polarization,*
            *Minority-Preferred Candidates Have The Potential*
            *To Succeed Under The Existing Electoral Framework*............12

        *C.*    *The District Court Did Not Clearly Err In Concluding*
            *That Racial Polarization Is Responsible For The Defeat*
            *Of Minority-Preferred Commission Candidates* ......................17

**TABLE OF CONTENTS (continued):**                    **PAGE**

II    SINGLE-MEMBER DISTRICTING IS AN
      APPROPRIATE REMEDY IN THIS CASE.................................... 19

      A.    Single-Member Districting Is The Standard Remedy
            For Vote Dilution Caused By At-Large Voting ......................19

      B.    A State's Interest In Maintaining An At-Large Election
            Scheme Does Not Automatically Render
            Single-Member Districting Improper ......................................26

CONCLUSION ....................................................................................30

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF CITATIONS

**CASES:**                                                                      **PAGE**

*Alpha Phi Alpha Fraternity Inc.* v. *Raffensperger*,
    587 F. Supp. 3d 1222 (N.D. Ga. 2022)........................................................16

*Brnovich* v. *Democratic Nat'l Comm.*, 141 S. Ct. 2321 (2021) ........................3, 13

*Burton* v. *City of Belle Glade*, 178 F.3d 1175 (11th Cir. 1999) .............................23

*Chapman* v. *Meier*, 420 U.S. 1 (1975).......................................................20

*Chisom* v. *Roemer*, 501 U.S. 380 (1991) ....................................................3

*City of Mobile* v. *Bolden*, 446 U.S. 55 (1980) ......................................... 2-3

*Cleveland Cnty. Ass'n for Gov't by the People* v. *Cleveland Cnty.*
    *Bd. of Comm'rs*, 142 F.3d 468 (D.C. Cir. 1998) ...........................................24

*Connor* v. *Johnson*, 402 U.S. 690 (1971) (per curiam) ...........................................20

*Davis* v. *Chiles*, 139 F.3d 1414 (11th Cir. 1998),
    cert. denied, 526 U.S. 1003 (1999)...................................................... 26-28

*Dillard* v. *Crenshaw Cnty.*, 831 F.2d 246 (11th Cir. 1987)....................................28

*Goosby* v. *Town Bd. of Hempstead*, 180 F.3d 476 (2d Cir. 1999),
    cert. denied, 528 U.S. 1138 (2000)....................................................... 10, 15

*Growe* v. *Emison*, 507 U.S. 25 (1993).......................................................4

*Holder* v. *Hall*, 512 U.S. 874 (1991) ..................................................... 21-22

*Houston Lawyers' Ass'n* v. *Attorney Gen. of Tex.*,
    501 U.S. 419 (1991)......................................................................26

*Large* v. *Fremont Cnty.*, 670 F.3d 1133 (10th Cir. 2012) ................................ 23-24

**CASES (continued):** **PAGE**

*League of Latin Am. Citizens* v. *Clements*,
   999 F.2d 831 (5th Cir. 1993),
   cert. denied, 510 U.S. 1071 (1994)..................................................................10

*Milwaukee Branch of the NAACP* v. *Thompson*,
   116 F.3d 1194 (7th Cir. 1997),
   cert. denied, 522 U.S. 1076 (1998)..................................................................10

*Nipper* v. *Smith*, 39 F.3d 1494 (11th Cir. 1994) (en banc),
   cert. denied, 514 U.S. 1083 (1995)...................................................... 10, 27-28

*Reynolds* v. *Sims*, 377 U.S. 533 (1964) ...................................................22

*Shelby Cnty.* v. *Holder*, 570 U.S. 529 (2013) ...........................................2

*Solomon* v. *Liberty Cnty. Comm'rs*,
   221 F.3d 1218 (11th Cir. 2000) (en banc) ....................................................13

*Southern Christian Leadership Conf. of Ala.* v. *Sessions*,
   56 F.3d 1281 (11th Cir. 1995) (en banc),
   cert. denied, 516 U.S. 1045 (1996)..................................................................27

*Tallahassee Branch of NAACP* v. *Leon Cnty.*,
   827 F.2d 1436 (11th Cir. 1987), cert. denied, 488 U.S. 960 (1988) .............20

*\*Thornburg* v. *Gingles*, 478 U.S. 30 (1986).................................................... *passim*

*United States* v. *Charleston Cnty.*,
   365 F.3d 341 (4th Cir.),
   cert. denied, 543 U.S. 999 (2004)..............................................10-11, 15-16

*United States* v. *City of Eastpointe*, No. 4:17-cv-10079,
   2019 WL 2647355 (E.D. Mich. June 26, 2019) ..........................................25

*United States* v. *Euclid City Sch. Bd.*,
   632 F. Supp. 2d 740 (N.D. Ohio 2009) .......................................................25

**CASES (continued):**                                                                   **PAGE**

\*_United States_ v. _Marengo Cnty. Comm'n_, 731 F.2d 1546,
cert. denied, 469 U.S. 976 (1984)........................................................ 12, 18

_United States_ v. _Village of Port Chester_,
704 F. Supp. 2d 411 (S.D.N.Y. 2010) ...........................................................25

_Uno_ v. _City of Holyoke_, 72 F.3d 973 (1st Cir. 1995)...............................................10

_White_ v. _Regester_, 412 U.S. 755 (1973) ................................................................ 3-4

\*_Wise_ v. _Lipscomb_, 437 U.S. 535 (1978) ........................................................ 19, 22

_Wright_ v. _Sumter Cnty. Bd. of Elections & Registration_,
979 F.3d 1282 (11th Cir. 2020) .............................................................. 12, 20

**CONSTITUTIONS AND STATUTES:**

Ga. Const.
Art. IV, § 1, ¶ I(a) ........................................................................5, 23
Art. IV, § 1, ¶ I(c) ........................................................................5, 23

La. Const. Art. IV, § 21 ..............................................................................24

Neb. Const. Art. IV, § 20 ...........................................................................24

N.M. Const. Art. XI, § 1(A)........................................................................24

Voting Rights Act of 1965
52 U.S.C. 10301......................................................................................1
52 U.S.C. 10301(a) ........................................................................ 3, 5, 11
52 U.S.C. 10301(b)....................................................................... _passim_
52 U.S.C. 10308(d) ...............................................................................1

Pub. L. No. 89-110, § 2, 79 Stat. 437 (1965)............................................2

Ga. Code Ann. § 46-2-20 (2012) ...............................................................5

Ga. Code Ann. § 46-2-1(a) (2022)..................................................... 6, 22-23

**STATUTES (continued):**                                        **PAGE**

Ga. Code Ann. § 46-2-1(c) (2022).........................................................6, 22

Ga. Code Ann. § 46-2-1(d) (2022)...........................................................6

Miss. Code Ann. § 77-1-1 (2020) ...........................................................24

Mont. Code Ann. § 69-1-103 (2021) ......................................................24

2022 Ga. Laws 14 ..................................................................................22

**RULE:**

Fed. R. App. P. 29(a) ...............................................................................1

**LEGISLATIVE HISTORY:**

S. Rep. No. 417, 97th Cong., 2d Sess. 28 (1982) ...........................4-5, 11

**MISCELLANEOUS:**

Steven J. Mulroy, *Alternative Ways Out:  A Remedial Road Map for the Use of Alternative Electoral Systems as Voting Rights Act Remedies*, 77 N.C. L. Rev. 1867 (1999) .......................................................25

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

_____

No. 22-12593

RICHARD ROSE, *et al.*,

Plaintiffs-Appellees

v.

GEORGIA SECRETARY OF STATE,

Defendant-Appellant

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA

_____

BRIEF FOR THE UNITED STATES AS AMICUS CURIAE IN SUPPORT OF
PLAINTIFFS-APPELLEES AND URGING AFFIRMANCE

_____

**INTEREST OF THE UNITED STATES**

This case presents important questions concerning how vote-dilution claims under Section 2 of the Voting Rights Act of 1965 (VRA), 52 U.S.C. 10301, can be proven and remedied.  The Department of Justice is charged with enforcing the VRA, see 52 U.S.C. 10308(d), and has a substantial interest in the statute's proper interpretation.  Accordingly, the United States files this brief under Rule 29(a) of the Federal Rules of Appellate Procedure.

## STATEMENT OF THE ISSUES

Following a five-day bench trial, the district court found that Georgia's at-large, statewide method of electing members of its Public Service Commission dilutes the voting strength of Black voters in violation of Section 2 of the VRA. The court permanently enjoined the Secretary of State from administering or certifying any future Commission election conducted under this method.

On appeal, the United States addresses the following questions only:

1.  Whether evidence that racially polarized voting patterns in general elections are correlated with partisan preferences can defeat a Section 2 vote-dilution claim.

2.  Whether single-member districting is an appropriate remedy in this case.

## STATEMENT OF THE CASE

*1.     Statutory Framework*

Section 2 of the VRA imposes a "permanent, nationwide ban on racial discrimination in voting." *Shelby Cnty.* v. *Holder*, 570 U.S. 529, 557 (2013). The statute as originally enacted in 1965 prohibited voting practices or procedures that "deny or abridge the right of any citizen of the United States to vote on account of race or color." Pub. L. No. 89-110, § 2, 79 Stat. 437 (1965). In *City of Mobile* v. *Bolden*, 446 U.S. 55 (1980), a plurality of the Supreme Court held that Section 2 "simply restated the prohibitions already contained in the Fifteenth Amendment"

and therefore reached only "purposefully discriminatory" government actions. *Id.* at 61, 65. Congress rewrote Section 2 in 1982 to "repudiate" *Bolden*'s interpretation of the statute. *Brnovich* v. *Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2332 (2021).

In its present form, Section 2 prohibits voting practices or procedures that "*result*[] in a denial or abridgement of the right  *  *  *  to vote on account of race." 52 U.S.C. 10301(a) (emphasis added). Thus, although Section 2 continues to encompass claims based on discriminatory intent, "[u]nder the amended statute, proof of intent is no longer required." *Chisom* v. *Roemer*, 501 U.S. 380, 394 (1991); see also *id.* at 394 n.21. Instead, "proof of discriminatory results alone" can establish a Section 2 violation. *Id.* at 404.

Congress specified that a discriminatory "result" is established "if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in [a] State or political subdivision are not equally open to participation by members of a class of citizens protected by" Section 2, "in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. 10301(b). That standard has its origins in *White* v. *Regester*, 412 U.S. 755 (1973), a pre-*Bolden* case holding that certain districting practices, when employed in areas where race played a pervasive role in the political process, unconstitutionally

"operated to dilute the voting strength of racial and ethnic minorities." *Id.* at 759; see also *id.* at 765-770; S. Rep. No. 417, 97th Cong., 2d Sess. 28 (1982) (Senate Report).  As amended, Section 2 continues to guard against vote dilution that often results from at-large elections and similar practices that "thwart[] a distinctive minority vote by submerging it in a larger white voting population" in jurisdictions pervaded by race-conscious politics.  *Growe* v. *Emison*, 507 U.S. 25, 40 (1993).

The Supreme Court held in its first opinion construing Section 2 after the 1982 amendments that plaintiffs bringing a vote-dilution claim under the statute must demonstrate three preconditions:  (1) that a minority group "is sufficiently large and geographically compact to constitute a majority in a single-member district"; (2) that the minority group "is politically cohesive"; and (3) "that the white majority votes sufficiently as a bloc to enable it  *  *  *  usually to defeat the minority's preferred candidate."  *Thornburg* v. *Gingles*, 478 U.S. 30, 50-51 (1986).

Preconditions one and two together implement Section 2's requirement that minority voters have less opportunity to "participate in the political process and to elect representatives of their choice" by ensuring that the defeat of minority-preferred candidates actually "results" from the challenged voting practice or procedure.  52 U.S.C. 10301(b).  They accomplish this by ensuring that the minority group in question "has the *potential* to elect a representative of its own choice in some single-member district."  *Growe*, 507 U.S. at 40 (emphasis added).

The third *Gingles* precondition ensures that Section 2 allows relief only when the minority group suffers unequal opportunity "on account of race," 52 U.S.C. 10301(a), by limiting relief to circumstances where a polarized voting majority consistently prevents the election of the preferred candidates of a cohesive group of minority voters.

Once a plaintiff has satisfied the *Gingles* preconditions, a court still must determine whether the "totality of circumstances" supports a finding of vote dilution. 52 U.S.C. 10301(b). *Gingles* held that nine factors enumerated in the Senate Report "will often be pertinent to certain types of § 2 violations, particularly to vote dilution claims," but that "other factors may also be relevant and may be considered." 478 U.S. at 45. "[T]here is no requirement that any particular number" of these so-called Senate Factors be proved "or that a majority of them point one way or the other." *Ibid.* (quoting Senate Report 29).

2.    *Procedural History*

a.  Georgia's Public Service Commission is an administrative body charged with regulating public utilities. Ga. Const., Art. IV, § 1, ¶ I(a); Ga. Code Ann. § 46-2-20 (2012). The Georgia constitution specifies that the Commission "shall consist of five members who shall be elected by the people," but it leaves to the state legislature's discretion the "manner and time of election." Ga. Const. Art. IV, § 1, ¶ I(c). A state statute provides that Commission members are to be selected in

- 6 -

statewide elections to serve staggered six-year terms.  Ga. Code Ann. § 46-2-1(a) and (d) (2022).  The same statute also divides Georgia's counties into five Commission residency districts.  Ga. Code Ann. § 46-2-1(c) (2022).  Although Commission members are elected on a statewide basis, they may run for office only in the district in which they reside.  Ga. Code Ann. § 46-2-1(a) (2022).

b.  Plaintiffs, four Black voters who live in the Commission's third residency district—which encompasses the Atlanta metropolitan area—sued Georgia's Secretary of State, alleging that the Commission's statewide election method violates Section 2 of the VRA by diluting the voting strength of Black voters.  Doc. 1, at 2, 9.[1]  A Black candidate has been elected to the Commission only once in the body's history, and that candidate was elected only after having been appointed by the Governor to fill a vacancy on the Commission.  Doc. 1, at 8-9.  Plaintiffs sought to have future Commission elections conducted using single-member districts, which would provide Black voters in at least one district the opportunity to elect a Commission member of their choice.  Doc. 1, at 5.

---

[1] "Doc. __, at __" refers to the docket entry number and relevant pages of the district court filings below in *Rose* v. *Raffensperger*, No. 1:20-cv-2921 (N.D. Ga.).  "Br. __" refers to the pages of the Secretary's opening brief.

c. Following a five-day bench trial, the district court found for plaintiffs and permanently enjoined the Secretary from administering or certifying any future Commission election conducted under the at-large method of election currently prescribed by Georgia law. Doc. 151, at 60, 64. The court's injunction leaves to the state legislature the task of fashioning a new method of conducting Commission elections that complies with Section 2. Doc. 151, at 63.

## SUMMARY OF THE ARGUMENT

This Court should reject the Secretary's argument that plaintiffs' Section 2 vote-dilution claim fails because the racially polarized voting patterns in Commission elections are purportedly correlated with partisan preferences. Courts may consider evidence of partisan preferences in determining whether the totality of the circumstances supports the conclusion that a challenged voting practice impermissibly dilutes the voting strength of minority voters. But such evidence can defeat a Section 2 vote-dilution claim only when the evidence proves that, despite apparent racial polarization, minority-preferred candidates have the potential to succeed under the existing electoral framework. The district court did not clearly err in concluding that the Secretary failed to meet that difficult standard.

In addition, this Court should reject the Secretary's argument that no remedy is available for any unlawful vote dilution in Commission elections because using

single-member districts for such elections would impermissibly force a new form
of government on Georgia.  Single-member districting is the standard remedy for
vote dilution caused by an at-large system.  And although courts can consider a
state's interests in maintaining a challenged voting practice when determining
liability under Section 2, the district court did not clearly err in concluding that
Georgia lacks sufficiently compelling interests to justify the continued use of its
current method of electing Commission members.

## ARGUMENT

### I

### EVIDENCE THAT RACIALLY POLARIZED VOTING PATTERNS ARE CORRELATED WITH PARTISAN PREFERENCES DOES NOT DEFEAT A SECTION 2 VOTE-DILUTION CLAIM

The Secretary primarily argues that plaintiffs' Section 2 vote-dilution claim
fails because plaintiffs did not show that voters in Commission elections are
polarized along racial as opposed to partisan lines.  Br. 43.  In so arguing, the
Secretary misunderstands both plaintiffs' burden under Supreme Court and
Eleventh Circuit precedent and the narrow circumstances in which evidence of
partisan voting preferences can defeat a vote-dilution claim.

A.   *Courts May Consider Evidence Of Partisan Voting Preferences Only As
     Part Of Section 2's Totality Analysis*

To establish a vote-dilution claim under Section 2, a plaintiff must first
establish the three preconditions set forth in the seminal case interpreting Section 2

- 9 -

as amended, *Thornburg* v. *Gingles*, 478 U.S. 30, 50-51 (1986).  See pp. 4-5, *supra*.

Even if a plaintiff establishes the *Gingles* preconditions, Section 2 liability attaches

only if the "totality of circumstances" ultimately supports a finding of vote

dilution.  52 U.S.C. 10301(b).  At issue here is whether and how partisan voting

preferences factor into that framework.

    *Gingles* makes clear that, although partisan preferences may be considered

in determining whether Section 2 liability should attach, courts cannot consider

such evidence in analyzing whether plaintiffs have established the necessary

preconditions for stating a vote-dilution claim.  Eight Justices agreed in *Gingles*

that analysis of the second and third preconditions for a vote-dilution claim should

focus exclusively on whether racially polarized voting exists, not whether partisan

voting preferences (or any other race-neutral factor) is the *reason* for such

polarization.[2]

---

    [2]  More specifically, Justice Brennan, joined by three other Justices, rejected the need for *any* causation inquiry in Section 2 claims, stating that "the reasons black and white voters vote differently have no relevance to the central inquiry of § 2." *Gingles*, 478 U.S. at 63.  Justice O'Connor, joined by three other Justices, "agree[d] [with the plurality] that defendants cannot rebut" a showing of minority political cohesion and usual minority defeat due to racial bloc voting—the second and third *Gingles* preconditions—"by offering evidence that the divergent racial voting patterns may be explained in part by causes other than race, such as an underlying divergence in the interests of minority and white voters." *Id.* at 100 (O'Connor, J., concurring).  But she explained that courts may consider evidence of non-racial reasons for apparent racial polarization in evaluating whether the totality of the circumstances supports a vote-dilution claim. *Ibid.*

- 10 -

Adhering to *Gingles*, courts of appeals consistently have held that evidence of non-racial explanations for apparent racial polarization—such as partisan voting preferences—are properly considered only as part of Section 2's totality analysis. *United States* v. *Charleston Cnty.*, 365 F.3d 341, 347-348 (4th Cir.), cert. denied, 543 U.S. 999 (2004); *Goosby* v. *Town Bd. of Hempstead*, 180 F.3d 476, 493 (2d Cir. 1999), cert. denied, 528 U.S. 1138 (2000); *Milwaukee Branch of the NAACP* v. *Thompson*, 116 F.3d 1194, 1199 (7th Cir. 1997), cert. denied, 522 U.S. 1076 (1998); *Uno* v. *City of Holyoke*, 72 F.3d 973, 983 (1st Cir. 1995); see also *Nipper* v. *Smith*, 39 F.3d 1494, 1513-1514 (11th Cir. 1994) (en banc) (opinion of Tjoflat, C.J., joined by Anderson, J.), cert. denied, 514 U.S. 1083 (1995).  The lone exception, on which the Secretary heavily relies (Br. 26, 33-36, 42), is *League of Latin American Citizens* v. *Clements*, 999 F.2d 831, 850 (5th Cir. 1993) (en banc), cert. denied, 510 U.S. 1071 (1994).  But, as its isolated position reflects, *Clements* cannot be reconciled with *Gingles*.[3]

Although the Secretary argued in the district court that evidence of partisan voting preferences should be considered in evaluating the second and third *Gingles* preconditions (Doc. 144, at 55), his position on appeal is that "while it makes far more sense" for courts to consider such evidence in analyzing the preconditions, it

---

[3] Moreover, even *Clements* did not hold, as the Secretary argues (Br. 27-36), that Section 2 plaintiffs bear the burden of disproving the influence of partisan preference on racially polarized voting patterns.  999 F.2d at 859-860.

- 11 -

"does not matter very much" at what stage courts consider such evidence (Br. 36). On the contrary, the order of operations is crucial. Considering partisan voting preferences in isolation from the Senate Factors would omit key evidence of race-conscious politics and undermine the function of the preconditions as a screening mechanism.

Expanding the *Gingles* preconditions inquiry "to ask not merely whether, but also why, voters are racially polarized  *  *  *  would convert the threshold test into precisely the wide-ranging, fact-intensive examination it is meant to precede." *Charleston Cnty.*, 365 F.3d at 348. Collectively, the *Gingles* preconditions limit relief in vote-dilution cases to circumstances where a challenged voting practice or procedure "results" in the defeat of a minority group's preferred candidates because of racial polarization in the electorate. 52 U.S.C. 10301(a). By contrast, whether liability ultimately should attach is properly considered in the totality-of-the-circumstances analysis, during which a court may consider evidence under the Senate Factors deemed probative of race-conscious politics. For example, the "history of official discrimination," the use of "overt or subtle racial appeals" in political campaigns, and whether "members of the minority group have been elected to public office" all provide important context that a myopic focus on partisan preferences in the preconditions analysis would elide. *Gingles*, 478 U.S. at 36-37 (quoting Senate Report 28-29).

B.    *Evidence Of Partisan Voting Preferences Can Defeat A Section 2 Claim Only When The Evidence Shows That, Despite Apparent Racial Polarization, Minority-Preferred Candidates Have The Potential To Succeed Under The Existing Electoral Framework*

Courts may consider evidence of partisan voting preferences in performing Section 2's totality analysis.  But such evidence can defeat a Section 2 claim only when the evidence shows that, despite apparent racial polarization, minority-preferred candidates have the potential to succeed under the existing electoral framework.

As Judge Minor Wisdom stated, the purpose of Section 2 is to remedy "race-conscious politics," and "[t]he surest indication of race-conscious politics is a pattern of racially polarized voting."  *United States* v. *Marengo Cnty. Comm'n*, 731 F.2d 1546, 1567 (11th Cir.), cert. denied, 469 U.S. 976 (1984); see also *Wright* v. *Sumter Cnty. Bd. of Elections & Registration*, 979 F.3d 1282, 1305 (11th Cir. 2020) (evidence of racial polarization "will ordinarily be the keystone of a dilution case" (quoting *Marengo Cnty.*, 731 F.2d at 1566)).  The second and third *Gingles* preconditions together provide proof of racial polarization.  A defendant can therefore defeat a Section 2 claim in the face of such evidence only if the totality of the circumstances demonstrates that minority-preferred candidates can prevail notwithstanding such polarization in more than isolated instances or that racial polarization does not actually exist, despite apparent bloc voting on account of

- 13 -

race.  See *Solomon* v. *Liberty Cnty. Comm'rs*, 221 F.3d 1218, 1225 (11th Cir. 2000) (en banc).

Justice O'Connor's concurrence in *Gingles* underscores the slender pathway available for a defendant to defeat a Section 2 claim based on evidence of partisan voting preferences.  A defendant cannot rebut proof of racial polarization merely by "offering evidence that the divergent racial voting patterns may be explained in part by causes other than race" like partisan voting preferences.  *Gingles*, 478 U.S. at 100 (O'Connor, J., concurring).  Instead, a defendant can defend against Section 2 liability by providing evidence at the totality stage "that a candidate preferred by the minority group in a particular election was rejected by white voters *for reasons other than those which made that candidate the preferred choice of the minority group.*"  *Gingles*, 478 U.S. at 100 (O'Connor, J., concurring) (emphasis added).  In those circumstances, "[s]uch evidence would suggest that another candidate, equally preferred by the minority group, might be able to attract greater white support in future elections."  *Ibid.*  This circumscribed causation analysis avoids converting Section 2's results test into the very sort of intent-based inquiry that Congress "repudiate[d]" in amending the statute in 1982.  *Brnovich* v. *Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2332 (2021).[4]

---

[4]  The Secretary places heavy emphasis on Justice White's concurrence in *Gingles*, in which he expressed the view that an at-large election method would not violate Section 2 where it results in the election of Black Republicans who are not

Consider two examples:

**Jurisdiction A:**  In Jurisdiction A, 60% of voters are white, and 40% are Black.  White voters in this jurisdiction prefer Republican candidates.  In contrast, Black voters prefer candidates from the eastern part of the jurisdiction, irrespective of the candidates' partisan affiliation.

**Jurisdiction B**:  Jurisdiction B has voter demographics identical to Jurisdiction A's.  But in Jurisdiction B, Black voters prefer Democratic candidates, while white voters prefer Republican candidates.

In Jurisdiction A, voting might appear racially polarized in a contest featuring an eastside Democrat and a westside Republican.  In such a contest, Black voters would vote for the Democrat, and white voters would vote for the Republican.  But defendants would have a good argument that the jurisdiction is not actually polarized along racial lines because, in this scenario, Black voter preference actually aligns with locality—eastide pride perhaps—while white voter preference aligns with party.  As such, an eastsider could run as a Republican in future elections and be "equally preferred" by Black voters in Jurisdiction A as an

---

the preferred candidates of Black voters who vote cohesively for Democratic candidates.  478 U.S. at 83 (White, J., concurring).  No other Justices joined Justice White's concurrence, and Justice O'Connor (and the three Justices who joined her opinion) agreed only with its proposition that a candidate's race is sometimes relevant "in identifying racially polarized voting." *Id.* at 101 (O'Connor, J., concurring).  Accordingly, although the five Justices represented in Justice O'Connor's and Justice White's concurrences took the view that partisan voting preferences can be considered as part of Section 2's totality analysis, the narrowest ground on which those Justices agreed is that partisan voting preferences can be considered in the limited way outlined in Justice O'Connor's concurrence.

eastside Democrat would be, while attracting "greater white support." *Gingles*, 478 U.S. at 100 (O'Connor, J., concurring).

In contrast, racial polarization is intractable in Jurisdiction B. The attribute that makes candidates preferable to Black voters in that jurisdiction is their affiliation with the Democratic Party, not any other distinguishable characteristic (such as in Jurisdiction A). A candidate cannot build a winning, multiracial coalition merely by changing their partisan affiliation: Running as a Republican would render a candidate anathema to the jurisdiction's minority voters.

Tracking Justice O'Connor's *Gingles* concurrence, courts consistently have found that racial polarization is not disproven by evidence that racially polarized voting patterns correlate with partisan preferences. The Second Circuit in *Goosby*, for example, rejected a defendant's "pervasive argument  *  *  *  that political partisanship, rather than race, accounts for the defeat of black candidates." 180 F.3d at 495. As the court aptly put it, "blacks should not be constrained to vote for Republicans who are not their preferred candidates." *Id.* at 495-496. And in *Charleston County*, the Fourth Circuit rejected a defendant's argument that a county was polarized along partisan rather than racial lines because "[e]ven assuming that the effects of partisanship and race on voting could have been isolated and measured," defendants failed to disprove that "race still  *  *  * *play[s] a role* in the voting patterns of white and minority voters." 365 F.3d at

352-353 (emphasis added); see also *Alpha Phi Alpha Fraternity Inc.* v.

*Raffensperger*, 587 F. Supp. 3d 1222, 1306 (N.D. Ga. 2022) (rejecting the

argument that evidence of partisan voting preferences defeated Section 2 liability

where there was "no evidentiary support in the record" for the defense expert's

"treatment of race and partisanship as separate and distinct factors affecting voter

behavior" and the expert "acknowledged that polarization can reflect both race *and*

partisanship").

Indeed, if mere correlation between racial voting patterns and partisan

preferences could defeat a Section 2 vote-dilution claim, few such claims would be

viable in the context of partisan general elections. That is because, as the district

court stressed, "high correlation between race and partisanship  *  *  *  is

*necessary*" to a Section 2 vote-dilution claim in the context of partisan general

elections. Doc. 151, at 34. The second *Gingles* precondition requires cohesion

among minority voters, while the third precondition requires white voters to

"vote[] sufficiently as a bloc" to usually "defeat the minority's preferred

candidate." *Gingles*, 478 U.S. at 51. In the context of partisan general elections,

those conditions typically cannot be satisfied unless minority and white voters are

polarized along both racial and partisan lines. The Secretary's argument, if

accepted by this Court, would therefore immunize jurisdictions in this Circuit from

Section 2 vote-dilution claims no matter the degree of race-conscious politics

unless, perhaps, they hold nonpartisan elections or primary elections featuring frequent interracial contests. No court has embraced an interpretation of Section 2 that would render it so inoperative in the vote-dilution context.

Nor is there any truth to the Secretary's argument that the approach outlined above transforms Section 2 into a "partisan preference" or "racial preference" that harms Republican-majority jurisdictions and benefits Black voters alone. Br. 32. This argument wrongly assumes that all jurisdictions have demographics and politics identical to Georgia's and that the nation's current political cleavages are etched in stone. But that of course is not the case. Section 2 will continue to play a role, and appropriately so, only in those jurisdictions where race plays an excessive role in the political process and minority voters do not have an equal opportunity to participate in the political process and elect candidates of their choice based on the interaction between the challenged voting practice and race-based conditions.

C.    *The District Court Did Not Clearly Err In Concluding That Racial Polarization Is Responsible For The Defeat Of Minority-Preferred Commission Candidates*

Because evidence of partisan voting preferences can defeat a Section 2 claim at the totality stage only when that evidence shows that racial polarization is not a barrier to the success of minority-preferred candidates, this Court need not tarry long in reviewing the Secretary's evidence on this score. The parties have

- 18 -

stipulated that Commission elections between 2012 and the present have been "polarized along racial lines." Doc. 121-3, at 3. That stipulation conclusively establishes that the "surest indication of race-conscious politics" is present in this case. *Marengo Cnty.*, 731 F.2d at 1567. Indeed, plaintiffs' expert, Dr. Stephen Popick, testified that his analysis of Commission general elections since 2012 shows "one of the clearest examples of racially polarized voting" he had ever seen. Doc. 140, at 22.

The Secretary offers no explanation for white voters' rejection of minority-preferred Commission candidates other than the attribute that makes those candidates "the preferred choice of the minority group," *Gingles*, 478 U.S. at 100 (O'Connor, J., concurring)—namely, their affiliation with the Democratic Party. Br. 27 ("The non-black majority simply prefers Republicans, regardless of race."). By the same token, the Secretary identifies no pathway by which other Commission candidates "equally preferred by" Black voters "might be able to attract greater white support in future elections." *Gingles*, 478 U.S. at 100 (O'Connor, J., concurring). The upshot of the Secretary's argument is that minority-preferred candidates must run as Republicans if they wish to succeed; but by doing so, they would cease to be minority-preferred candidates. The very purpose of Section 2 is to disrupt this sort of Catch-22 and provide minority voters

an equal "opportunity  *  *  *  to participate in the political process and to elect
representatives of their choice."  52 U.S.C. 10301(b).

## II

## SINGLE-MEMBER DISTRICTING IS AN APPROPRIATE REMEDY IN THIS CASE

The Secretary also argues that no remedy is available for any unlawful vote
dilution in Commission elections because conducting Commission elections using
single-member districts would impermissibly force a new form of government on
Georgia.  Br. 49-59.  But single-member districting is the standard remedy for vote
dilution caused by at-large districts.  Relatedly, the district court reasonably
concluded at the liability stage that Georgia lacks sufficiently compelling state
interests to justify maintaining its current method of electing Commission
members.

A.    *Single-Member Districting Is The Standard Remedy For Vote Dilution
      Caused By At-Large Voting*

The Secretary objects to single-member districting as a remedy in this case,
but the district court correctly recognized that it is the "standard remedy for a
Section 2 violation caused by at-large elections."  Doc. 151, at 57.  Indeed, the
Supreme Court stated in *Wise* v. *Lipscomb*, 437 U.S. 535 (1978), that, "absent
special circumstances," courts generally should "employ single-member districts
when they impose remedial plans" to redress vote dilution caused by at-large

districts.  *Id.* at 540; accord *Chapman* v. *Meier*, 420 U.S. 1, 21 (1975); *Connor* v. *Johnson*, 402 U.S. 690, 692 (1971) (per curiam); *Tallahassee Branch of NAACP* v. *Leon Cnty.*, 827 F.2d 1436, 1438 (11th Cir. 1987), cert. denied, 488 U.S. 960 (1988).

Of course, the remedy here is ultimately the state legislature's choice, so long as it complies with Section 2.  But single-member districts are a sensible choice because they are "the smallest political unit from which representatives are elected" and are therefore "generally the appropriate standard against which to measure minority group potential to elect." *Thornburg* v. *Gingles*, 478 U.S. 30, 50 n.17 (1986).  This Court also has described single-member districting as a "simple, straightforward, and indisputably available" remedy in circumstances comparable to those in this case. *Wright* v. *Sumter Cnty. Bd. of Elections & Registration*, 979 F.3d 1282, 1310 (11th Cir. 2020) (rejecting a defendant's argument that no appropriate remedy existed to redress vote dilution caused by two at-large seats on a school board).  Single-member districting is therefore an appropriate remedy in this case.

Despite single-member districting being the standard remedy for vote dilution caused by at-large voting, the Secretary argues that it provides no "reasonable benchmark by which to evaluate" whether the statewide method of electing Commission members dilutes the voting strength of Black voters.  Br. 50

- 21 -

(quoting *Holder* v. *Hall*, 512 U.S. 874, 881 (1991)).  But the principal case on which the Secretary relies for that proposition did not reject single-member districting as an appropriate remedy in vote-dilution cases.

In *Holder*, plaintiffs brought a Section 2 vote-dilution claim against a single-member county commission and sought to increase the number of commissioners to remedy the alleged violation.  512 U.S. at 876.  The Court held, as a categorical matter, that plaintiffs "cannot maintain a § 2 challenge to the *size* of a government body."  *Id.* at 885 (emphasis added).  Justice Kennedy's opinion announcing judgment of the Court explained that Section 2 claims are not cognizable under such circumstances because "[t]here is no principled reason why one size should be picked over another as the benchmark for comparison."  *Id.* at 881; accord *id.* at 889 (O'Connor, J., concurring in the judgment) ("The wide range of possibilities makes the choice [concerning the size of a government body] inherently standardless.").  In contrast, the appropriate benchmark is "self-evident" in a case challenging "a multimember at-large system" because "a court may compare it to a system of multiple single-member districts."  *Id.* at 888 (O'Connor, J., concurring in the judgment).

Plaintiffs plainly do not challenge the Commission's size.  Instead, they take the Commission's size—five members—as a given and challenge only the at-large, statewide method of electing its members.  Doc. 1, at 2.  Single-member districts

- 22 -

are both the "self-evident" benchmark against which such a claim should be measured, *Holder*, 512 U.S. at 888 (O'Connor, J., concurring), and the standard remedy for such claims, *Wise*, 437 U.S. at 541.

Indeed, single-member districting is an especially straightforward benchmark and remedy in this case because Georgia already treats the Commission as a district-based body in all respects *except* the method by which its members are elected. The statute that governs the manner and time of Commission elections divides the state's counties into five Commission residency districts. Ga. Code Ann. § 46-2-1(c) (2022). A candidate can run only for the Commission seat associated with the district in which they reside. Ga. Code Ann. § 46-2-1(a) (2022). And although the statute prescribes a statewide method of electing Commission members, *ibid.*, Georgia reapportions the Commission's residency districts each decade to ensure that the state's population is distributed roughly equally among the five districts, see, *e.g.*, 2022 Ga. Laws 14 (amending Ga. Code Ann. § 46-2-1). That is the very process that Georgia would be required to undertake each decade to comply with the Fourteenth Amendment's one-person, one-vote principle if Commission members were elected using single-member voting districts. *Reynolds* v. *Sims*, 377 U.S. 533, 568 (1964). No feat of imagination is therefore required to identify an appropriate remedy in this case:

- 23 -

Plaintiffs merely ask that Georgia use five *voting* districts for Commission elections in place of five *residency* districts.

The Secretary also attempts to argue that single-member districting is not an appropriate remedy and that statewide elections are instead required because Georgia's constitution provides that Commission members must be "elected by the people." Br. 58 (quoting Ga. Const. Art. IV, § 1, ¶ I(a)). But as the district court persuasively explained, the text, structure, and history of that provision "make[] clear that the requirement that commissioners be 'elected by the people' was intended only to require that they be elected rather than appointed by the governor," as was the case for earlier iterations of the Commission. Doc. 151, at 59-60. Georgia's constitution expressly leaves to the state legislature discretion over the "*manner* and time" of Commission elections. Ga. Const. Art. IV, § 1, ¶ I(c) (emphasis added).

Although the legislature has chosen a statewide method of electing Commission members, Ga. Code Ann. § 46-2-1(a) (2022), nothing precludes instead using single-member districts. And even if Georgia's constitution prescribed a statewide method of electing Commission members, "state law will not impede a court from fashioning an appropriate remedy" for a Section 2 violation. *Burton* v. *City of Belle Glade*, 178 F.3d 1175, 1200 (11th Cir. 1999); see also, *e.g.*, *Large* v. *Fremont Cnty.*, 670 F.3d 1133, 1144-1145 (10th Cir. 2012) ("In

- 24 -

remedial situations under Section 2 where state laws are *necessarily* abrogated, the Supremacy Clause appropriately works to suspend those laws because they are an *unavoidable obstacle* to the vindication of the federal right."); accord *Cleveland Cnty. Ass'n for Gov't by the People* v. *Cleveland Cnty. Bd. of Comm'rs*, 142 F.3d 468, 477 (D.C. Cir. 1998).[5]

Nevertheless, alternative remedies might exist that would allow Georgia to retain a statewide method of electing Commission members.  Although the district court's opinion clearly anticipates single-member districts going forward (Doc. 151, at 57), its injunction does not impose that remedy.  Instead, the court's order enjoins the Secretary from administering or certifying Commission elections "using the statewide, at-large method currently prescribed" by Georgia law.  Doc. 151, at 63.  To the extent that the state legislature can conceive of an alternative to both the current election method and single-member districting that complies with Section 2, nothing in the court's order precludes it from adopting that plan.

---

[5] Nor is there anything inherent to utility regulation that requires use of an at-large system when commissioners are elected.  At least five states—Louisiana, Mississippi, Montana, Nebraska, and New Mexico—currently use single-member voting districts to elect members to their public service commissions.  See La. Const. Art. IV, § 21; Neb. Const. Art. IV, § 20; N.M. Const. Art. XI, § 1(A); Miss. Code Ann. § 77-1-1 (2020); Mont. Code Ann. § 69-1-103 (2021).

For example, the state legislature may consider cumulative voting, limited voting, or ranked-choice voting to remedy the Section 2 violation here while retaining an at-large method of electing Commission members. See *United States* v. *City of Eastpointe*, No. 4:17-cv-10079, 2019 WL 2647355, at *2 (E.D. Mich. June 26, 2019) (entering a consent decree in a Section 2 case that implemented ranked-choice voting as a remedy); *United States* v. *Village of Port Chester*, 704 F. Supp. 2d 411, 448-451 (S.D.N.Y. 2010) (approving a jurisdiction's proposal to remedy a Section 2 violation with cumulative voting); *United States* v. *Euclid City Sch. Bd.*, 632 F. Supp. 2d 740, 770 (N.D. Ohio 2009) (approving a jurisdiction's proposal to remedy a Section 2 violation with limited voting).[6]

---

[6] Cumulative voting is an election method for multimember districts by which voters are allotted multiple votes that they can "distribute among the candidates any way they see fit," including casting multiple votes for a preferred candidate. Steven J. Mulroy, *Alternative Ways Out:  A Remedial Road Map for the Use of Alternative Electoral Systems as Voting Rights Act Remedies*, 77 N.C. L. Rev. 1867, 1878 (1999).  Limited voting is an election method for multimember districts by which a voter is allotted fewer votes than the total number of seats to be filled and may cast their votes for whichever candidates they most prefer. *Id.* at 1877.  Ranked-choice voting is an election method by which voters rank candidates in order of preference, and votes are counted in a series of rounds, with the lowest-ranked candidate in each round being eliminated and their votes redistributed among the remaining candidates based on voters' rankings. *Id.* at 1878-1879.

- 26 -

B.    *A State's Interest In Maintaining An At-Large Election Scheme Does Not Automatically Render Single-Member Districting Improper*

In resisting the conclusion that single-member districting is an appropriate remedy in this case, the Secretary argues that "single-member districts are not compatible with fundamental aspects" of the Commission.  Br. 54.  Specifically, according to the Secretary, statewide elections "align[] each commissioner's interests with the state's best interests" rather than making them "beholden" to voters in their district.  Br. 55, 57.  The district court did not clearly err in concluding that the record fails to establish that Georgia has a sufficiently strong interest in maintaining its current method of electing Commission members to justify its continued use.

The Supreme Court held in *Houston Lawyers' Association* v. *Attorney General of Texas*, 501 U.S. 419 (1991), that a state's "interest in maintaining an electoral system  *  *  *  is a legitimate factor to be considered by courts among the 'totality of circumstances' in determining whether a § 2 violation has occurred." *Id.* at 426.  But the Court stressed that a state's interest in maintaining its existing approach to filling an elective office "does not automatically, and in every case, outweigh proof of racial vote dilution."  *Id.* at 427.

In arguing that Georgia's interests preclude single-member districting, the Secretary relies heavily on a series of cases finding that remedy inappropriate in the unique context of elections for trial-level judges.  See *Davis* v. *Chiles*, 139 F.3d

- 27 -

1414 (11th Cir. 1998), cert. denied, 526 U.S. 1003 (1999); *Southern Christian*

*Leadership Conf. of Ala.* v. *Sessions*, 56 F.3d 1281 (11th Cir. 1995) (en banc), cert.

denied, 516 U.S. 1045 (1996); *Nipper* v. *Smith*, 39 F.3d 1494 (11th Cir. 1994) (en

banc), cert. denied, 514 U.S. 1083 (1995).  These cases provide no sound basis for

disturbing the district court's judgment.

Judge Tjoflat's non-precedential opinion in *Nipper* explained that Florida's

interest in "judicial accountability" justified "maintenance of the linkage between a

trial court judge's territorial jurisdiction and electoral base."  39 F.3d at 1543.

First, unlike members of "collegial bodies" such as the Public Service

Commission, trial judges act alone in rendering their decisions.  *Id.* at 1543-1544.

Thus, assigning trial judges to voting districts smaller than the geographic area

over which they exercise jurisdiction "would disenfranchise every voter residing

beyond a judge's subdistrict."  *Id.* at 1543.  In contrast, when a multimember body

is divided into single-member districts "all citizens continue to elect at least one

person involved in the decisionmaking process and are, therefore, guaranteed a

voice in most decisions."  *Ibid.*  Second, single-member districting in the context

of trial-judge elections would "override the State's judgment concerning the

appropriate size of trial court electorates and would foster the idea that judges

should be responsive to constituents," thereby "undermining the ideal of an

independent-minded judiciary."  *Id.* at 1544.

*Nipper* and its progeny are inapposite in the context of a multimember administrative body like the Commission.  As this Court earlier explained, "[n]owhere in the language of Section 2 nor in the legislative history does Congress condition the applicability of Section 2 on the function performed by an elected official." *Dillard* v. *Crenshaw Cnty.*, 831 F.2d 246, 250-251 (11th Cir. 1987).  Section 2's text "is only and uncompromisingly premised on the fact of nomination or election." *Ibid.*  And even under *Nipper*'s reasoning, because the Commission is a "collegial bod[y]," single-member districting would not deprive any Georgia voters of a voice in the Commission's decisions.  *Nipper*, 39 F.3d at 1543 (opinion of Tjoflat, J.).  Nor does the Secretary suggest that the Commission is designed to be "independent-minded" akin to judges.  *Id.* at 1544.

The Secretary places great weight on the "quasi-judicial" nature of the Commission due to its adjudication of rate cases.  Br. 56 (citing Doc. 121-3, at 5).  But the Commission also is a "quasi-legislative" body (Doc. 121-3, at 5) with "policy-making responsibilities that make it qualitatively different than courts" (Doc. 151, at 54).  This Court already has expressed doubt that *Nipper* and its progeny can be reconciled with *Houston Lawyers' Association*, given the near-automatic bar that those cases erect to single-member districting as a Section 2 remedy in the context of trial-judge elections.  *Davis*, 139 F.3d at 1424.  There is therefore even less basis to apply the rigid rule in those cases to an administrative

body that performs "quasi-judicial" alongside "quasi-legislative" tasks. Indeed, a

defendant in any Section 2 case challenging an at-large method of election could

argue that state interests support the existing framework on the ground that single-

member districting would produce more parochial decisionmaking. Even if such

concerns have some purchase in the context of trial-judge elections, they do not

preclude a remedy in Section 2 vote-dilution cases outside of that unique context.

## CONCLUSION

For the foregoing reasons, this Court should affirm the district court's determinations that plaintiffs' Section 2 claim is not defeated by evidence of partisan voting preferences and that single-member districting is an appropriate remedy here.

Respectfully submitted,

RYAN K. BUCHANAN
  United States Attorney
  Northern District of Georgia

KRISTEN CLARKE
  Assistant Attorney General


s/ Jonathan L. Backer
ERIN H. FLYNN
JONATHAN L. BACKER
  Attorneys
  Department of Justice
  Civil Rights Division
  Appellate Section
  Ben Franklin Station
  P.O. Box 14403
  Washington, D.C.  20044-4403
  (202) 532-3528

AILEEN BELL HUGHES
  Assistant U.S. Attorney
  Office of the United States Attorney
  600 U.S. Courthouse
  75 Ted Turner Drive, SW
  Atlanta, GA 30303
  (404) 581-6000

## CERTIFICATE OF COMPLIANCE

I certify that the attached BRIEF FOR THE UNITED STATES AS AMICUS CURIAE IN SUPPORT OF PLAINTIFFS-APPELLEES AND URGING AFFIRMANCE:

1. complies with the type-volume limitation of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B) because it contains 6,479 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f); and

2. complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Word 2019, in 14-point Times New Roman font.

s/ Jonathan L. Backer
JONATHAN L. BACKER
 Attorney

Date:  October 26, 2022

## CERTIFICATE OF SERVICE

I certify that on October 26, 2022, I electronically filed the foregoing BRIEF

FOR THE UNITED STATES AS AMICUS CURIAE IN SUPPORT OF

PLAINTIFFS-APPELLEES AND URGING AFFIRMANCE with the Clerk of the

Court for the United States Court of Appeals for the Eleventh Circuit by using the

appellate CM/ECF system.

I certify that all participants in this case are registered CM/ECF users and

that service will be accomplished by the appellate CM/ECF system.

s/ Jonathan L. Backer
JONATHAN L. BACKER
 Attorney