[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 22-12593

_____

RICHARD ROSE,
an individual,
BRIONTE MCCORKLE,
an individual,
WANDA MOSLEY,
an individual,
JAMES MAJOR WOODALL,

Plaintiffs-Appellees,

*versus*

SECRETARY, STATE OF GEORGIA,

Defendant-Appellant.

————————————————

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:20-cv-02921-SDG

————————————————

Before BRANCH and GRANT, Circuit Judges, and SCHLESINGER,[*]
District Judge.

BRANCH, Circuit Judge:

The Georgia Public Service Commission ("PSC") consists of five commissioners elected through statewide, at-large elections.[1] Plaintiffs—four black residents of Fulton County, Georgia—sued the Georgia Secretary of State ("Secretary") alleging that this election system constitutes unlawful vote dilution under Section 2 of the Voting Rights Act ("VRA"). In short, plaintiffs allege that black Georgians have been unable to elect their preferred PSC candidates because the statewide electoral system forces them to go head-to-head with the preferences of white Georgians across the State. Plaintiffs contend that single-member districts would be

———————————————

[*] The Honorable Harvey Schlesinger, United States District Judge for the Middle District of Florida, sitting by designation.

[1] As the district court recognized in its order, Georgia's PSC elections are "statewide" because they are open to every registered Georgia voter and "at-large" because all voters are eligible to vote directly for all five commissioners (instead of electing a single commissioner that then represents their district on the PSC). For ease of reference, we refer to this as a "statewide" system.

less dilutive and, therefore, are required.  The Secretary argues that partisanship—not race—has driven the PSC's electoral outcomes. He also argues that plaintiffs' requested remedy (single-member districts) would impermissibly alter Georgia's chosen form of government—a statewide body designed to avoid provincialism in the tough business of regulating energy.  The district court agreed with plaintiffs and enjoined the Secretary from administering statewide PSC elections and from certifying any commissioner elected via such method.[2]  For the reasons below, and with the benefit of oral argument, we reverse.

## I.    Background

### A.  The PSC's Functions and Method of Election

The Georgia Constitution requires a five-member PSC for utility regulation.  Ga. Const. Art. IV, § 1, ¶ I(a) ("There shall be a [PSC] for the regulation of utilities which shall consist of five members who shall be elected by the people.").  The PSC's significant responsibilities are wide-ranging.  At a basic level, the PSC determines, or at least monitors, the prices consumers pay for utilities—including electricity, natural gas, and some telephone services.  The PSC also controls permitting for power plant construction and it has some jurisdiction over internet connectivity and rural broadband, among other functions.  Simply put, the PSC is important to the State and its citizens.

---

[2] This order also cancelled elections for two PSC seats that were scheduled for November 2022.

The PSC carries out its responsibilities as an "administrative body" that performs "quasi-judicial" and "quasi-legislative" functions. *Tamiami Trail Tours, Inc. v. Ga. Pub. Serv. Comm'n*, 99 S.E.2d 225, 233 (Ga. 1957). That is, it conducts some of its proceedings as an adjudicatory body that "hears rate cases, holds hearings, listens to witnesses, makes evidentiary rulings, and weighs testimony from stakeholders"—similar to the judicial role. But it also sets utility rates, controls permitting for power plant construction, and regulates pole attachments and landlines for communications—similar to the legislative role.

The PSC dates back to 1879 when the Georgia General Assembly adopted an act establishing its predecessor, the Railroad Commission. In 1922, the General Assembly changed the name of the Railroad Commission to the PSC and expanded its powers and duties. Since 1906, Georgia's PSC commissioners—railroad commissioners prior to 1922—have been elected statewide to staggered six-year terms. When the PSC achieved constitutional status in 1945, the General Assembly retained the same election system.[3] In fact, in over 100 years, there has only been one change to PSC elections. Specifically, in 1998, under Governor Roy Barnes, the Georgia General Assembly created a five-district system with a residency requirement that remains in place today. Under this system, PSC commissioners must live in the district they represent,

---

[3] Before 1945, the PSC was only a creature of statute.

but they are still elected through statewide elections.[4]  For example, to represent the PSC's third district (Clayton, DeKalb, and Fulton Counties), a PSC commissioner must live in one of those three counties; however, Georgians in all 159 counties will vote on that commissioner's candidacy.  The residency requirement did not alter the electoral system (*i.e.*, statewide elections are still used), but it did change the candidate pool (*i.e.*, a PSC candidate must live in the district that he would represent if he were to win the statewide election).

The PSC's statewide electoral structure was deliberately chosen to advance policy interests that the Georgia General Assembly deemed important.  For example, the PSC's statewide elections allow each commissioner to prioritize the "best interest[s] of the whole state" without logjams from regionalized disputes. As PSC Chair Tricia Pridemore testified below:

---

[4] The Georgia Constitution requires that the PSC be "elected by the people," Ga. Const. Art. IV, § 1, ¶ I(a), leaving room for the Georgia General Assembly to spell out the specifics of the electoral system by statute.  Since 1998, the governing law has provided:

> The [PSC] shall consist of five members to be elected as provided in this Code Section. . . . [M]embers elected to the commission shall be required to be residents of one of five [PSC] Districts as hereafter provided, but each member of the commission shall be elected state wide by the qualified voters of this state who are entitled to vote for members of the General Assembly.

O.C.G.A. § 46-2-1(a).

> [T]he one thing about the five commissioners is that
> we don't fight over where things go.  We don't fight
> over which district gets a new gas plant or . . . a solar
> farm. . . .  The way [PSC elections are] structured
> enables us to . . . maximize the needs for the state.

If each commissioner represented only a district, then important questions of utility regulation—such as the location of energy and infrastructure—could turn into a zero-sum game between commissioners beholden to their districts instead of a collaborative effort to reach the best result for the entire State.   Similarly, Pridemore testified that the statewide electoral system discourages fights over rate setting, one of the PSC's most important functions: "We don't fight and argue amongst the five of us . . . over [whether] District 5 customers pay less than District 3 or District 3 electric customers pay more."   Other PSC commissioners provided similar views.[5]   At the end of the day, the Georgia General Assembly selected a statewide election system that allows PSC commissioners to focus on the needs of Georgia as a whole.

### B.  Section 2 of the VRA

An upfront understanding of the framework of Section 2 of the VRA helps contextualize plaintiffs' allegations, the Secretary's counter arguments, and the district court's various rulings.

---

[5] Commissioner Tim Echols, for example, provided that he "think[s] it's important that commissioners understand the issues of constituents all across [Georgia] regardless of where they live."

The text of Section 2 is straightforward:[6] It forbids "any State or political subdivision" from imposing any "voting qualification or prerequisite to voting or standard, practice, or procedure . . . which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a). The right protected by Section 2 is "equality of opportunity, not a guarantee of electoral success for minority-preferred candidates of whatever race." *Johnson v. De*

---

[6] The pertinent text of Section 2 provides:

> (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 10303(f)(2) of this title, as provided in subsection (b).

> (b) A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided*, [t]hat nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

52 U.S.C. § 10301(a)–(b).

*Grandy*, 512 U.S. 997, 1014 n.11 (1994).  Notably, Section 2 explicitly disclaims a right to proportionality.  52 U.S.C. § 10301(b) ("[N]othing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.").

In *Thornburg v. Gingles*, 478 U.S. 30, (1986), the Supreme Court laid the foundation for assessing at-large voting systems for vote dilution under Section 2.  *Id*. at 43–51.  "[A]t-large elections" are not "*per se* violative of § 2," but the Supreme Court has "long recognized that . . . at-large voting schemes may operate to minimize or cancel out the voting strength of racial minorities in the voting population." *Id*. at 46–47 (quotation omitted) (alteration adopted).  In such a case, at-large districts are prohibited.  *Id*. at 48.

To establish vote dilution under Section 2, plaintiffs must first satisfy the three *Gingles* preconditions:

> First, the minority group must be sufficiently large and [geographically] compact to constitute a majority in a reasonably configured district.  Second, the minority group must be able to show that it is politically cohesive.  And third, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it . . . to defeat the minority's preferred candidate."

*Allen v. Milligan*, 599 U.S. 1, 18 (2023) (brackets in original) (ellipses in original) (quotations omitted) (internal citations omitted) (citing *Gingles*, 478 U.S. at 51).

Importantly, we have interpreted the first *Gingles* precondition—a minority group being sufficiently large and geographically compact to constitute a majority in a reasonably configured district—to require plaintiffs to "offer[] a satisfactory remedial plan." *Wright v. Sumter Cnty. Bd. of Elections & Registration*, 979 F.3d 1282, 1302 (11th Cir. 2020). Without a satisfactory remedial plan, plaintiffs "cannot succeed." *Id.*; *see also Nipper v. Smith*, 39 F.3d 1494, 1530 (11th Cir. 1994) (en banc) ("[T]he issue of remedy is part of the plaintiff's prima facie case in section 2 vote dilution cases."); *Burton v. City of Belle Glade*, 178 F.3d 1175, 1199 (11th Cir. 1999) ("We have repeatedly construed the first *Gingles* factor as requiring a plaintiff to demonstrate the existence of a proper remedy."). Further, plaintiffs' remedial plan cannot be fundamentally at odds with the state's chosen model of government because "[n]othing in the Voting Rights Act suggests an intent on the part of Congress to permit the federal judiciary to force on the states a new model of government." *Nipper*, 39 F.3d at 1531.

Our interpretation of the first *Gingles* precondition has attracted support in other circuits. *See Sanchez v. Colorado*, 97 F.3d 1303, 1311 (10th Cir. 1996) ("The inquiries into remedy and liability, therefore, cannot be separated: A district court must determine as part of the *Gingles* threshold inquiry whether it can fashion a permissible remedy in the particular context of the challenged system."(quoting *Nipper*, 39 F.3d at 1530–31)); *Bone Shirt v. Hazeltine*, 461 F.3d 1011, 1025 (8th Cir. 2006) (Gruender, J. concurring) (same). Even circuits that do not assess the viability of

the proposed remedy as part of the first precondition inquiry recognize that proper remedies are critical in Section 2 vote dilution cases. *See generally Cousin v. Sundquist*, 145 F.3d 818, 831 (6th Cir. 1998) ("Therefore, even if we found that plaintiffs' showing met the *Gingles* pre-conditions or satisfied the totality of the circumstances test, we would not approve the imposition of such a remedy."). Thus, especially in a case like this one, where plaintiffs offer only a single, dramatic remedy—transforming a statewide voting system into a single-member districted plan—it makes no difference whether a claim fails for the lack of a permissible remedy at the precondition stage or after the totality of the circumstances analysis.

If plaintiffs can satisfy each *Gingles* precondition, the analysis then proceeds to a totality of the circumstances test[7] to determine

---

[7] As part of the totality of the circumstances analysis, we traditionally consider the "Senate factors," which include:

1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

whether the voting system "result[s] in unequal access to the electoral process." *Gingles*, 478 U.S. at 46; *see also Wright*, 979 F.3d at 1288 ("Once all three *Gingles* requirements are established, the statutory text directs us to consider the totality of the circumstances to determine whether members of a racial group have less opportunity than do other members of the electorate." (quotation omitted)). "[I]t is the plaintiff's burden to establish <u>each</u> of the *Gingles* preconditions <u>and</u> to show, under the totality of the circumstances, that members of a protected class suffer unequal

---

4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6. whether political campaigns have been characterized by overt or subtle racial appeals; and

7. the extent to which members of the minority group have been elected to public office in the jurisdiction.

. . .

8. whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group; and

9. whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

*Wright*, 979 F.3d at 1289.

access to the political process." *Wright*, 979 F.3d at 1307 (emphasis in original).

Putting these pieces together, the traditional Section 2 vote dilution case challenges the operative boundaries of an electoral system and seeks to redraw those boundaries so that the minority population's voting strength is no longer diluted across the aggregated voting population. *Gingles*, 478 U.S. at 46–47. Often, these cases challenge multi-member, at-large districts used by governmental subunits within a state—such as city councils, county commissions, or school boards—and allege vote dilution because white voters get to vote for every board member which, in turn, drowns out the preferences of minority voters. *See generally United States v. Marengo Cnty. Comm'n*, 731 F.2d 1546, 1552 (11th Cir. 1984) (county commission and school board); *Sanchez v. Bond*, 875 F.2d 1488, 1489–90 (10th Cir. 1989) (county commission); *Badillo v. City of Stockton*, 956 F.2d 884, 885–86 (9th Cir. 1992) (city council); *Harvell v. Blytheville Sch. Dist. No. 5*, 71 F.3d 1382, 1385 (8th Cir. 1995) (school board); *McNeil v. Springfield Park Dist.*, 851 F.2d 937, 938 (7th Cir. 1988) (school board and park district); *Clarke v. City of Cincinnati*, 40 F.3d 807, 808 (6th Cir. 1994) (city council); *Washington v. Tensas Par. Sch. Bd.*, 819 F.2d 609, 610–12 (5th Cir. 1987) (school board and policy jury which was the "parish governing authority"); *Holloway v. City of Va. Beach*, 42 F.4th 266, 270–71 (4th Cir. 2022) (city council); *Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ.*, 4 F.3d 1103, 1111–12 (3d Cir. 1993) (school board); *Goosby v. Town Bd. of Hempstead*, 180 F.3d 476, 481 (2d Cir. 1999) (town board); *Uno v. City of Holyoke*, 72 F.3d 973, 977–78 (1st Cir. 1995) (city council). In these

cases, plaintiffs essentially allege that there are no "safe" districts in which minority voters have an enhanced opportunity to elect their preferred candidates. If vote dilution is found in these multi-member, at-large electoral systems, then the traditional remedy entails imposing a single-member districted system with some allocation of "majority-minority" districts in which "a minority group composes a numerical, working majority of the voting-age population." *Bartlett v. Strickland*, 556 U.S. 1, 13 (2009); *see Connor v. Johnson*, 402 U.S. 690, 692 (1971) ("[S]ingle-member districts are preferable to large multi-member districts as a general matter.").

Section 2 vote dilution challenges have also been brought against electoral systems that employ single-member districts. *Voinovich v. Quilter*, 507 U.S. 146, 157–58 (1993) ("In [*Growe v. Emison*, 507 U.S. 25, 40–42 (1993)], however, we held that the *Gingles* preconditions apply in challenges to single-member as well as multimember districts."); *see, e.g.*, *De Grandy*, 512 U.S. at 1000. Plaintiffs in these cases generally allege that their votes are diluted because the operative electoral map has an insufficient number of majority-minority districts. In the context of these single-member districts, if vote dilution is found, the traditional remedy is to redraw the boundaries of the already-existing single-member districts to remove the plan's dilutive effect. *See League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 495 (2006) (Roberts, J., concurring) ("[I]n the context of single-member districting schemes, we have invariably understood [Section 2 of the VRA] to require the possibility of *additional* single-member districts that minority voters might control." (emphasis in original)).

In these two types of traditional Section 2 cases, plaintiffs have experienced mixed levels of success depending—of course— on the facts of the case.  Importantly, however, despite the extensive and litigious history of Section 2, it had *never* been used to invalidate a statewide election system on vote dilution grounds until the district court reached such a holding in this case.[8]

### C. *Procedural History*

Plaintiffs filed this lawsuit in the Northern District of Georgia in July 2020.  They alleged that Georgia's statewide PSC elections dilute their votes in violation of Section 2 of the VRA because black voters have been consistently unable to elect their preferred candidates over the voting strength of white voters across Georgia.[9]  Plaintiffs maintained that this electoral ineffectiveness

---

[8] We are unaware of—and plaintiffs failed to provide—any case that has invalidated a statewide election system under the Section 2 framework.  When asked at oral argument if plaintiffs' counsel was "aware of any case where § 2 renders a statewide election illegal," counsel admitted that "[he thought] the answer [was] no."  The district court recognized the unprecedented nature of this case as well, noting that "[t]his case presents the novel question of whether there can be vote dilution in violation of Section 2 of the [VRA] when the challenged election is held on a statewide basis."

[9] Plaintiffs do not cabin their argument to the PSC's unique statewide system that is coupled with a residency requirement—rather, they take aim at the statewide system in general.  That is, even without the live-in-the-district requirement, plaintiffs would put forth the same vote dilution argument, as they made clear during proceedings at the district court:

was despite the fact that "African Americans in Georgia [were] sufficiently numerous and geographically compact to constitute a majority of the voting-age population in at least one single-member district." Accordingly, plaintiffs sought a remedy that would change Georgia's statewide system to single-member districts—including one Atlanta-based district with a black majority.

The Secretary moved to dismiss. The district court denied the Secretary's motion in full.

Then, the parties cross-moved for summary judgment. In particular, plaintiffs argued that they were entitled to partial summary judgment because they satisfied the three preconditions for a Section 2 vote dilution claim as set forth in *Gingles*. 478 U.S. at 50–51. The Secretary again argued that plaintiffs lacked standing or that, at least, plaintiffs "failed to demonstrate they have a sufficient remedy" because "the undisputed evidence demonstrates the State has a strong interest in maintaining its form of government for the PSC as a statewide elected body."

---

District Court: So you're saying that even if there was no residency requirement your challenge would still be viable? Your challenge is to the statewide at-large nature of election?

[Plaintiffs' Counsel]: Absolutely, Your Honor. In a nutshell, our claim is that African-American voters votes are diluted by the at-large nature of elections for the [PSC] because of the presence of racially-polarized voting.

While the Secretary's motion was denied in its entirety, plaintiffs' motions were granted in part. The district court agreed that plaintiffs satisfied the *Gingles* preconditions and were entitled to summary judgment on those points. However, it determined that plaintiffs were not entitled to summary judgment on their proposed remedy, and the case was set for trial. After a five-day bench trial, the district court found that Georgia's statewide PSC elections diluted the voting strength of black voters in violation of Section 2 and permanently enjoined the Secretary from administering or certifying future PSC elections under this method. The district court also found that plaintiffs' proposed remedy (single-member districts) was viable.

The Secretary appealed, and "move[d] for a stay pending appeal of the district court's . . . order permanently enjoining him from conducting state-wide elections on November 8, 2022, for Districts 2 and 3 of the Georgia [PSC]." A panel of this Court granted a stay, finding that the district court should not have altered the rules of an election that was about to occur under the "*Purcell* principle." *See Purcell v. Gonzalez*, 549 U.S. 1 (2006). The Supreme Court, however, vacated the stay, concluding that we erred in failing to analyze the request under the traditional stay factors.[10] *Rose v. Reffensperger*, 143 S. Ct. 58, 59 (2022).

---

[10] The Supreme Court stated:

> The August 12, 2022 order of the United States Court of Appeals for the Eleventh Circuit staying the district court's

Accordingly, we ordered the Secretary to "file a supplemental brief addressing whether a stay pending appeal is appropriate under the traditional stay factors." Instead, the Secretary filed an "Unopposed Motion to Withdraw Emergency Stay Injunction Pending Appeal," which was granted, and the PSC elections at issue did not occur in November 2022. We then heard oral arguments on the merits of the Section 2 vote dilution claim.

## II.     Standard of Review

We review a district court's "finding of vote dilution under § 2" of the VRA for "clear error." *Wright*, 979 F.3d at 1288. Similarly, a "district court's determination regarding one of the *Gingles* prongs is entitled to considerable deference." *Johnson v. Hamrick*, 296 F.3d 1065, 1074 (11th Cir. 2002). We have emphasized,

---

injunction is vacated. Respondent's emergency motion for a stay pending appeal relied on the traditional stay factors and a likelihood of success on the merits, see *Nken v. Holder*, 556 U.S. 418 (2009), yet the Eleventh Circuit failed to analyze the motion under that framework. Instead, it applied a version of the *Purcell* principle, *see Purcell v. Gonzalez*, 549 U.S. 1 (2006) (*per curiam*), that respondent could not fairly have advanced himself in light of his previous representations to the district court that the schedule on which the district court proceeded was sufficient to enable effectual relief as to the November election should applicants win at trial. The Eleventh Circuit may reconsider whether a stay pending appeal is appropriate, subject to sound equitable discretion.

*Rose v. Raffensperger*, 143 S. Ct. 58 (Mem), 213 L. Ed. 2d 1143 (2022)

however, that clear error review is not a "rubber stamp," *Wright*, 979 F.3d at 1301, and we always retain the power to "correct a district court's errors of law and its findings of fact based upon misconceptions of law," *United States v. Jones*, 57 F.3d 1020, 1022 (11th Cir. 1995).

### III.    Discussion

This vote dilution challenge is not a traditional one.  Rather, plaintiffs ask us to find—*for the first time ever*—that statewide elections constitute vote dilution under Section 2.  And, as a remedy, plaintiffs ask that we replace Georgia's chosen form of government (five statewide commissioners) with a completely different system (one commission with five single-member districts) that does not protect the statewide interests the Georgia General Assembly deemed important.  Simply put, plaintiffs' request strains both federalism and Section 2 to the breaking point.

Nonetheless, in a novel decision, the district court ruled that Georgia's statewide PSC elections constitute vote dilution in violation of Section 2.  But, because it is clear to us that plaintiffs' proposed remedy is a unique application of Section 2 that would upset Georgia's policy interests that are afforded protection by federalism and our precedents, we hold that plaintiffs have not proposed a viable remedy and have failed to satisfy *Gingles*'s first

precondition.  *See, e.g.*, *Nipper*, 39 F.3d at 1529.  Thus, we conclude that the district court made a mistake of law, and we reverse.[11]

### A.  *Plaintiffs' proposed remedy*

Plaintiffs propose converting PSC elections from statewide to single-member districted elections.  Specifically, under plaintiffs' proposal, the State of Georgia would be divided into five districts and PSC commissioners would be elected by voters in their district rather than by every voter in the State.  Plaintiffs' proposed map includes one majority-minority district.  That district (proposed District 1) would span the Atlanta area and include all of Clayton, DeKalb, Fayette, Henry, Newton, and Rockdale Counties as well as the southern half of Fulton County.  This district would have a 54% black voting-age population.  The other four districts would be largely rural and majority white.

### B.  *Plaintiffs' proposed remedy is not viable*

As an initial matter, we agree with plaintiffs that Section 2 applies because it explicitly protects against voting "standard[s], practice[s], or procedure[s]" imposed by "any State or political subdivision" that "result[] in a denial or abridgement of the right of any citizen . . . to vote on account of race or color."  52 U.S.C. § 10301(a); *see Milligan*, 599 U.S. at 24–25. Nonetheless, plaintiffs

---

[11] Because we decide this appeal on the remedy requirement at the first *Gingles* precondition, we do not consider the Secretary's argument that the district court's finding of racial vote dilution was clearly erroneous, and we do not proceed to analyze the "Senate factors" at *Gingles*'s totality of the circumstances stage.

cannot satisfy the first *Gingles* precondition because their novel application of Section 2 relies on a remedy that is not viable. *Wright*, 979 F.3d at 1302 ("A section 2 plaintiff cannot succeed without offering a satisfactory remedial plan.").

To reiterate a critical point, plaintiffs' proposed remedy asks us to wade into uncharted territory. Plaintiffs do not bring a routine challenge to an at-large voting structure at the municipal or county level and seek a single-member districted plan as the remedy. Nor do they seek to redraw an already-existing single-member districted system into a less dilutive single-member system. We have considered those challenges. *See generally Wright*, 979 F.3d at 1287; *De Grandy*, 512 U.S. at 1000. Instead, plaintiffs' novel proposal is that we dismantle Georgia's statewide PSC system and replace it with an entirely new districted system. But we have never gone this far.

We start by laying out the applicable legal framework established by three of our precedents and then we apply our precedent to the instant case. *See Nipper*, 39 F.3d at 1497; *S. Christian Leadership Conf. v. Sessions*, 56 F.3d 1281, 1296–97 (11th Cir. 1995) [hereinafter *SCLC*] (en banc); *Davis v. Chiles*, 139 F.3d 1414, 1416 (11th Cir. 1998).

*Nipper* is the first case of the trifecta. 39 F.3d at 1496. In *Nipper*, this Court—sitting *en banc*—expressly limited our reach in certain Section 2 vote dilution cases. *Id*. In that case, plaintiffs "challenge[d] the [at-large election] system used to elect the judges of Florida's Fourth Judicial Circuit Court [comprised of three

counties] . . . and the judges of the Duval County Court." *Id.* They sought "a remedy, such as the creation of subdistricts, that [would] ensure their ability to elect black judges of their choice." *Id.* at 1497. A majority of the Court[12] interpreted the first *Gingles* precondition to require "a remedy *within the confines of the state's judicial model.*" *Id.* at 1531 (emphasis added). Without such a remedy, plaintiffs could not succeed because "[n]othing in the [VRA] . . . permit[s] the federal judiciary to force on the states a new model of government; moreover, from a pragmatic standpoint, federal courts simply lack legal standards for choosing among alternatives." *Id.* Then, after examining the alternative models proposed by the plaintiffs, we held that plaintiffs' claim failed because each alternative would threaten important state interests and "undermine the administration of justice." *Id.* at

---

[12] Due to recusals, eight judges sat *en banc* for *Nipper.* 39 F.3d at 1496 n.*. Judge Tjoflat's plurality opinion was joined by one judge. *Id.* at 1496–1547. Judge Edmondson concurred and was joined by three judges. *Id.* at 1547 (Edmondson, J., concurring). As such, the portions of the plurality opinion that were concurred to (specifically Parts III(A) and III(B)(1)) are binding because they were joined by a six-judge majority. *Id.* For Judge Edmondson (and the three judges that joined his concurrence), the case was open and shut:

> For me, the point that determines the outcome of the case is this one: The State of Florida's legitimate interest in maintaining linkage between jurisdiction and the electoral bases of its trial judges is, as a matter of law, great and outweighs (either at the vote-dilution-finding stage or at the remedy stage) whatever minority vote dilution that may possibly have been shown here.

*Id.*

1543, 1546–47 ("Florida's current model of trial court elections embodies a state judgment that the voters in a judge's jurisdiction should have the right to hold that judge accountable for his or her performance in office.").

The logic of *Nipper* was quickly reaffirmed, this time in a challenge to Alabama's at-large elections for trial judges. *SCLC*, 56 F.3d at 1281. Sitting *en banc* again, we had the power to revisit the legal standards employed in *Nipper*—but did not. *Id.* at 1294. Instead, after affirming the district court's finding that there was no vote dilution, we went on to hold that "no remedy [was] available." *Id.* We reiterated that "[w]hen determining whether the remedy a plaintiff seeks is a feasible alternative to the challenged electoral system, a state's interest in maintaining the challenged system is a legitimate factor to be considered." *Id.* Then, we considered Alabama's interests in "maintaining the link between a trial judge's electoral base and jurisdiction," protecting against "favoritism concerns" that arise when smaller districts are created, and "ensuring a reasonable pool of qualified potential candidates." *Id.* at 1297. In sum, we held that "the many state policy interests . . . preclude[d] the remedies appellants[] propose[d]." *Id.* Thus, *SCLC* cemented the analysis of *Nipper*.

Finally, in *Davis*, in affirming the district court's rejection of a proposed remedy in a Section 2 vote dilution suit challenging an at-large judicial election system in Florida, a panel of this Court reiterated our prior holdings regarding impermissible remedies:

> In *Nipper* and *SCLC*, we ruled that a state's interest in
> maintaining its judicial model and in preserving such
> linkage outweighed the plaintiffs' interest in
> ameliorating the effects of racial polarization in at-
> large judicial elections. . . . Based on these precedents,
> we hold that Davis's [proposed remedy] would not be
> a proper remedy . . . .

139 F.3d at 1423 (citations omitted). In fact, this holding was the
only possible outcome because our case law "has placed . . . an
insurmountable weight on a state's interest in preserving its
constitution's judicial selection system and in maintaining linkage
between its judges' jurisdictions and electoral bases." *Id.*

The primary takeaway from this line of precedent is that
general principles of federalism undergird our decisions—as they
must. *Id.* ("[W]e must consider Florida's interest in maintaining the
challenged electoral system. . . . Of primary importance in this
case, our adoption of Davis's plan would require us to contravene
Florida's Constitution and to substantially break the link between
the affected judges' jurisdictions and electoral bases."); *see also*
*SCLC*, 56 F.3d at 1298 (Edmondson, J., concurring) ("The basic
structure of Alabama's judicial branch of government, including
the shape of its judicial jurisdictions and the manner of selecting
trial judges, is in the hands of Alabama's people."). This significant
respect for a state's decisions on matters involving its governmental
structure stems from our federalist system of government which
necessitates respect for states that are "residuary sovereigns and
joint participants in the governance of the Nation." *Alden v. Maine*,

527 U.S. 706, 748 (1999); *Printz v. United States*, 521 U.S. 898, 918–19 (1997) ("Although the States surrendered many of their powers to the new Federal Government, they retained 'a residuary and inviolable sovereignty.'" (quoting The Federalist No. 39, at 245 (James Madison)). Thus, while the Fourteenth Amendment and VRA overcome state sovereignty in certain factual situations in the voting rights arena, we must remain mindful of state authority, which is a hallmark of American government. *See, e.g.*, *League of United Latin Am. Citizens v. Clements*, 999 F.2d 831, 871 (5th Cir. 1993) ("The substantiality of the state's interest has long been the centerpiece of the inquiry into the interpretation of the Civil War Amendments and their interplay with the civil rights statutes.").

Building on federalism, the second critical takeaway is that we must assess a plaintiff's proposed remedy early and strongly consider the state's interest in maintaining its form of government when making that assessment. Specifically, "there must be a remedy *within the confines of the state's [PSC] model*[.]" *Nipper*, 39 F.3d at 1531. And we must consider "a state's interest in maintaining the challenged system" when "determining whether the remedy a plaintiff seeks is a feasible alternative to the challenged electoral system." *SCLC*, 56 F.3d at 1294; *see also Davis*, 139 F.3d at 1423; *Houston Lawyer's Ass'n v. Att'y Gen.*, 501 U.S. 419, 426–27 (1991) (recognizing the importance of considering the state's interest in assessing a plaintiff's proposed remedy). We must be mindful that "[i]mplicit in this first *Gingles* requirement is a limitation on the ability of a federal court to abolish a particular form of government and to use its imagination to fashion a new

system." *Nipper*, 39 F.3d at 1531; *Wright*, 979 F.3d at 1302 ("A section 2 plaintiff cannot succeed without offering a satisfactory remedial plan," because "the issue of remedy [at the first *Gingles* precondition] is part of the plaintiff's prima facie case.").

The Georgia General Assembly determined that the PSC—a state commission with statewide authority and statewide responsibilities—should be elected on a statewide basis. O.C.G.A. § 46-2-1(a). It did so for race-neutral reasons, and plaintiffs do not suggest otherwise. Indeed, there is no evidence that race motivated Georgia's choice of electoral format at all. To the contrary, the State's deliberate choice was informed by significant policy considerations that would be undermined by a forced change in the Commission's structure—from a statewide body to a single-member districted body. Thus, an adequate remedy has not been proposed. *See SCLC*, 56 F.3d at 1297 ("[T]he many state policy interests we have discussed . . . preclude the remedies appellants[] propose; moreover[,] these interests outweigh whatever possible vote dilution may have been shown in this case.").

We reach this conclusion because plaintiffs' proposed remedy would fundamentally change the PSC's structure and operations.[13] A change from statewide to single-member districted

---

[13] To combat this point, plaintiffs point to the dissent to our grant of a stay in this case in August 2022. In pertinent part, the dissent argued that the district court did not permit a remedy that altered Georgia's chosen form of government because "[t]he district court didn't, for instance, add a branch of

elections would clearly affect the inner-workings of the PSC because commissioners would be serving a new constituency—their respective districts rather than the State as a whole.[14] As PSC Chair Pridemore testified, the current system allows commissioners to focus on the needs of the entire State, whereas a districted plan has the potential to disconnect commissioners from that critical statewide mission. *See Id.* at 1296 (recognizing, in the judicial context, an important state interest in "linkage," which preserves accountability by "[l]inking a trial court judge's territorial jurisdiction and electoral base"); *Cousin*, 145 F.3d at 827 (same).

Plaintiffs' proposed remedy would also undo a fundamental component of Georgia's current PSC electoral system—its insulation from localized special interests. Our precedents make clear that this concern is not only relevant, but also can be the defining feature of an elected body. *See, e.g.*, *Nipper*, 39 F.3d at 1544.

---

government, or move a power from one branch to another" or "change how any of the three branches must conduct themselves." *Rose v. Sec'y*, No. 22-12593, 2022 WL 3572823, at *11 (11th Cir. 2022) (Rosenbaum, J., dissenting). This test sets an arbitrarily high threshold such that nearly every conceivable proposal would pass muster (*i.e.*, no proposed remedy will be as significant as offering a fourth branch of government). Such a test does not comport with our precedents that expressly protect a state's chosen form of government. And moving from a statewide electoral system to a districted one is, in any event, a change of significant magnitude.

[14] Because the PSC's electoral map is already drawn into residency districts, plaintiffs argue that single-member districted elections would be consistent with the State's chosen model of government. This argument ignores that each commissioner is still elected statewide.

As we have stated, "[t]he implementation of subdistricts would increase the potential for 'home cooking' by creating a smaller electorate and thereby placing added pressure on elected [officials] to favor constituents—especially as election time approaches." *Id.*; *see also SCLC*, 56 F.3d at 1297 ("Subdistricting would also increase the specter of 'home cooking': Creating a smaller electorate would increase the pressure to favor constituents."). And the concern over provincialism is merited because "[e]veryone agrees that in some politically volatile and controversial cases it is beneficial to have the electorate come from the entire circuit rather than some smaller portion." *SCLC*, 56 F.3d at 1297.

The provincialism concerns discussed in our precedents are magnified when dealing with a statewide body like the PSC. Compared to county commission districts, for example, there is much greater potential for divisive problems to arise across an entire state—especially one as large as Georgia—and the pertinent issues are more likely to be large-scale with huge significance.[15]

---

[15] Just one example of a hugely divisive and significant issue with which the PSC is involved is the construction of Plant Vogtle near Augusta, Georgia. The total project "nears $35 billion" in cost. Jeff Amy, *Utilities Begin Loading Radioactive Fuel into a Second New Reactor at Georgia Nuclear Plant*, Assoc. Press (Aug. 17, 2023), [https://perma.cc/2PZY-7YTG]. And soon there will be "a hearing . . . by the PSC to determine how much customers will pay versus Georgia Power." Erica Van Buren, *Georgia Power to Start Loading Fuel into Plant Vogtle Unit 4, Test the Reactor*, Augusta Chron. (Aug. 18, 2023), [https://perma.cc/AYD3-D4G9]. It is easy to see how such a project—which carries large costs and directly affects one specific area of the state (in order to, in theory, reduce energy costs across the entire state)—would implicate

Thus, while changing an at-large electoral system to a single-member districted system may be a permissible remedy at the county level where there is little risk of provincialism due to the county's size, such a remedy can be impermissible at the State level where provincialism concerns merit considerable weight. And the State's interest is all the stronger where, as here, the PSC's statewide body furthers important race-neutral goals. Accordingly, the need to prioritize the State's interests over local concerns supports the State's policy-based decision to have its PSC elected statewide. And finally, while it does not play a determinative role in our analysis, we note that Georgia is not the only state to undertake this calculus and conclude that statewide elections are best for state boards like the PSC. Rather, nine other states—of varying regions and political majorities—employ statewide elections for their state commissions. Plaintiffs' counsel admitted as much at oral argument: "there are . . . seven states . . . including Georgia, that use [statewide] at-large elections for some or all of their utility regulators," as well as "two states . . . that use [statewide] at-large elections for some or all of their boards of education[]," and "Hawaii . . . uses [statewide] at-large elections for a native Hawaiian board." And there is no reason that if the statewide PSC—justified by a legitimate desire to avoid provincialism in the regulation of utilities and untainted by even a suggestion of racial bias in its creation—could be converted by this

---

"home cooking" concerns in a way that would negatively affect the PSC's mission to protect the interests of the entire State.

Court into a multidistrict body, that the State Supreme Courts and other multi-member statewide entities could not be converted as well.

Here, plaintiffs have failed to put forward an alternative less-dilutive voting practice that can be implemented to elect commissioners to the statewide PSC. Plaintiffs instead propose adopting an election scheme that would effectively change the structure of the PSC itself from a statewide body to a body that comprises single-member districts. This extraordinary remedy is not viable given Georgia's strong interests in maintaining the PSC as a statewide body.

We do not mean to suggest that Section 2 plaintiffs could never prevail when asserting a Section 2 vote dilution claim against a statewide body. Instead, we merely reaffirm the principle that plaintiffs must propose a remedy within the confines of the state's chosen model of government when bringing such a claim.

Further supporting our decision is the difficulty in selecting a reasonable benchmark to evaluate the challenged voting practice. As the Supreme Court has explained, sometimes selecting a reasonable benchmark is easy, sometimes it is hard. *Holder v. Hall*, 512 U.S. 874, 880–81 (1994). Here, plaintiffs simply state, without citing any case, that their proposed remedy is the benchmark. But that cannot be right. If we accepted plaintiffs' argument that a proposed remedy is the benchmark, we would never struggle to find one. And, in fact, in *Holder*, the Supreme Court wrestled with the issue of how to choose an appropriate benchmark. *Id.* at 881.

In that case, the plaintiffs challenged the size of a county commission and argued that a five-member commission should serve as the benchmark over the single member commission that was in place. *Id.* The Supreme Court held that "there [was] no principled reason why one size should be picked over another as the benchmark for comparison." *Id.* Similarly, here, plaintiffs have not provided a principled reason why a PSC comprising single-member districts should be picked as the benchmark.

We turn now to plaintiffs' counterarguments—and reject them.

To start, despite plaintiffs' argument to the contrary, the *Nipper* line of precedent is binding on the instant case. Of course, we are fully aware that *Nipper*, *SCLC*, and *Davis* involve judicial elections. But the application of these decisions is not limited to judicial elections only. Even if that were the case, these decisions would still have equal force here because the PSC is a "quasi-judicial" administrative body. *Tamiami Trail*, 99 S.E.2d at 233 ("It has been recognized by this court and by the courts of other jurisdictions that an administrative body such as the Public Service Commission may, in matters which come before it for determination, perform quasi-judicial functions as well as quasi-legislative functions."). This categorization is not hollow. Rather, the PSC operates in a distinctly judicial fashion. It "hears rate cases, holds hearings, listens to witnesses, makes evidentiary rulings, and weighs testimony from stakeholders to come to a decision." Further, the reasons that we respect a state's decision regarding its

judicial election system (*i.e.*, linking the electoral and jurisdictional districts for accountability, protecting against "home cooking," and promoting fairness) apply just the same in the "quasi-judicial" context (as analyzed above). *See generally Nipper*, 39 F.3d at 1544.

We also recognize that *Davis* references a state's "constitutional" model at multiple points. 139 F.3d at 1423. We do not read *Davis* to mean, however, that only constitutionally enshrined models of government are entitled to judicial respect. To the contrary, as explicated in *Davis*, "[u]nder *Nipper* . . . this court must carefully consider the impact that any remedial proposal would have on the judicial model enshrined in a state's constitution *or statutes*." 139 F.3d at 1421 (emphasis added). As such, we do not analyze whether the Georgia General Assembly chose its form of government by constitutional or statutory means because it makes no difference.[16] *Compare* Ga. Const. Art. IV, § I, ¶ I(a), *with* O.C.G.A. § 46-2-1(a). Either way, Georgia chose the statewide electoral model for the PSC, and plaintiffs' proposed remedy would alter that choice in contravention of the principles of federalism.

---

[16] We recognize that the district court interpreted the Georgia Constitution's requirement that the PSC be "elected by the people" to require only that the PSC be elected—instead of appointed by the governor, for example. *See* Ga. Const. Art. IV, § I, ¶ I(a). In other words, the district court found that the specific form of those elections (statewide) is not constitutionally prescribed and is rooted only in statute. *See* O.C.G.A. § 46-2-1(a). As such, the district court concluded that plaintiffs' proposed remedy would not require the alteration of Georgia's chosen form of government.

Next, plaintiffs argue in a Federal Rule of Appellate Procedure 28(j) letter that the Supreme Court's decision in *Allen v. Milligan* supports their argument because the Supreme Court rejected Alabama's arguments which "echoe[d] the Secretary's state-interest argument." 599 U.S. at 24–26. *Milligan* counsels against a "single-minded view of § 2" and quotes *Wisconsin Legislature v. Wisconsin Elections Commission*, 595 U.S. 398, 405 (2022), to provide that a court cannot "improperly reduc[e] *Gingles'* totality-of-circumstances analysis to a single [Senate] factor." *Milligan*, 599 U.S. at 24–26. Critically, however, our analysis is not "single-minded"; rather, in conformance with precedent, we analyze plaintiffs' proposed remedy and look to a state's policy interests and rationales as one part of that larger undertaking.[17] Similarly, *Wisconsin Legislature* does not change our analysis—we are not weighing the Senate factors because we do not reach Section 2's totality of the circumstances test (*i.e.*, step two of the Section 2 analysis once the *Gingles* preconditions are satisfied). Rather, we go no further than the first *Gingles* precondition as interpreted by binding Eleventh Circuit precedent. *See League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*, 66 F.4th 905, 943 (11th Cir. 2023) (describing our binding commitment to our Circuit's precedent). At this first step, we conclude that plaintiffs' lack of an adequate remedial proposal means that their claim cannot proceed.

---

[17] A state's interest, however, is not infallible. *See, e.g.*, *SCLC*, 56 F.3d at 1297 ("[T]hese interests outweigh whatever possible vote dilution may have been shown in this case.").

*See Milligan*, 599 U.S. at 18 ("To succeed in proving a § 2 violation under *Gingles*, plaintiff *must* satisfy three preconditions." (italics added) (quotations omitted)).

Finally, plaintiffs argue that other evidence—such as testimony from other commissioners that their duties would not change and testimony from the "long-time director of the Secretary's Center for Election Systems" that transitioning to single-member districts would be feasible—proves that "switching to single-member districts would not even affect the commissioners' day-to-day work."[18] As to whether the PSC will be affected by the potential change in electoral format, the district court dismissed the State's interests, such as its "linkage" concern (*i.e.*, its interest in promoting accountability by having an official's territorial jurisdiction mirror his electoral base). But the district

---

[18] Despite their own reliance on lay opinion testimony, plaintiffs also argue that PSC Chair Pridemore's "lay opinion" regarding the State's policy interest in maintaining its statewide election system is insufficient. The district court agreed, finding that Pridemore's testimony was "not tethered to any objective data" and "lacked foundation." It is unclear to us what "data" could be offered to better support Georgia's policy interests. To the extent that the district court preferred "arguments buried in legislative history" over Pridemore's testimony, we disagree that such forms of evidence would be more compelling or instructive. All in all, we understand the principal reasons that Georgia adopted a statewide elected PSC were a concern for avoiding conflicts amongst the PSC's commissioners in order to achieve cohesive utility policy that favors Georgians in each region of the State equally and the desire to dodge the "home cooking" problem (issues that we have highlighted as important in our precedents). We find these rationales are properly considered.

court's reasoning was premised on discounting our *Nipper* line of precedent because those cases concerned judicial elections. We have already explained how this conclusion rests on a mistake of law. *See Jones*, 57 F.3d at 1022 ("We may correct a district court's errors of law and its findings of fact based upon misconceptions of law."). And because the district court also mistook other critical parts of our law—including our Circuit's emphasis on *Gingles's* first precondition and the effect that federalism and our precedent have in a novel Section 2 case—we must reverse. *Id.*

### IV.    Conclusion

The Georgia General Assembly determined that the State's PSC—a constitutionally created state commission with statewide authority and statewide responsibilities—should be elected statewide. Georgia chose this electoral format to protect critical policy interests and there is no evidence, or allegation, that race was a motivating factor in this decision. On the facts of this case, we conclude that plaintiffs' novel remedial request fails because Georgia's chosen form of government for the PSC is afforded protection by federalism and our precedents. In simple terms, plaintiffs have failed to propose a viable remedy and cannot satisfy the first *Gingles* precondition as we understand it. Because the district court made mistakes of law, we reverse.

**REVERSED.**