In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 22-12593

_____

RICHARD ROSE,
an individual,
BRIONTE MCCORKLE,
an individual,
WANDA MOSLEY,
an individual,
JAMES MAJOR WOODALL,

Plaintiffs-Appellees,

_versus_

SECRETARY, STATE OF GEORGIA,

Defendant-Appellant.

_____

2                    Order of the Court                    22-12593

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:20-cv-02921-SDG

————————————

Before William Pryor, Chief Judge, Wilson, Jordan, Rosenbaum, Jill Pryor, Newsom, Branch, Grant, Luck, Lagoa, and Brasher, Circuit Judges.*

BY THE COURT:

A judge of this Court having requested a poll on whether this appeal should be reheard by the Court sitting en banc , and a majority of the judges in active service on this Court having voted against granting rehearing en banc, the Court sua sponte ORDERS that this appeal will not be reheard en banc.

————————————

* Judge Abudu recused herself and did not participate in the en banc poll.

BRANCH, Circuit Judge, respecting the denial of rehearing en banc, joined by GRANT, Circuit Judge:

A majority of the Court has voted not to rehear this case en banc. Although our opinion speaks for itself, *see Rose v. Secretary, State of Georgia*, 87 F.4th 469 (11th Cir. 2023), I write to respond to the dissents on four points.[1]

I begin with a brief background of this case. In *Rose*, plaintiffs challenged Georgia's statewide, at-large elections for members of the Public Service Commission ("PSC")[2]—a quasi-judicial and quasi-legislative body—under Section 2 of the Voting Rights Act ("VRA"). Plaintiffs brought the instant lawsuit to challenge Georgia's system of statewide PSC elections. They alleged that statewide elections diluted their votes in violation of Section 2 of

---

[1] I note that the Supreme Court recently declined to take up this case by denying a petition for writ of *certiorari*. *See Rose v. Raffensperger*, No. 23-1060, 2024 WL 3089563 (U.S. June 24, 2024).

[2] The PSC is a Georgia constitutional body that dates back to 1879. Its quasi-judicial duties including hearing utility rate cases, holding hearings, listening to witnesses, making evidentiary rulings, and weighing testimony of stakeholders. Its quasi-legislative duties include setting utility rates, controlling permitting for power plant construction, and regulating pole attachments and landlines for communications. Since 1906, PSC Commissioners (and their predecessors on the Railroad Commission), have been elected statewide to staggered six-year terms. In the over 100 years since Commissioners began being elected, there has only been one change to PSC elections: in 1998, the Georgia General Assembly created a five-district system with a residency requirement which remains in place today. Under this system, PSC commissioners must live in one of five districts, but they are still elected statewide and serve the entire state.

the VRA because black voters consistently have been unable to elect their preferred candidate over the voting strength of white voters across Georgia. The district court granted partial summary judgment to plaintiffs, finding that they had satisfied the *Gingles*[3] preconditions, and set the case for trial. After a five-day bench trial, the district court found that under *Gingles'* totality of the circumstances test, Georgia's statewide elections for PSC commissioners diluted the strength of black voters in violation of Section 2. Thus, it permanently enjoined the Secretary from carrying out PSC elections under the statewide method. The district court also determined after the trial that the plaintiffs' *only proposed remedy*—changing the PSC from a statewide body into a body comprising single-member districts—was viable. The Secretary appealed.

On appeal, we unanimously found that the district court had committed an error of law by failing to properly apply our precedent regarding the first *Gingles* precondition. Specifically, we held that the district court erred because plaintiffs had "failed to propose a viable remedy and [could not] satisfy the first *Gingles* precondition[.]" *Rose*, 87 F.4th at 486. We so held because plaintiffs' proposed remedy of single-member districted elections would fundamentally alter the PSC's statewide structure and operations. *Id.* at 482–86.

With this background in mind, I now turn to the dissentals' issues with our opinion.

---

[3] *Thornburg v. Gingles*, 478 U.S. 30 (1986).

First, Judges Wilson and Rosenbaum argue that we misapplied *Nipper v. Smith*, 39 F.3d 1494 (11th Cir. 1994) (en banc), and its progeny because in their view, these cases should apply to judicial elections only. Not so. While our opinion recognized that these cases involved judicial elections, *Rose*, 87 F.4th at 484–85, we emphasized that their core teachings—forbidding courts from abolishing a state's chosen form of government and giving strong weight to this choice at the first *Gingles* precondition—have wider applications. *Id.* Indeed, as our opinion explained, *Nipper* emphasized that "[n]othing in the [VRA] suggests an intent on the part of Congress to permit the federal judiciary to force on the states a new model of government," *Nipper*, 39 F.3d at 1531, and accordingly, a court "must determine as part of the *Gingles* threshold inquiry whether it can fashion a permissible remedy in the particular context of the challenged system." *Rose*, 87 F.4th at 475 (quotations omitted). Nothing about these principles is limited to judicial elections only. And even if these principles were so limited, the PSC at issue in this case is a quasi-judicial body that "hears rate cases, holds hearings, listens to witnesses, makes evidentiary rulings, and weighs testimony from stakeholders."[4] *Id.* at 473.

---

[4] Judges Wilson and Rosenbaum attempt to distinguish the PSC from the trial judges at issue in the *Nipper* line of cases by arguing that those cases were "grounded in independent nature of the judicial role" whereas the PSC "operate[s] as a collegial body that makes decisions through majority rule." Judge Rosenbaum further argues that PSC commissioners are elected in partisan elections, whereas Georgia's elections of judges are non-partisan. But these distinctions are unconvincing. Many judicial bodies operate in a collaborative manner and not every state in the Eleventh Circuit elects its judges in a non-

Second, Judge Wilson faults us for not reaching the totality of the circumstances analysis because we determined at the first *Gingles* precondition that plaintiffs had not met their burden of proposing a viable remedy within Georgia's chosen form of government. Judge Wilson asserts that we "functionally render[ed] the preconditions exhaustive" in contravention of the Supreme Court's decision in *Johnson v. De Grandy*,[5] which in his view "will deny many future plaintiffs meaningful review of their [Section] 2 challenges." Judge Wilson fundamentally misunderstands *De Grandy, Nipper,* and our opinion in *Rose.*

In *De Grandy*, the Supreme Court held that while the three *Gingles* preconditions are necessary, they are not sufficient standing alone to prove a Section 2 claim. *Id.* at 1009–13. In *Nipper* we noted that this decision "resolved any doubt as to the *threshold* nature of the *Gingles* factors." *Nipper*, 39 F.3d at 1513 (emphasis added). When a plaintiff cannot satisfy these preconditions, we need not reach the totality of the circumstances analysis. *See Wright v. Sumter County Board of Elections & Registration*, 979 F.3d 1282, 1288 (11th Cir. 2020) ("[O]nce all three *Gingles* requirements are established,

---

partisan manner. For example, Alabama conducts partisan elections for its judges, *Butler v. Alabama Jud. Inquiry Comm'n*, 802 So. 2d 207, 214 (Ala. 2001), and state appellate courts, which are collegial, multi-member bodies, are often (although not always) elected statewide. If the dissentals' distinctions were accepted, Section 2 could be used to force states to draw their intermediate appellate and State Supreme Court judges into single member districts, thus reconfiguring their entire State court systems.

[5] 512 U.S. 997 (1994).

the statutory text directs us to consider the totality of the circum-
stances to determine whether members of a racial group have less
opportunity than do other members of the electorate." (quotations
omitted)). Because we, in *Rose*, assessed the plaintiffs' remedy at
the first *Gingles* precondition stage, as Judge Wilson admits was re-
quired, we gave Georgia's interest in maintaining its chosen form
of government the weight it was due and "reaffirm[ed] the princi-
ple that plaintiffs must propose a remedy within the confines of
the state's chosen model of government" when bringing a vote di-
lution claim. *Rose*, 87 F.4th at 484. And because we held that the
plaintiffs failed to satisfy the first *Gingles* precondition, we were not
required to proceed to the totality of the circumstances analysis.
Thus, contrary to the dissentals' views, future Section 2 plaintiffs
will merely need to continue to satisfy the preconditions to prevail
on their claims, a requirement which has been in place for decades.[6]

Third, Judge Wilson asserts that we did not sufficiently en-
gage with cases where this Court has upheld Section 2 challenges
to at-large elections for multi-member administrative bodies, like

---

[6] Judge Rosenbaum reads our opinion as suggesting that if we had conducted
a totality of the circumstances analysis we would have found no vote dilution
based solely on the State's policy interests. She is incorrect. Instead, we simply
pointed to other circuits which, despite evaluating the remedy at the totality
of the circumstances stage, recognize the critical nature of the proposed rem-
edy. Accordingly, we noted "in cases like this one, where plaintiffs offer only
a single, dramatic remedy . . . it makes no difference whether a claim fails for
the lack of a permissible remedy at the precondition stage or *after* the totality
of the circumstances analysis." *Rose*, 87 F.4th at 475–76 (emphasis added). But
our analysis stayed at the precondition stage.

6                    BRANCH J., respecting denial                    22-12593

the school board at issue in *Wright*.[7]  He asserts that these cases demonstrate "that, even when a state has an important interest in maintaining an electoral system, this interest is not outcome determinative."[8]  Judge Wilson again misses the mark.  For starters, we

---

[7] Similarly, both Judges Wilson and Rosenbaum express concern that our analysis was influenced by our determination that this case was novel in that it dealt with a challenge to elections for a statewide body as opposed to county or municipal bodies.  Judge Rosenbaum in particular takes issue with this determination, asserting that "[n]either Plaintiffs' claim nor their proposed remedy is 'novel.'"  It is true we referred to the novel nature both of plaintiffs' challenge and proposed remedy.  Our opinion, however, was based entirely on the impermissibility of plaintiffs' proposed remedy.  *Rose*, 87 F.4th at 480 (noting that "plaintiffs cannot satisfy the first *Gingles* precondition because their novel application of Section 2 relies on a remedy that is not viable" and their "novel proposal is that we dismantle Georgia's statewide PSC system and replace it with an entirely new districted system.").  Further, I note that the Supreme Court and the Fourth Circuit rejected a unique Section 2 challenge because the proposed remedy was not viable.  *See Holder v. Hall*, 512 U.S. 874, (1994), *infra* at 9; *Baten v. McMaster*, 967 F.3d 345, 360–61 (4th Cir. 2020) (rejecting a Section 2 challenge to South Carolina's winner-take-all method of selecting presidential electors because "[t]he relevant geographic area for the selection of president [e]lectors [was] the entire State" and thus "there [was] no alternative of a 'single-member-district'").

[8] In a similar vein, Judge Rosenbaum argues that we "effectively overrule[d] *Gingles*" by "disregard[ing] decades of binding precedent" and making "the state's interest in maintaining its existing electoral system dispositive."  As discussed above, Judge Rosenbaum is wrong for the same reasons as Judge Wilson, namely a state's interest is not outcome determinative; rather the plaintiff is required to propose a remedy within the confines of a state's chosen model of government.  And while Judge Rosenbaum believes that single-member districts would be an allowable remedy in this case because it is the default remedy for vote dilution claims, such a remedy "do[es] not map onto the type of challenge that the plaintiffs have mounted here" because "[t]he relevant

did not hold in *Rose* that a state's interest was outcome determinative. Indeed, we explicitly rejected such a reading of our opinion by stating "[w]e do not mean to suggest that Section 2 plaintiffs could never prevail when asserting a Section 2 vote dilution claim against a statewide body" and instead were "merely reaffirm[ing] the principle that plaintiffs must propose a remedy within the confines of a state's chosen model of government" when bringing Section 2 claims. *Id.* Furthermore, we explained that a state's provincialism concerns are much greater for statewide bodies like Georgia's PSC than county administrative bodies, like the school board at issue in *Wright* because "there is much greater potential for divisive problems to arise across an entire state . . . and the pertinent issues are more likely to be large-scale with huge significance." *Id.* at 483. And while Judge Wilson takes issue with the discussion of these provincialism concerns because PSC commissioners are required to live in one of five statutorily defined districts, State law makes clear that their constituency is the State as a whole and they perform statewide functions, unlike the school board members in *Wright*. Thus, far from not engaging with cases like *Wright*, our opinion distinguished cases involving elections of county administrative bodies with those involving elections of statewide bodies like the PSC at issue here.[9]

---

geographic area for the selection of [PSC commissioners] is the entire State." *Baten*, 967 F.3d at 360–61.

[9] Judge Wilson asserts that "[t]he inconsistent nature of our precedent's treatment of state interests" in *Wright* and *Nipper* warrants further en banc review. But there is no inconsistency. Building on Supreme Court precedent, the en

Finally, Judge Wilson asserts that "[t]he injection of federalism in the context of voting rights is a problematic 'recent vintage.'" Yet, the Civil War Amendments and the VRA cannot be understood except by reference to federalism principles. Indeed, the Civil War Amendments altered our constitutional design, and the VRA enforces the Fifteenth Amendment. *Shelby Cnty., Ala. v. Holder*, 570 U.S. 529, 536 (2013). Accordingly, the VRA must be read in light of this legal context. *See id.* at 534–35. When doing so, we see that the Civil War Amendments and the VRA changed the relationship between state and federal governments according to their terms, and no more. As the Supreme Court has recognized, even "the Fourteenth Amendment does not override all principles of federalism." *Gregory v. Ashcroft*, 501 U.S. 452, 469 (1991). Furthermore, as explained in our opinion, federalism principles undergird *Nipper*, which made clear that the VRA does not "permit the

---

banc *Nipper* court made clear that "[t]he inquiries into remedy and liability . . . cannot be separated" and therefore a court "must determine as part of the *Gingles* threshold inquiry whether it can fashion a permissible remedy in the particular context of the challenged system." *Nipper*, 39 F.3d at 1530–31. The *Wright* court fully recognized this requirement. *Wright*, 979 F.3d at 1302–03. Furthermore, courts must evaluate a state's interests both at the precondition stage and, if the preconditions are met, again at the totality of the circumstances stage. *Nipper*, 39 F.3d at 1542. And while in many cases a state's interest will have "minimal relevancy in the totality of the circumstances analysis" those interests can "play[] a major role" in evaluating the viability of a proposed remedy. *Id.* In the instant case, Georgia's interests in preserving a statewide PSC played such a role at the precondition stage.

federal judiciary to force on the states a new model of government." *Nipper*, 39 F.3d at 1531.

And the *Nipper* court did not go out on a limb in considering federalism principles in reaching its holding. Instead, it followed the Supreme Court's lead. In *Holder v. Hall*, the plaintiffs brought a Section 2 lawsuit challenging the size of a single-member county commission, arguing that their proposed remedy—a five-member county commission elected by single-member districts—should serve as the benchmark for the district court to compare the alleged dilution. 512 U.S. 874, 881 (1994). The Supreme Court held that "there [was] no principled reason why one size should be picked over another as the benchmark for comparison." *Id.* The *Nipper* court recognized that implicit in *Holder* was the principle that federal courts "may not alter the state's form of government itself when [plaintiffs] cannot identify a 'principled reason why one [alternative to the model being challenged] should be picked over another as a benchmark for comparison.'" *Nipper*, 39 F.3d at 1532. (second brackets in original) (quoting *Holder*, 512 U.S. at 881). As in *Holder*, the plaintiffs here failed to provide a principled reason for selecting a PSC comprising single-member districts as opposed to a statewide PSC as the benchmark. Accordingly, they failed to provide a viable remedy resulting in a failure to satisfy the first *Gingles* precondition.

For these reasons, we did not err in reversing the district court's decision.

WILSON, Circuit Judge, dissenting from the denial of rehearing en banc, joined by ROSENBAUM and JILL PRYOR, Circuit Judges:

The Voting Rights Act strives to realize "an America defined by pluralism, where everyone's voice is heard, everyone's vote is counted, and everyone's interests are represented."[1]  It is considered to be "the most successful civil rights statute in the history of the Nation," *Allen v. Milligan*, 599 U.S. 1, 10 (2023) (quotation omitted), and its continued success hinges on the good faith enforcement of its most litigated provision.  Section 2 provides a necessary mechanism for challenging state and local electoral schemes that deny voters equal participation in the political process to elect representatives of their choice.  *See* 52 U.S.C. § 10301.  In its reversal of the district court's well-reasoned opinion, the panel improperly narrows § 2, eroding the guarantees of the Voting Rights Act.  Accordingly, I dissent from this court's refusal to rehear this case en banc.

I.

I begin with our primary authority for evaluating § 2 voter dilution challenges.  The Supreme Court "has long recognized that multimember districts and at-large voting schemes may operate to minimize or cancel out the voting strength of racial minorities in the voting population." *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986) (internal quotations omitted and alteration adopted).  The Court has faithfully applied *Gingles* "in one § 2 case after another, to

---

[1] Eric Holder, *Our Unfinished March* 12 (2022).

different kinds of electoral systems and to different jurisdictions in States all over the country." *Milligan*, 599 U.S. at 19.

The *Gingles* Court recognized that § 2 is a limited statutory sword, and did not disclaim at-large elections as *per se* violations of minority voters' rights.  478 U.S. at 48.  Instead, the Court articulated three preconditions that plaintiffs must satisfy to obtain relief from the challenged electoral practice:

> First, the minority group must be sufficiently large and geographically compact to constitute a majority in a reasonably configured district. . . . Second, the minority group must be able to show that it is politically cohesive.  And third, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it to defeat the minority's preferred candidate.

*Milligan*, 599 U.S. at 18 (internal citation and quotations omitted) (alterations adopted) (citing *Gingles*, 478 U.S. at 50–51).  Our circuit interprets the first *Gingles* precondition to implicitly require plaintiffs to propose a viable remedy to the challenged electoral system. *See Nipper v. Smith*, 39 F.3d 1494, 1530–31 (11th Cir. 1994) (en banc). The remedy must fall "within the confines of the state's system of government."  *See id*. at 1533.

Once a court has determined that the *Gingles* preconditions are met, "the statutory text directs us to consider the totality of circumstances to determine whether members of a racial group have less opportunity than do other members of the electorate." *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 425–26 (2006)

(internal quotations omitted). The Supreme Court "'has provided some structure to the statute's totality of circumstances test' by adopting the Senate Report on the 1982 amendments to the Voting Rights Act," which identifies nine "Senate Factors" typically relevant to a § 2 dilution claim. *Wright v. Sumter Cnty. Bd. of Elections and Registration*, 979 F.3d 1282, 1288–89 (11th Cir. 2020) (quoting *Johnson v. De Grandy*, 512 U.S. 997, 1010–11 (1994)). A state's interest in the electoral system is one of the nine factors considered.[2]

*Nipper* states that courts should give a state's interest significant weight when evaluating the viability of a proposed remedy at the preconditions stage, and in doing so, treats this analysis as separate from a totality of circumstances analysis. *See* 39 F.3d at 1533. Our decision in *Davis v. Chiles* similarly reviewed the state's interest in light of the proposed remedy, but employed the totality of the circumstances language at the outset:

> As part of any prima facie case under Section Two, a plaintiff must demonstrate the existence of a proper remedy. In assessing a plaintiff's proposed remedy, a court must look to the totality of the circumstances, weighing both the state's interest in maintaining its election system and the plaintiff's interest in the adoption of his suggested remedial plan.

---

[2] The ninth Senate Factor is "whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous." *Wright*, 979 F.3d at 1289 (quotations omitted). It is referred to as "state interest" throughout § 2 jurisprudence.

4                         WILSON, J., Dissenting                22-12593

139 F.3d 1414, 1419–20 (11th Cir. 1998) (internal citations omitted).
But in *Wright*, we did not consider the state's interest in assessing
the remedy as a *Gingles* precondition. 979 F.3d at 1302–04. Instead,
we considered the state's interest only within our review of the to-
tality of the circumstances. *Id*. at 1296–97.

Here, the panel places such great weight on the state's inter-
est at the preconditions stage that they foreclose reaching the total-
ity of the circumstances stage, where they would have weighed the
state's interest against the other Senate Factors. The inconsistent
nature of our precedent's treatment of state interests speaks to our
need for en banc review.

II.

The Georgia Public Service Commission (PSC) is a five-
member administrative body responsible for ensuring the safety,
reliability, and affordability of utility services for Georgians. For
nearly 100 years, commissioners were elected via an at-large,
statewide vote and could reside anywhere in the state. But in 1998,
the Georgia General Assembly amended the Georgia Code to cre-
ate five PSC districts, requiring each commissioner to serve—and
*reside in*—their respective district for the duration of their six-year
term. Notably, commissioners continued to be elected by
statewide vote.

In this case, Plaintiffs—Black residents and voters in District
3—sued Georgia's Secretary of State, alleging that PSC's at-large
electoral system dilutes the strength of their vote in violation of § 2
and propose the standard remedy for § 2 violations: single-member

districting. The Northern District of Georgia, finding that Plaintiffs satisfied the *Gingles* preconditions and that a balance of the Senate Factors compelled a finding of vote dilution, enjoined the state from conducting future PSC elections under an at-large method. *Rose v. Raffensperger*, 619 F. Supp. 3d 1241, 1260–69, 1272 (N.D. Ga. 2022). A panel of this court reversed the district court's injunction. *Rose v. Sec'y, State of Ga.*, 87 F.4th 469 (11th Cir. 2023).

With that background, I begin by explaining how the panel misapplies our precedent before turning to its improper prioritization of federalism. But in order to frame my analysis, I must first note my concern with how the panel's insistence that this case is "novel" steers its analysis. *Id.* at 479. Because our precedent to date has only concerned § 2 challenges to municipal and county elections, the panel posits that Plaintiffs' proposed remedy to a *statewide* election "asks us to wade into uncharted territory." *Id.* at 479–80. However, § 2 explicitly protects voters from discriminatory electoral practices by a *"State* or political subdivision." *See* 52 U.S.C. § 10301(b) (emphasis added). Nothing in our precedent indicates that its underlying reasoning and logic should be cabined to local elections.

*A.*

Plaintiffs here proposed converting PSC's statewide, at-large elections to elections by single-member districts. They presented

a map with one majority-Black district.[3]  In reviewing Plaintiffs'
proffered remedy, the district court engaged in a "fact-intensive"
inquiry and applied "'an intensely local appraisal of the design and
impact' of the electoral structure, practice, or procedure at issue."
*See Nipper*, 39 F.3d at 1498 (quoting *Gingles*, 478 U.S. at 79).  The
district court noted that where the challenged system is at-large
voting, single-member districting is the "standard remedy," and
that Georgia's Secretary of State conceded that there was nothing
"facially problematic" with Plaintiffs' proposed map.  *Rose*, 619 F.
Supp. 3d at 1269–70.  The district court concluded that single-mem-
ber districts were a viable remedy.

The panel reasons that Plaintiffs have not proposed a viable
remedy because the identified remedy "would upset Georgia's pol-
icy interests that are afforded protection by federalism and our
precedents."  *Rose*, 87 F.4th at 479.  This reflects a misunderstand-
ing of circuit law for the following reasons.

\*    \*    \*

In *Nipper*, this court, sitting en banc, struck down a § 2 chal-
lenge of at-large elections of judges in Florida's Fourth Judicial Cir-
cuit.  39 F.3d at 1546–47.  *Nipper* established a requirement that
plaintiffs must propose a viable remedy[4] to meet the first *Gingles*

---

[3] Under the proposal, District 1 would cover Clayton, DeKalb, Fayette, and
part of Fulton, Henry, Newton and Rockdale Counties.  This proposed Dis-
trict 1 overlaps significantly with existing PSC District 3.

[4] *Nipper* drew from the Supreme Court's decision in *Holder v. Hall*, 512 U.S.
874, 880–881 (1994), to find that courts "cannot determine whether the voting

precondition. *Id.* at 1530. We noted that the "State's interest in linking the jurisdictional and electoral bases of its circuit and county court judges . . . plays a major role" in considering the plaintiffs' proposed remedies. *Id.* at 1542. Importantly, this court provided that "[t]he maintenance of the linkage between a trial court judge's territorial jurisdiction and electoral base serves to *preserve judicial accountability*," while subdistricting "would disenfranchise every voter residing beyond a judge's subdistrict, thus rendering the judge accountable only to the voters in his or her subdistrict." *Id.* at 1543 (emphasis added). We placed significant emphasis on judicial independence, reasoning that the concern for disenfranchisement is "more pronounced [in the judicial context] because trial court judges act alone in exercising their power," whereas "[i]n the case of collegial bodies, all citizens continue to elect at least one person involved in the decisionmaking process and are, therefore, guaranteed a voice in most decisions." *Id.* at 1543. We reasoned that the "implementation of subdistricts would increase the potential for 'home cooking' by creating a smaller electorate and thereby placing added pressure on elected judges to favor constituents." *Id.* at 1544. Florida clearly explained how the existing at-large judicial selection process insulated judges from external pressures and facilitated impartial decisionmaking. We therefore concluded that the proposed remedy of single-district voting would undermine numerous, clearly identified state interests. *Id.* at 1546–47.

---

strength of a minority group has been impermissibly diluted without having some alternative electoral structure in mind for comparison." 39 F.3d at 1533.

In *Southern Christian Leadership Conference of Alabama v. Sessions* (hereinafter *SCLC*), this court, again sitting en banc, considered another § 2 challenge to at-large judicial elections. 56 F.3d 1281, 1285 (11th Cir. 1995) (en banc). We collectively considered the plaintiffs' proposed remedies against the state's clearly identified interest in "maintaining the link between a trial judge's jurisdiction and elective base." *Id.* at 1294. One of the plaintiffs' remedial plans proposed carving existing circuits and counties into single-member and multi-member districts. *Id.* at 1296. We rejected this plan, finding that "in the context of circuit reconfiguration, subdistricting would directly implicate the State's linkage interest." *Id.* Our reasoning in *SCLC* was like that in *Nipper*; we maintained that subdistricting "would strip every voter residing beyond a judge's subdistrict of his or her participation in the judicial selection process—leaving [a] judge accountable only to those voters in his or her subdistrict." *Id.* at 1297. We recognized Alabama's value of "judicial independence," and found that subdistricting would "undermine the Alabama system of fostering an independent judiciary by holding judges accountable to a broad section of the population." *Id.* We went on to explain that subdistricting, which creates smaller electorates, would "increase the pressure to favor constituents," thus "increase[ing] the specter of 'home cooking.'" *Id.* Just as in *Nipper*, our consideration of a state's interest laboriously discussed the unique demands of the judiciary.

Turning to *Davis*, we see an inconsistency in how our court considers a state's interests at both the preconditions and totality of the circumstances stages. The panel here aptly points out that

the *Davis* court acknowledged that *Nipper* and *SCLC* "placed an insurmountable weight on a state's interest in preserving its constitution's *judicial* selection system and in maintaining linkage between its judges' jurisdiction and electoral bases." *Rose*, 87 F.4th at 481 (quoting *Davis*, 139 F.3d at 1423) (alteration adopted) (emphasis added). But notably, this weight was applied for a limited and specific purpose—to preserve the particular interest states have in *judicial* elections. *Nipper* and *SCLC* explained why a state's interest in maintaining an election system is uniquely considered in judicial contexts, *i.e.*, the nature of the judicial role is distinct from other elected positions and the state has a heavy interest in maintaining judicial independence. But in *Davis*, we criticized *Nipper* and *SCLC*'s doctrinal development as unworkable, noting that that "in this circuit, Section Two of the Voting Rights Act frankly cannot be said to apply, in any meaningful way, to at-large *judicial* elections." 139 F.3d at 1424 (emphasis added).

In considering the challenge brought before us here, what tied the *Davis* court's hands should not tie ours: states do not have the same interest in regulating elections for multi-member administrative bodies as they do the judiciary. The panel asserts that this line of cases has "equal force here because the PSC is a 'quasi-judicial' administrative body." *Rose*, 87 F.4th at 484. While it is true that the PSC conducts hearings and makes evidentiary rulings, those were not the dispositive functions of the judicial bodies there. Our decisions in *Nipper*, *SCLC*, and *Davis* were grounded in the independent nature of the judicial role. This case presents a fundamentally different situation. The panel admits that the PSC

operates as a collective administrative body with both quasi-legislative and quasi-judicial functions. *Id.* at 473. However, unlike judges who adjudicate independently, decisions by the PSC are made by the body as a whole, informed not only by constituents but also by "a consumer affairs group that works for all five commissioners to field issues raised by consumers." *Rose*, 619 F. Supp. 3d at 1255.

This circuit has considered, and upheld, a § 2 challenge to an at-large system used to elect a multi-member administrative body like the one here. *See Wright*, 979 F.3d at 1311. The panel cites to *Wright* several times while not sufficiently engaging with its underlying reasoning. In *Wright*, we considered a § 2 challenge to a county's re-drawn school district map. *Id.* at 1287. The school board reduced its size and restructured to include at-large seats in what had previously been an all single-member board. A plaintiff brought suit, claiming that these changes diluted the strength of Black voters.[5] *Id.* at 1288. On review, this court affirmed the district court's holding that the plaintiff met the three *Gingles* preconditions and that the totality of circumstances weighed in favor of the plaintiff. *Id.* at 1303, 1311. In relevant part, we affirmed the finding that a viable remedy was available. *Id.* at 1303–04. And while we did not discuss the state's interest in considering the

---

[5] The district court originally denied the plaintiff's motion to enjoin the school board elections and granted the county's motion for summary judgment. *Wright*, 979 F.3d at 1290. We reversed and remanded, and following a bench trial on remand, the district court enjoined the upcoming election and drew a new district map. *Id.* 1290–91. The school board appealed. *Id.*

viability of the remedy, we did consider it under the totality of the circumstances analysis. *Id.* at 1296–97. Importantly, we affirmed the district court's determination that the state's interest in reducing the board size weighed in its favor but did not outweigh the plaintiff's "showing through other factors that the challenged practice denie[d] minorities fair access to the electoral process." *Id.* at 1297 (quotations omitted and alteration adopted). *Wright* demonstrates that, even when a state has an important interest in maintaining an electoral system, this interest is not outcome determinative.

As a result, a fulsome reading of our precedent reveals two important points. First, while it's true that *Nipper* and *SCLC* stress the importance of ensuring that a state's interests are considered in assessing the viability of a proposed remedy, these cases do not render the presence of an identifiable state interest as dispositive. Accordingly, we should have found that the district court paid appropriate consideration to Georgia's interest in maintaining a statewide electoral system. The district court noted at trial that the Secretary failed to explain why Georgia's method of selecting PSC members was "thoughtfully contemplated by the General Assembly, or that it otherwise furthered some concrete interest that was documented and provable." *Rose*, 619 F. Supp. 3d at 1267. The state did not point to a policy statement or legislative history that explained why this particular electoral mechanism makes sense for Georgia. *Id.*

Second, our precedent suggests that a state's interest in maintaining its electoral scheme is heavily weighed only in *judicial* contexts. While our antipathy to "home cooking" is logical in limited contexts—i.e., a judge who adjudicates independently over an entire district should not be beholden to constituents from only one subdistrict[6]—it is illogical here. This precedent permits states to justify dilutive at-large elections merely because statewide, at-large elections allow for "insulation from localized special interests." *Rose*, 87 F.4th at 483. The panel's decision to defend this electoral system against provincialism, *see id.* at 483–84, is similarly unfounded. Each member of the commission already represents one of five statutorily defined districts. If we accept protection against provincialism as an overriding state interest in the context of statewide, at-large electoral systems, then it is hard to imagine that single-member districted elections will ever pass muster under *Gingles*.

In sum, *Nipper*, *SCLC*, *Davis*, and *Wright* deploy differing frameworks for weighing a state's interest at the preconditions and totality of the circumstances stages. The panel erred in acting as if our precedent clearly resolves the question of how to consider the state's interest in maintaining its form of government. Further, I am compelled to note an alarming consequence of the panel's decision. The Supreme Court dictates that the *Gingles* preconditions

---

[6] "[T]rial courts [] do not operate as collegial bodies; rather, the judges exercise independent judicial authority, engaging in coordinated decisionmaking only for the handling of some administrative matters." *Nipper*, 39 F.3d at 1498.

do not "exhaust[] the enquiry required by § 2." *De Grandy*, 512 U.S. at 1013. But in weighing state's interests so heavily at the *Gingles* preconditions stage, the panel functionally renders the preconditions exhaustive. Their decision to do so will deny many future plaintiffs meaningful review of their § 2 challenges. We should be wary of this outcome as it runs directly counter to precedent and undermines the purpose of § 2.

*B.*

The injection of federalism in the context of voting rights is a problematic "recent vintage."[7] In prioritizing state sovereignty, *see Rose*, 87 F.4th at 481–82, the panel ignores the constitutional and statutory framework underlying § 2 of the Voting Rights Act.

The Fourteenth and Fifteenth Amendments expressly limit state sovereignty in the design and administration of state elections. The Fourteenth Amendment's Equal Protection Clause ensures no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV. The Fifteenth Amendment guarantees that the right to vote "shall not be denied . . . by any State on account of race, color, or previous condition of servitude." U.S. Const. amend. XV. Further, both Amendments provide that "Congress shall have the power to enforce" the Amendments' substantive terms. U.S. Const. amend. XIV, cl. 5; U.S. Const. amend. XV, cl. 2. Accordingly, while we

---

[7] Guy-Uriel E. Charles & Luis Fuentes-Rohwer, *Race, Federalism, and Voting Rights*, 2015 U. Chi. Legal F. 113, 113–14 (2015).

14                    WILSON, J., Dissenting                22-12593

have long understood that states have an important interest in regulating their elections, state sovereignty may *not* be "used as an instrument for circumventing a federally protected right." *South Carolina v. Katzenbach*, 383 U.S. 301, 325 (1966) (quotations omitted) (discussing the Fifteenth Amendment). Unfortunately, the panel's opinion permits such circumvention.

It is "not a great intrusion into state autonomy to require the states to live up to their obligation to avoid discriminatory practices in the election process." *United States v. Marengo Cnty. Comm'n*, 731 F.2d 1546, 1561 (11th Cir. 1984). Ultimately, the panel's preoccupation with state sovereignty undermines the effectiveness of the Voting Rights Act,[8] undercutting oversight of election processes.

III.

The Voting Rights Act is a representation of the best of America, and a reminder of the worst of America. *See Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2350 (2021) (Kagan, J., dissenting). This panel's opinion reminds us why the Act "was—and remains—so necessary." *See id.* I therefore dissent from my colleagues' refusal to reconsider this case.

---

[8] Franita Tolson, *Reinventing Sovereignty?: Federalism as a Constraint on the Voting Rights Act*, 65 Vand. L. Rev. 1195, 1200 (2012).

ROSENBAUM, Circuit Judge, joined by WILSON and JILL PRYOR, Circuit Judges, dissenting from the denial of rehearing en banc:

Before us is a challenge to the statewide, at-large elections that Georgia uses for its Public Service Commission ("PSC"). In a well-reasoned opinion following significant briefing and a five-day bench trial, the district court concluded that these elections constitute vote dilution in violation of Section 2 of the Voting Rights Act.

A panel of this Court reversed the district court's ruling. *Rose v. Sec'y, State of Ga.*, 87 F.4th 469, 486 (11th Cir. 2023).[1] In its opinion, the panel did not disagree with the district court's factual findings. Nor did it disagree with the district court's conclusion that the existing PSC elections result in racial bloc voting that prevents Black voters in Georgia from electing their preferred candidates to the PSC. Instead, the panel determined that Plaintiffs' challenge cannot succeed because their proposed remedy—a single-member districted election—is not the same as the State's existing electoral system. But given that the State's existing electoral system makes the PSC election "not equally open," 52 U.S.C. § 10301(b), to Black voters, that's the point.

---

[1] The Branch Statement "note[s] the Supreme Court recently declined to take up this case by denying a petition for writ of *certiorari*." *See* J. Branch Statement at 1 (citing *Rose v. Raffensperger*, No. 23-1060, 2024 WL 3089563 (U.S. June 24, 2024)). Of course, "a denial carries with it no implication whatever regarding the Court's views on the merits of a case which it has declined to review. The Court has said this again and again; again and again the admonition has to be repeated." *State v. Baltimore Radio Show, Inc.*, 338 U.S. 912, 919 (1950) (Statement of J. Frankfurter respecting the denial of certiorari).

The panel opinion commits several errors of law. It ignores binding and long-standing law governing Section 2 cases. It inappropriately extends our precedent. And it replaces the appropriate framework for Section 2 challenges with its own single-minded test. In making these errors, the panel opinion severely and unlawfully limits the application of Section 2 in this Circuit.

For these reasons, I respectfully dissent from the denial of rehearing en banc.

### I.    The Panel Opinion erroneously frames Plaintiffs' challenge as a novel Section 2 case.

Since 1982, Section 2 has prohibited the imposition of any "voting qualification or prerequisite to voting or standard, practice, or procedure . . . by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race." 52 U.S.C. § 10301(a). A violation occurs whenever, "based on the totality of the circumstances," the electoral processes "in the State or political subdivision are not equally open to participation by members" of a racial minority." *Id.* § 10301(b). To effectuate this goal of combatting racial discrimination in voting, Congress has charged us with giving these provisions "the broadest possible scope." *Chisom v. Roemer*, 501 U.S. 380, 403 (1991).

Here, Plaintiffs have sued Georgia on the ground that its at-large elections for commissioners on the PSC prevent Black voters from electing their preferred representatives. *See Thornburg v. Gingles*, 478 U.S. 30, 47 (1986). In fact, they allege that the at-large

election system is so noxious that only one Black person has been elected to the Commission in nearly 150 years—and that was only after he was originally appointed.[2]

According to the panel opinion, Plaintiffs' challenge presents an exceptional issue of first impression because PSC elections are statewide elections. *See Rose*, 87 F.4th at 486. The panel opinion strikes an almost incredulous tone in emphasizing that Plaintiffs have asked the Court to make what it calls a "novel application of Section 2" to statewide elections *"for the first time ever." Id.* at 479, 480. And the panel appears even more troubled by the so-called "extraordinary remedy" that Plaintiffs propose—single-member districted elections, a solution that the panel opinion chides for "strain[ing] both federalism and Section 2 to the breaking point." *Id.* at 479, 484. So the panel opinion characterizes itself as "wad[ing] into uncharted territory" to reject Plaintiffs' "novel pro-posal . . . that we dismantle Georgia's statewide PSC system" and "fundamentally change the PSC[]." *Id.* at 480, 482.[3]

---

[2] That commissioner, David Burgess was appointed in 1999. After that, he narrowly won his first election in 2000 and, despite winning the plurality in the 2006 election, ultimately lost to a white candidate in the runoff election that same year.

[3] The Branch Statement defends the panel opinion for "reject[ing] a unique Section 2 challenge" in the same manner as *Holder v. Hall*, 512 U.S. 874 (1994), and *Baten v. McMaster*, 967 F.3d 345 (4th Cir. 2020). J. Branch Statement at 6 n.6. But these other decisions don't support the panel's reasoning. *Holder* rejected a Section 2 challenge because the voters proposed a change in the size of the governing body, not single-member districting. *Holder*, 512 U.S. at 878, 881–82. And *Baten* rejected a Section 2 challenge with a dangerous suggestion

That is wrong in every way. Neither Plaintiffs' claim nor their proposed remedy is "novel." First, and most importantly, Section 2 expressly applies to voting practices imposed "by any State." 52 U.S.C. § 10301(a). As Judge Wilson notes, the text of the statute draws no distinction between the electoral practices of "any State" and the electoral practices of any "political subdivision." *See id.*; J. Wilson Dissent at 5. This language "is straightforward." *Rose*, 87 F.4th at 474. The panel's insistence that we treat this challenge to a statewide system any differently than we treat challenges to other political subdivisions therefore finds no support in the statutory text. *Cf. Brnovich v. Democratic Nat'l Comm.*, 592 U.S. 647, 666–67 (2021) (showing that our application of Section 2 always begins with the text of the statute).

Second, the caselaw on Section 2 clearly anticipates that the statute extends equally to statewide bodies. We have long recognized that we must defer to "Congress' considered judgment" that the statute presents "an effective method of preventing States from undoing or defeating the rights" that Black Americans won with the passage of the Voting Rights Act. *City of Rome v. United States*, 446 U.S. 156, 178 (1980) (alterations and internal quotation marks omitted) (quoting *Beer v. United States*, 425 U.S. 130, 140 (1976)), *abrogated on other grounds in Nw. Austin Mun. Util. Dist. No. 1 v. Holder*, 557 U.S. 193 (2009). And following the 1982 amendment, we expressly contemplated that Section 2 applies equally to state and

---

that Section 2 might not apply at all to at-large election systems. *See Baten*, 967 F.3d at 360–61 (rejecting challenge to elections for presidential electors).

local governments and that we must "require the states to live up to their obligation to avoid discriminatory practices in the election process," despite their "important interest in determining their election practices." *United States v. Marengo Cnty. Comm'n*, 731 F.2d 1546, 1561 (11th Cir. 1984).

Third, the relative rarity of Section 2 challenges to statewide bodies doesn't make them unique. Unlike other provisions of the Voting Rights Act, Section 2 depends on litigation, which "occurs only after the fact, when the illegal voting scheme has already been put in place and individuals have been elected pursuant to it." *Shelby County v. Holder*, 570 U.S. 529, 572 (2013) (Ginsburg, J., dissenting). For this reason, Section 2 "was supposed to be a back-up." *Brnovich*, 594 U.S. at 700 (Kagan, J., dissenting); *cf. id.* at 657 (detailing how Section 2 "was 'little-used' for more than a decade after its passage"). But since the Supreme Court invalidated Section 4(b) and dismantled Section 5 of the Voting Rights Act, *Shelby County*, 570 U.S. at 556–57; voters now must rely on Section 2 alone to remedy racial discrimination in voting, *Brnovich*, 594 U.S. at 700–01 (Kagan, J., dissenting). Given this backdrop, we should expect increased Section 2 litigation and claims that more frequently address a wider range of electoral practices.

And finally, the panel's focus on the novelty of this case ignores two general features of Section 2 litigation. One, the core challenge that voters may sustain under Section 2 is one that alleges vote dilution. *See id.* at 660 (recognizing the "steady stream" of vote-dilution claims under Section 2). Nearly every Section 2 case

involves a claim that a districting plan, such as at-large elections, "dilute[s] the ability of particular voters to affect the outcome of elections." *Id.* at 657 (discussing legislative districts); *Houston Lawyers' Ass'n v. Att'y Gen. of Tex.*, 501 U.S. 419, 428 (1991) (applying Section 2 to judicial elections).

And two, the Supreme Court has instructed that, "absent special circumstances," we should "employ single-member districts" to remedy vote dilution that at-large systems cause. *Wise v. Lipscomb*, 437 U.S. 535, 540 (1978). This "remedial principle" has guided us for decades. *Id.* (citing *Connor v. Williams*, 404 U.S. 549, 551 (1972); *Mahan v. Howell*, 410 U.S. 315, 333 (1973); *Chapman v. Meier*, 420 U.S. 1, 18 (1975); *E. Carroll Parish Sch. Bd. v. Marshall*, 424 U.S. 636, 639 (1976)). And for good reason. "The single-member district is generally the appropriate standard against which to measure minority group potential to elect because it is the smallest political unit from which representatives are elected." *Gingles*, 478 U.S. at 50 n.17. So we recognize single-member districts as the "simple, straightforward, and indisputably available" remedies for challenges to at-large systems. *Wright v. Sumter Cnty. Bd. of Elections & Registration*, 979 F.3d 1282, 1310 (11th Cir. 2020); *see also Holder*, 512 U.S. at 888 (1994) (O'Connor, J., concurring in the judgment) ("[T]he alternative benchmark is often self-evident. In a challenge to a multimember at-large system, for example, a court may compare it to a system of multiple single-member districts.").

In short, all factors—from the text of the statute to the history of Voting Rights Act litigation—underscore that Section 2

embraces challenges to statewide, at-large elections that propose single-member districting as a remedial measure.

## II.    The panel opinion's decision to extend *Nipper* here is a mistake of law.

The panel opinion asserts that our decisions in *Nipper v. Smith*, 39 F.3d 1494 (11th Cir. 1994) (en banc), *Southern Christian Leadership Conference v. Sessions*, 56 F.3d 1281 (11th Cir. 1995) (en banc), and *Davis v. Chiles*, 139 F.3d 1414 (11th Cir. 1998), provide the applicable legal framework to evaluate Plaintiffs' challenge to the at-large elections for commissioners serving on Georgia's PSC. *Rose*, 87 F.4th at 480. But as Judge Wilson points out, all three cases concern judicial elections. *Nipper*, 39 F.3d at 1496; *S. Christian Leadership Conf. ("SCLC")*, 56 F.3d at 1283; *Davis*, 139 F.3d at 1416; J. Wilson Dissent at 10. Indeed, those decisions themselves explain that they find their basis in "the unique features of judicial elections and the manner in which they affect the vote dilution inquiry." *Nipper*, 39 F.3d at 1527–28. So we have limited our application of this line of precedent to judicial elections for the past thirty years.

Notwithstanding the clear language of our past decisions and three decades of precedent, the panel opinion concludes that *Nipper* and its progeny must guide our analysis here for two reasons. *Rose*, 87 F.4th at 484–85. First, the panel opinion baldly states—without reason or citation—that these cases are "not limited to judicial elections only." *Id.* at 484. And second, it claims that the *Nipper* line of precedent has "equal force here" because "the PSC is a 'quasi-judicial' administrative body." *Id.* at 485 (quoting

*Tamiami Trail Tours, Inc. v. Ga. Pub. Serv. Comm'n*, 99 S.E.2d 225, 233 (Ga. 1957)).

This move is novel, dramatic, and wrong. It belies a fundamental misunderstanding of our caselaw and reflects a total failure to consider the consequences on future Section 2 litigation. Our failure to rehear the case and correct the panel opinion's doctrinal errors shirks our responsibility to clean up this mess.

### A. Nipper *and its progeny govern our consideration of judicial elections only.*

The panel opinion's conclusory determination that *Nipper* and its progeny apply outside the context of judicial elections is at odds with our caselaw. I agree with Judge Wilson's analysis and write separately to emphasize a few points. *See* J. Wilson Dissent at 6–13.

We'll start with *Nipper*. There, this Court, sitting en banc, considered a claim that the at-large elections for certain trial-level judges in Florida diluted the voting strength of Black voters in violation of Section 2. *Nipper*, 39 F.3d at 1496–97. Following a thorough review of the record, we determined that the plaintiff voters had presented sufficient evidence to "create[] a strong inference of racial vote dilution." *Id.* at 1541. Nevertheless, we struck the challenge on the ground that the remedies proposed by the plaintiff voters weren't viable. *Id.* at 1542–43.

One framework guided our analysis: *Gingles*. *See id.* at 1537–42 (reviewing the district court's factual findings and conclusions

of law under *Gingles*). In fact, the *Nipper* decision dedicates nearly seventeen pages to reviewing *Gingles*' requirements. *See id.* at 1509–27. Rightly so. *Gingles* binds our consideration of any vote-dilution challenge because it faithfully interprets "the text and purpose" of Section 2. *Bartlett v. Strickland*, 556 U.S. 1, 21 (2009).

But because *Gingles* requires more than a mechanical application, in *Nipper*, we set forth two additional principles to address "the unique features of judicial elections and the manner in which they affect the vote dilution inquiry." *Nipper*, 39 F.3d at 1527–28. First, we said that our *Gingles* analysis must include a "judicially-specific consideration—the state's interest in maintaining its judicial elections structure." *Id.* at 1530; *see also id.* at 1528–30 (discussing the Supreme Court's application of Section 2 to judicial elections in *Chisom v. Roemer*, 501 U.S. 380 (1991), and *Houston Lawyers' Ass'n v. Att'y Gen. of Tex.*, 501 U.S. 419 (1991)). Second, we explained that we must make certain "modulations" to account for the judicial context. *See id.* at 1530–37.

Specifically, plaintiffs alleging vote dilution in judicial elections must show the following under *Nipper*: (1) that a remedy exists "within the confines of the state's judicial model that does not undermine the administration of justice," to satisfy the first *Gingles* precondition; (2) that racial bloc voting exists, to satisfy the second and third preconditions; and (3) that circumstantial evidence specific to the "unique features surrounding judicial elections" supports a finding of vote dilution. *Id.* Armed with these principles, we rejected all three of the proposed remedies for reasons that are

unambiguously unique to the context of judicial elections. *See id.* at 1543–47.

Our decision in *SCLC* follows the same logic. Like *Nipper*, *SCLC* involved a challenge to the at-large system for electing trial-level judges in Alabama. *SCLC*, 56 F.3d at 1283. Once again sitting en banc, we concluded that the plaintiff voters hadn't established a Section 2 violation because the evidence in the record failed to satisfy the third *Gingles* precondition. *Id.* at 1293–94.

In response to the district court's alternative holding, we also determined that the plaintiff voters had failed to propose a viable remedy. *Id.* at 1294. As in *Nipper*, we emphasized that we can't "[l]ump[] together all elections" and instead must consider the "significant differences" between judicial and non-judicial elections. *Id.* at 1293. We reasoned that single-member subdistricts that elected judges to serve district-wide would result in home-cooking, making judges responsive to the voters of their own subdistrict and violating judicial independence. *See id.* at 1296–97. So we rejected the plaintiff voters' two proposed remedies for their failure to maintain the link between a judge's electoral base and the trial court's territorial jurisdiction and for their adverse effect on the pool of qualified candidates for judicial office. *See id.* at 1294–97. Stated differently, we allowed the at-large judicial elections to continue because the proposed remedies didn't account for the "unique features" of judicial elections. *See id.*

This pair of en banc decisions binds our evaluation of challenges to judicial elections today. *See Davis*, 139 F.3d at 1419–24.

But accompanying our reliance on them are serious misgivings about their continued viability. In the past thirty years, we have rejected almost every conceivable remedy to Section 2 violations in at-large judicial elections, including, but not limited to, re-districting, sub-districting, modified sub-districting, cumulative voting, limited voting, and special nomination. *Id.* at 1423 (citing *Nipper*, 39 F.3d at 1542–46; *SCLC*, 56 F.3d at 1294–97; *White v. Alabama*, 74 F.3d 1058, 1072–73 (11th Cir. 1996)). In practice, *Nipper* stands as an impregnable wall for voters alleging vote dilution in at-large judicial elections in this Circuit. *Id.* at 1424 ("[I]n this circuit, Section Two of the Voting Rights Act frankly cannot be said to apply, in any meaningful way, to at-large judicial elections.").

Through *Nipper*, we have effectively created a bright-line rule that categorically exempts at-large judicial elections from federal law. And we've done so despite Congress's intention that, like all other elections, judicial elections fall within the scope of Section 2. *See Chisom*, 501 U.S. at 404. Now, the panel opinion pushes that line further, excluding a yet-to-be-defined group of state bodies from Section 2's purview without any textual or precedential basis. *See* J. Wilson Dissent at 12.

### B. The panel opinion wrongly extended Nipper to apply to Georgia's PSC.

Perhaps recognizing the novelty of extending *Nipper* beyond the context of judicial elections, the panel opinion reasons that *Nipper* applies with "equal force here" because the PSC "operates in a distinctly judicial fashion." *Rose*, 87 F.4th at 484–85. To reach this

conclusion, the panel opinion lists the PSC's "quasi-judicial func-
tions" and claims that the unique features of a state's judicial sys-
tem are also inherent "in the 'quasi-judicial' context." *Id.* at 485.
But the panel's characterization of the PSC runs counter to Geor-
gia law.

Georgia has long expressed that the PSC is entirely distinct
from the state judiciary. In *Tamiami Trail Tours*, the Georgia Su-
preme Court established that the PSC "is an administrative body"
empowered to perform both quasi-legislative and quasi-judicial
functions. *Tamiami Trail Tours*, 99 S.E.2d at 232 (holding that the
PSC isn't bound to follow the same rules of evidence and proce-
dure that govern judicial proceedings when it hears cases). This is
not an unusual structure. *See Starnes v. Fulton Cnty. Sch. Dist.*, 503
S.E.2d 665, 667 (Ga. Ct. App. 1998) ("A particular administrative
body may at times exercise judicial or quasi-judicial functions and
at other times exercise administrative, ministerial, or legislative
functions."). In fact, administrative bodies are baked into the state's
constitutional structure. Ga. Const. art. VI, § 1, ¶ 1. And as the
Georgia Constitution makes clear, any "quasi-judicial powers" that
administrative bodies exercise are distinguishable from the "judi-
cial power of the state." *Id.* (stating that "[t]he judicial power of
the state shall be vested exclusively" in various courts and that the
legislature "may authorize administrative agencies to exercise
quasi-judicial powers"); *see also Bentley v. Chastain*, 249 S.E.2d 38, 40
(Ga. 1978) (quoting *Dep't of Nat. Res. v. Linchester Sand & Gravel
Corp.*, 334 A.2d 514, 522 (Md. 1975)).

Not only that, but the panel opinion's decision to represent PSC's quasi-judicial functions as "distinctly judicial" doesn't even make sense when we clarify what those quasi-judicial functions are. *See Rose*, 87 F.4th at 485. True, the PSC "hears rate cases, holds hearings, listens to witnesses, makes evidentiary rulings, and weighs testimony from stakeholders" to come to a decision. *Id.* But the PSC takes these actions largely in the context of its regulation of the rates various utilities charge and the services utilities provide. These activities are distinctly legislative. *See, e.g.*, *Ga. Pub. Serv. Comm'n v. S. Bell*, 327 S.E.2d 726, 728 (Ga. 1985) (describing ratemaking as part of "the legislative domain"); *Tamiami Trail Tours*, 99 S.E.2d at 233 (describing the grant and revocation of certificates of public convenience and necessity as an "exercise of administrative or legislative power").

Equally unpersuasive is the panel opinion's claim that elections for the PSC possess the same "unique features" as judicial elections. *See Rose*, 87 F.4th at 485; J. Wilson Dissent at 10. For starters, Georgia elects its PSC commissioners through partisan elections, *see* Ga. Code Ann. § 46-2-1(a); but it elects its judges through non-partisan elections, *see* Ga. Const. art. VI, § VII, ¶ I. And significantly, PSC commissioners operate as a collegial body that makes decisions through majority rule, *see* Ga. Comp. R. & Regs. 515-2-1-.10; but judges exercise their authority independently, *see Nipper*, 39 F.3d at 1534–35. So unlike in the hypothetical judicial scenario, a single PSC commissioner is unable to home-town her rulings to favor only her voters in a single-member district. *See* J. Wilson Dissent at 12. Indeed, Georgia voters understand that PSC

14          ROSENBAUM, J., Dissenting          22-12593

commissioners are responsive to their concerns. *See Ga. Power Co. v. Allied Chem. Corp.*, 212 S.E.2d 628, 632 (Ga. 1975) ("It is said that Public Service Commissions and legislatures should be 'collectively responsive to the popular will.'" (quoting *Reynolds v. Sims*, 377 U.S. 533, 565 (1964)). These "significant differences between the legislative and judicial arenas" animated our decision to deviate from *Gingles* in the context of judicial elections. *Nipper*, 39 F.3d at 1534. So in their absence, we have no reason to deviate.[4]

The PSC's "quasi-judicial" functions do not transform this administrative body into a judicial body. *See* J. Wilson Dissent at 9–10. In holding otherwise, the panel disrespects both Georgia law and our decision in *Nipper*.

### III.    The panel's opinion effectively overrules *Gingles*.

Just last year, the Supreme Court confirmed that the framework it developed in *Gingles* continues to guide our assessment of claims alleging vote dilution under Section 2. *Allen v. Milligan*, 599 U.S. 1, 17–19 (2023). Together, *Milligan* and *Gingles* mandate that

---

[4] The Branch Statement claims that "these distinctions are unconvincing" because other states hold partisan elections for judges, and state appellate courts act as collegial, multi-member bodies. J. Branch Statement at 3–4 n.3. The Branch Statement misunderstands. I don't suggest that partisan elections or collegial operations are dispositive factors in distinguishing between legislative and judicial bodies. Nor could I; *Nipper* expressly states that "significant differences" exist between the two "arenas, chief among them being the varied expectations of responsiveness and bias in favor of constituents." *Nipper*, 39 F.3d at 1534. To this point of law, the Branch Statement offers no satisfactory response.

22-12593          ROSENBAUM, J., Dissenting          15

we assess whether plaintiffs have satisfied three "preconditions." *Id.* at 18 (citing *Gingles*, 578 U.S. at 50). First, plaintiffs must show that the minority group is "sufficiently large and geographically compact" to constitute a political group. *Id.* (alteration and internal quotation marks omitted) (quoting *Wis. Legislature v. Wis. Elections Comm'n*, 142 S. Ct. 1245, 1248 (2022) (per curiam)). Second, plaintiffs must prove that the minority group is "politically cohesive." *Id.* (internal quotation marks omitted) (quoting *Gingles*, 478 U.S. at 51). Third, plaintiffs must demonstrate that the majority group votes to defeat the preferred candidates of the minority group. *Id.* (citing *Gingles*, 478 U.S. at 51). And then, if they establish those three preconditions, plaintiffs also must show that "the political process is not 'equally open' to minority voters" based on the "totality of the circumstances." *Id.* (citing *Gingles*, 478 U.S. at 45–46). So each step requires a different showing from the plaintiffs and a different evaluation by the courts.

The panel opinion rejected Plaintiffs' challenge because it said their proposed remedy isn't viable in light of Georgia's asserted "policy interests" in maintaining at-large elections for the PSC. *Rose*, 87 F.4th at 480, 485. In coming to this conclusion, the panel opinion claims that Plaintiffs, in fact, failed to satisfy the first *Gingles* precondition. *Id.* at 480. The panel opinion also suggests that the outcome would be the same after consideration of the totality of the circumstances. *Id.* at 475–76 ("[W]here plaintiffs offer only a single, dramatic remedy . . . it makes no difference whether a claim fails for the lack of a permissible remedy at the precondition stage or after the totality of the circumstances analysis.").

Yet the panel's opinion is nearly bereft of any discussion of the three well-established *Gingles* preconditions and of the various factors that make up our totality-of-the-circumstances analysis, as the Supreme Court described in *Milligan*. Rather than engage with this binding framework, the panel opinion instead focused its inquiry on only whether "the State's deliberate choice" of at-large PSC elections "was informed by significant policy considerations that would be undermined by a forced change . . . from a statewide body to a single-member districted body." *Id.* at 482.

But again, just last year, the Supreme Court announced that such a "single-minded view of § 2 cannot be squared with the [Voting Right Act]'s demand that courts employ a more refined approach." *Milligan*, 599 U.S. at 26. That is nothing new. As Judge Wilson recognizes, we have long understood that we may not reduce the *Gingles* framework to a solitary factor. *Wis. Legislature*, 595 U.S. at 405; J. Wilson Dissent at 13. The panel here focused on a single factor: the state's interest in maintaining its existing electoral system. *Rose*, 87 F.4th at 480–86. *Gingles* doesn't countenance this sort of evaluation of a Section 2 claim, and we should correct the panel opinion's contrary analysis.

> *A. The first* Gingles *precondition doesn't center on the state's interest in its existing system.*

As I've noted, the panel opinion determined that Plaintiffs failed to satisfy the first *Gingles* precondition. *Id.* at 480. But its analysis completely disregards decades of binding precedent about the limited showing this step of the *Gingles* analysis requires.

Under the first *Gingles* precondition, plaintiffs alleging vote dilution in violation of Section 2 must show that the minority group is "sufficiently large and geographically compact" to make up a majority in some "reasonably configured district." *Milligan*, 599 U.S. at 18 (quoting *Wis. Legislature*, 142 S. Ct. at 1248). To satisfy this precondition, they must produce some illustrative map in which the minority group "make[s] up more than 50 percent of the voting-age population in the relevant geographic area." *Bartlett*, 556 U.S. at 18. This illustrative map may be useful to the defendant state in devising its ultimate remedial map if the court finds a Section 2 violation. *See Milligan*, 599 U.S. at 20 (explaining that the plaintiffs' illustrative maps were "example districting maps" that the defendant state could choose to enact).

But we impose this map requirement for a much simpler purpose: to determine whether at-large voting is responsible for the minority group's inability to elect its preferred candidates. *Gingles*, 478 U.S. at 51 & n.17 ("Unless minority voters possess the *potential* to elect representatives in the absence of the challenged structure or practice, they cannot claim to have been injured by that structure or practice."); *see also Milligan*, 599 U.S. at 18 (explaining that the purpose of the illustrative map is "to establish that the minority has the potential to elect a representative of its own choice in some single-member district" (quoting *Growe v. Emison*, 507 U.S. 25, 40 (1993))).

As a result, satisfaction of the first *Gingles* precondition requires only that plaintiffs show a hypothetical alternative district

that is "reasonably configured" and in which the minority population is "geographically compact" according to "traditional districting principles such as maintaining communities of interest and traditional boundaries." *Abrams v. Johnson*, 521 U.S. 74, 92 (1997) (quoting *Bush v. Vera*, 517 U.S. 952, 977 (1996)).

Despite this clear and consistent guidance, the panel opinion grafts onto the first precondition a new requirement that plaintiffs produce a map that respects "the state's interest in maintaining its form of government." *Rose*, 87 F.4th at 482. As Judge Wilson details, the panel opinion lifts this idea from *Nipper*, where we stated that the first precondition implies "a limitation on the ability of a federal court to abolish a particular form of government and to use its imagination to fashion a new system." *Nipper*, 39 F.3d at 1531; J. Wilson Dissent at 11–12. But in *Nipper*, we recognized just two limits on the illustrative maps that Section 2 plaintiffs may propose. *See id.* at 1531–33. First, we explained that any proposed remedy may not alter the size of the governmental body at issue. *Id.* at 1532 (discussing *Holder v. Hall*, 512 U.S. 874 (1994)). And second, we determined that the first precondition requires that the proposed map fall "within the confines of the state's judicial model" and not "undermine the administration of justice." *Id.* at 1531.

In the decades since *Gingles*, the Supreme Court has never required that Section 2 plaintiffs produce an illustrative map that doesn't alter the state's "chosen form of government." *See, e.g.*, *Milligan*, 599 U.S. at 18; *Abbott v. Perez*, 585 U.S. 579, 614 (2018); *Bartlett*, 556 U.S. at 11–12 (2009) (plurality opinion); *League of United Latin*

*Am. Citizens v. Perry*, 548 U.S. 399, 425 (2006); *Holder*, 512 U.S. at 880 n.1; *Growe*, 507 U.S. at 40.  Nor has any other federal appellate court adopted this rule.  For good reason.  The panel opinion's rule creates a Catch-22 for plaintiffs, both requiring them to show a single-member district in which voters of the minority group are the majority and then striking their challenge if the state doesn't already use single-member districts.  To the extent that dicta in *Nipper* implies the broad rule that the panel opinion suggests, it is incompatible with *Gingles*.  We should have "decline[d] to depart from the uniform interpretation of § 2 that has guided federal courts and state and local officials for" nearly forty years.  *Bartlett*, 556 U.S. at 19.

> *B.  By definition, any totality-of-the-circumstances analysis requires consideration of more than the state's interest alone.*

The panel opinion says it would have reached the same answer had it considered the totality-of-the-circumstances analysis.  *Rose*, 87 F.4th at 475–76.  Again, this statement is inconsistent with binding Supreme Court precedent.

In cases where plaintiffs have satisfied the three preconditions, *Gingles* directs us to consider the "totality of the circumstances" to determine whether the challenged electoral system dilutes the minority group's vote in violation of Section 2.  *See Johnson v. De Grandy*, 512 U.S. 997, 1010–11 (1994) (detailing the nine so-called "Senate factors" we must consider when analyzing the totality of the circumstances).  Although the state's interest in

maintaining its existing electoral structure is one of several "legitimate factor[s] to be considered by courts among the 'totality of circumstances' in determining whether a § 2 violation has occurred," *Houston Lawyers' Ass'n*, 501 U.S. at 426; this interest "does not automatically, and in every case, outweigh proof of racial vote dilution," *id*. at 427. As the Supreme Court clarified last year, Section 2 liability "must be determined 'based on the totality of circumstances,'" not a single factor. *Milligan*, 599 U.S. at 26. We have long followed this command. *See, e.g.*, *Wright*, 979 F.3d at 1304–11 (considering the various Senate factors and weighing them against each other).

But here, the panel opinion considered only one of the nine Senate factors: "whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous." *Id*. at 1289 (quoting *Solomon v. Liberty Cnty. Comm'rs*, 221 F.3d 1218, 1226 (11th Cir. 2000) (en banc)). And despite the panel opinion's approving citation, its approach to this particular factor "place[s] . . . an insurmountable weight on [the] state's interest" in defiance of the Supreme Court's contrary command. *Rose*, 87 F.4th at 281 (quoting *Davis*, 139 F.3d at 1423).

The panel opinion makes the state's interest in maintaining its existing electoral system dispositive. In doing so, the panel opinion has erased the entirety of the *Gingles* framework, from the first precondition through the totality-of-the-circumstances analysis.

22-12593          ROSENBAUM, J., Dissenting          21

Our decision to let the panel opinion stand therefore renders Section 2 a dead letter in this Circuit.

## IV.    Conclusion

For the foregoing reasons, I dissent from this Court's denial of rehearing en banc.